## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **DR. STEPHEN T. SKOLY, Jr.,** | |
| *Plaintiff,* | **Civil Case No.** __1:22-cv-58_____ |
| v. | |
| **DANIEL J. MCKEE, in his official capacity as the Governor of the State of Rhode Island; and JAMES McDONALD, in his official capacity as the Interim Director of the Rhode Island Department of Health,** | **COMPLAINT** |
| | **FOR DECLARATORY AND INJUNCTIVE, AND OTHER RELIEF** |
| *Defendants.* | |

Plaintiff, by and through his attorneys at the New Civil Liberties Alliance ("NCLA") and Gregory Piccirilli, Esq., hereby complains and alleges the following:

### INTRODUCTORY STATEMENT

1.      Dr. Stephen T. Skoly, Jr., is one of Rhode Island's handful of oral and maxillofacial surgeons. Since October 1, 2021, the State of Rhode Island has arbitrarily and unlawfully prevented Dr. Skoly from practicing medicine, forcing him to shut down his 11-person medical facility. In compelling the closure of Dr. Skoly's medical practice, Rhode Island has violated Dr. Skoly's rights to Equal Protection and Due Process of the law under the Fourteenth Amendment of the U.S. Constitution. The State has also harmed hundreds of Rhode Island patients, including its most vulnerable (*i.e.*, residents of the State's psychiatric hospital and its prison), who, with the State's removal of Dr. Skoly, have suffered due to the absence of necessary surgeries.

1

2.      Dr. Skoly has been banned from practice because he declines to receive a COVID-19 vaccine. Pursuant to an emergency health regulation, vaccination was mandated for Rhode Island health care workers effective October 1, 2021. The justification of the vaccine mandate is the protection of the vulnerable patient.

3.      Dr. Skoly is not an anti-vaxxer. On two previous occasions, he suffered Bell's Palsy facial paralysis. Considering this medical history, and the scientifically demonstrated association between COVID-19 vaccination and the onset of Bell's Palsy paralysis, Dr. Skoly requested a medical exemption from the vaccine mandate. He asked the State to treat him in the same manner as other health care workers being granted medical or religious exemptions.

4.      The exempted are permitted to continue to practice their profession, including attending to vulnerable patients, provided they adhere to certain safety precautions. Dr. Skoly agreed to be bound by those state-mandated precautions—primarily, N95 masking during employment (as health care workers in a surgical facility, he and his staff had been adhering to strict masking since 1988, when Dr. Skoly began his surgical practice).

5.      In addition, having recovered from COVID-19, Dr. Skoly has natural immunity. As confirmed by a recent blood test, Dr. Skoly retains a positive level of IgG COVID-19 antibodies. Any risk his presence poses to a vulnerable patient is, at worst, identical to the risk posed by a physician whose COVID-19 immunity is achieved through vaccination.

6.      In an irrational and arbitrary move, Rhode Island denied Dr. Skoly's request for a medical exemption. A history of Bell's Palsy paralysis is a valid medical reason to be exempted from the vaccine requirement. Rhode Island's refusal to acknowledge this medical risk is, in effect, a state directive that Dr. Skoly must risk facial paralysis to continue to practice his profession.

7.      This state directive is a callous violation of Dr. Skoly's rights, and unnecessary to protect the vulnerable patient.

8.      In terms of patient protection, the State acknowledges that a strict N95 masking mandate is an acceptable substitute for a vaccine. This acknowledgement is why unvaccinated health care workers—exempt from the vaccine for medical or religious reasons—are permitted to work in physical proximity to vulnerable patients.

9.      The State even allows a vaccinated health care worker with an active COVID-19 infection to treat vulnerable patients so long as the infected worker is N95 masked.

10.     In sum, the key element in determining whether a health care worker is allowed in close proximity to a patient, vulnerable or otherwise, is not whether the worker is vaccinated or unvaccinated, or healthy or infected with an active case of COVID-19. The determinative factor is whether the worker is N95 masked.

11.     In terms of patient safety, there is no rational basis for treating the N95 masked, unvaccinated, and naturally immune Dr. Skoly worse than the N95 masked, unvaccinated exempt health care worker or the N95 masked worker with an active infection. The N95 mask protects the patient similarly in all these situations, and the N95 mask allows the worker, healthy or infected, to retain his employment as a health care worker.

12.     Yet, the State is allowing the N95 masked exempt worker, and the N95 masked infected worker, to retain their livelihoods while barring Dr. Skoly from practicing his profession. This arbitrary and capricious distinction denies Dr. Skoly the equal protection of the law.

13.     Defendants' conduct is additionally irrational because Dr. Skoly has natural immunity. He is COVID-19 recovered and has tested positive for IgG COVID-19 antibodies.

14.     Natural immunity is a scientific fact. As the Centers for Medicare & Medicaid Services (CMS) acknowledged in its November 5, 2021 Interim Rule on COVID-19 vaccination, recently upheld by the Supreme Court, the COVID-19 recovered, such as Dr. Skoly, are "no longer sources of future infection." 86 FR 61555, at 61604.

15.     In fact, mere days ago, the CDC acknowledged that naturally acquired immunity provides better protection against the Delta variant than vaccine-induced immunity. *See* "COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis," *CDC* (Jan. 19, 2022), *available at* https://tinyurl.com/348anr53 (last visited Jan. 20, 2022), and Marty Makary, "The High Cost of Disparaging Natural Immunity to COVID," THE WALL STREET JOURNAL (Jan. 26, 2022) https://tinyurl.com/2fmdsurc (last visited Jan. 27, 2022).

16.     While incurring no benefit whatsoever to the health or well-being of the residents of Rhode Island, the State's termination of Dr. Skoly's career has caused, and continues every day to cause, hardship and suffering to hundreds of Rhode Islanders.

17.     In a State with a critical shortage of dental surgeons, Rhode Island has ended Dr. Skoly's distinguished surgical practice, and shuttered his medical facility.

18.     A dozen of Dr. Skoly's staff have been made unemployed.

19.     Dr. Skoly's patients have suffered an absence or shortage of critical surgery and other services. These patients number hundreds of Rhode Island residents—eight hundred a month before October 2021 (excluding the emergency walk-ins, and the hundreds of residents of the State's mental facilities and prisons, where Dr. Skoly was contracted to work).

20.     Dr. Skoly seeks an order enjoining the State from barring him from practice.

21.     In the interim, Dr. Skoly requests a restraining order to that effect.

22.     If the Compliance Order is stayed, Dr. Skoly believes that he can re-assemble much of his staff and resume critical patient treatments—both for private patients and those confined at the State's institutions—within 48 hours.

### JURISDICTION AND VENUE

23.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the federal law claims arise under the Constitution and statutes of the United States. This action is brought pursuant to 42 U.S.C. § 1983.

24.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred in this District.

25.     This Court may issue a declaratory judgment and grant permanent injunctive relief pursuant to 28 U.S.C. §§ 2201-2202.

### PARTIES

26.     Plaintiff Dr. Stephen T. Skoly, Jr. ("Dr. Skoly") is an oral and maxillofacial surgeon licensed by the State of Rhode Island. Prior to October 1, 2021, Dr. Skoly conducted a dental and surgical practice, "Associates in Oral and Maxillofacial Surgery," in Cranston, Rhode Island.

27.     Defendant Daniel J. McKee is the Governor of the State of Rhode Island, entitled by Rhode Island law to promulgate, directly or through his subordinates, rules and regulations to address health emergencies such as COVID-19. He is sued in his official capacity.

28.     Defendant James McDonald is the Interim Director of the Rhode Island Department of Health ("RIDOH"), subordinate to and appointed by the Governor. She is sued in her official capacity. Collectively, Governor McKee and Dr. Alexander-Scott are referred to as "Defendants."

## STATEMENT OF FACTS

### I.    DR. SKOLY'S DENTAL AND SURGICAL PRACTICE

29.    Prior to October 1, 2021, Dr. Skoly ran a robust dental and surgical practice, "Associates in Oral and Maxillofacial Surgery," in Cranston, Rhode Island. Dr. Skoly and his five surgical assistants treated forty patients a day, excluding emergencies, five days a week. 1/20/2022 Declaration of Rosemarie Xifaras ("Xifaras Decl."), attached as Exhibit A.

30.    Dr. Skoly's 800 or so monthly patients were representative of Rhode Island's vibrant and diverse community: Young and old, those with insurance (private or government) and those without. The procedures Dr. Skoly provided ranged from simple dental extractions to highly skilled and complex surgical procedures.

31.    Dr. Skoly never charged patients in need and was (and is) known in the community as a doctor who provided *pro bono* care. Declaration of Matt McLaren ("McLaren Decl."), attached as Exhibit B.

32.    Rhode Island also retained Dr. Skoly to provide surgical services to those institutionalized by the State.

33.    Beginning around 1990, and continuing until October 1, 2021, Dr. Skoly was a dental surgeon—and for the past decade, the only dental surgeon—for the Eleanor Slater Hospital, the State's psychiatric rehabilitative hospital operated by BHDDH (the Rhode Island Department of Behavioral Healthcare, Developmental Disabilities & Hospitals). Declaration of Dr. Ibrahim Shihadeh ("Shihadeh Decl."), attached as Exhibit C.

34.    Eleanor Slater is an institutional facility for patients with acute and long-term medical illnesses, as well as patients with mental health conditions. It has two campuses: Cranston (Regan Unit) and Burriville (Zambarano Unit).

35.    Eleanor Slater also has a unit that houses psychiatric inmates confined under the authority of the Rhode Island Department of Corrections. Dr. Skoly provided surgical dental care to the residents of that unit as well.

36.    In addition to Eleanor Slater, since 1998, Dr. Skoly was retained as the only dental surgeon by the Adult Correctional Institute ("ACI"), the State's penitentiary complex in Cranston. Dr. Skoly visited ACI once a week, performing 10 to 20 procedures.

37.    Dr. Skoly visited Eleanor Slater (Regan) and ACI to treat patients for simple procedures. Complex surgeries, and all procedures performed on Eleanor Slater and Zambarano residents, required inmates of the psychiatric hospital or ACI to be transported to the more sophisticated operating theatre at Dr. Skoly's Cranston medical facility. Dr. Skoly saw an ACI patient in his Cranston office about every day.

38.    The institutionalized patients could not travel to the Cranston office by themselves. Rather, they needed to be accompanied, and, in the case of prisoners, accompanied by armed guards.

39.     Dr. Skoly designed his Cranston medical facility to include a large elevator so that it could accommodate the type of gurney transported in an ambulance.

40.    In treating the residents of Eleanor Slater and ACI, Dr. Skoly worked and came into prolonged and close physical contact with those institutions' health care workers and other employees. The institutions' employees who worked in the close physical presence of Dr. Skoly and the patients are members of Rhode Island Council 94, AFSCME, AFL-CIO.

## II.   DURING THE PANDEMIC, DR. SKOLY AND HIS STAFF CONTINUED TO SERVE

41.    After the COVID-19 lockdowns began in March 2020, Dr. Skoly and his staff continued to treat patients in person—the only way that surgical procedures can be performed.

42.    As a dental surgeon, Dr. Skoly engaged in scrupulous masking and other hygienic requirements. He supplemented these procedures with safety precautions and guidelines recommended by the RIDOH Provider Advisory, the CDC Health Advisory, the American Dental Association and the American Association of Oral and Maxillofacial Surgeons.

43.    Dr. Skoly and his staff held daily meetings to discuss and educate themselves regarding the safety precautions, and to confirm that they were being followed strictly.

44.    The precautions taken by Dr. Skoly and his staff appear to have successfully protected the eight hundred patients being served monthly. Dr. Skoly is not aware of a single patient testing positive for COVID-19 as a consequence of his treatment at Dr. Skoly's medical facility.

45.    Dr. Skoly himself was not so fortunate. During the pandemic, Dr. Skoly continued to treat the inmates at the psychiatric hospital and the prisons. Apparently during one of those visits, Dr. Skoly contracted COVID-19 in December 2020. After the required quarantine period, he returned to work.

## III.   THE OCTOBER 1, 2021 COMPLIANCE ORDER

46.    On August 17, 2021, pursuant to the general authority granted by R.I. Gen. Laws § 23-1-1 and R. I. Gen. Laws § 23-11-17, the Governor, through the RIDOH, promulgated a regulation that "all health care workers and health care providers be vaccinated against COVID-19 by October 1, 2021." REQUIREMENT FOR IMMUNIZATION AGAINST COVID-19 FOR

ALL WORKERS IN LICENSED HEALTH CARE FACILITIES AND OTHER PRACTICING

HEALTH CARE PROVIDERS, 216-RICR-20-15-8 (the "Regulation"), attached as Exhibit D.

47.    The justification for the vaccine mandate is the protection of "vulnerable

populations": "Health care workers and providers interact with Rhode Island's most vulnerable

populations: individuals who are immunocompromised and individuals with co-morbidities. These

vulnerable populations are at risk for adverse health outcomes from COVID-19. As COVID-19

positive individuals are often asymptomatic or presymptomatic, health care workers and health

care providers may unintentionally spread infection to these vulnerable patients." See

https://rules.sos.ri.gov/regulations/part/216-20-15-8 (last visited Jan. 20, 2022).

48.    The narrow justification for the Regulation—the protection of "vulnerable

populations"—is based upon science and Rhode Island's experience: COVID-19 is a disease of

institutionalized sick people, particularly the elderly.

49.    "[COVID-19] is a very discriminatory virus. Some people are much more at risk

from it than others. People over seventy-five are an astonishingly 10,000 times more at risk than

those who are under fifteen." Robin McKie, *Britain got it wrong on Covid: long lockdown did

more harm than good*, MANCHESTER GUARDIAN, The Observer (Jan. 2, 2022) (quoting

immunologist Professor Mark Woolhouse), available at https://tinyurl.com/3f87pet9 (last visited

Jan. 20, 2022).

50.     In the United States, COVID-19 is particularly a disease of the elderly sick: "The

overwhelming number of [COVID] deaths, over 75%, occurred in people who had at least four

comorbidities. So really these are people who were unwell to begin with …;" the task of health

care services is to protect "those at highest risk … those w/ chronic health conditions, disabilities

& older adults." James Freeman, "So Now She Tells Us," THE WALL STREET JOURNAL (Jan. 10,

2022) (quoting CDC Director Dr. Rochelle Walensky), available at https://www.wsj.com/articles/now-she-tells-us-11641843802 (last visited Jan. 20, 2022).

51.     These observations are supported by the death statistics in Rhode Island. No Rhode Islander younger than twenty-four has died from COVID-19. The bulk of Rhode Island's 3,000 deaths are among those older than 60: 60 to 69 (415 deaths), 70 to 79 (713 deaths), and above 80 (1701 deaths). https://ri-department-of-health-covid-19-fatality-data-rihealth.hub.arcgis.com/ (last visited January 20, 2022).

52.     The vaccine mandate—directed to these vulnerable populations—nonetheless provided for medical exemptions. Exemptions are allowed where there is a history of severe or immediate allergic reactions to the vaccine, or a component of the vaccine, or a history of myocarditis or pericarditis. Medical Immunization Exemption Certificate, attached as Exhibit E.

53.     No other medical exemptions are permitted. RIDOH Vaccination Requirement, FAQ, attached as Exhibit F ("A medical exemption form with reasons other than those listed is not considered valid under the regulation").

54.     Those "health care workers" and "health care providers" who received a medical exemption are, as a condition of continued employment, "required to wear a procedure mask or higher-grade mask (*e.g.*, KN95 or N95) in the course of their employment." Regulation, section 8.3(a)(2) and (d), Exhibit D.

55.     Other than masking, the Regulation places no restriction on the physical interaction between the vulnerable patient and the unvaccinated, exempt health care worker. The unvaccinated worker may interact with the patient just as a vaccinated worker would. Regulation, section 8.3(a)(2) and (d), Exhibit D.

56.     The Defendants have designated 365 Rhode Island health care workers to be medically exempt from the vaccine mandate.

57.     After promulgation of the vaccine mandate, Dr. Skoly conferred with his personal physician regarding the potential dangers of vaccination.

58.     In 2006, Dr. Skoly had contracted Lyme disease, which caused two attacks of Bell's Palsy. The palsy paralyzed the muscles around Dr. Skoly's left eye, and, subsequently, his right eye. The muscles around his right eye still display a mild residual droopiness. 1/19/2022 Declaration of Dr. Sam Pappas ("Pappas Decl."), ¶¶ 3 to 5, attached as Exhibit G, and 1/20/22 Declaration of Dr. Stephen T. Skoly, Jr. ("Skoly Decl."), ¶¶ 5 to 6, attached as Exhibit H.

59.     Dr. Skoly was aware of medical literature showing an association between receiving a COVID-19 vaccine and the onset of Bell's Palsy. The literature does not indicate whether the onset of paralysis is more likely to occur were one a prior Bell's Palsy victim (as was Dr. Skoly). Nor does the literature address whether, where there has been prior paralysis, a vaccine-induced re-occurrence is of similar or greater duration than the prior paralysis.

60.     Due to the uncertainties regarding the risk of onset, or duration, of a palsy re-occurrence, and his naturally acquired immunity, Dr. Skoly made the medical decision not to be vaccinated.

61.     Ever cognizant of the necessity of protecting his vulnerable patients from infection, Dr. Skoly was confident that he could practice medicine and continue to protect his patients. The basis of this confidence was two-fold.

62.     First, Dr. Skoly continued to maintain the scrupulous masking and sanitation procedures that had been in effect in his medical facility since 1988, which procedures he supplemented in 2020 and 2021.

63.     Dr. Skoly's masking procedures were at least equivalent to the masking requirement for "health care providers" to whom defendants had given a medical exemption from the vaccine mandate. The masking requirement for the exempt worker—the condition of the exempt worker's continued employment—is wearing an N95 mask. *See* paragraphs 55 and 56 above; Regulation section 8.3(a)(2) and (d), Exhibit D.

64.     Second, in September 2021, Dr. Skoly had his blood tested for IgG COVID-19 antibodies. The test result (Skoly Decl. ¶ 4 and attachment) shows a positive level of IgG COVID-19 antibodies.

65.     Dr. Skoly did not apply for a medical exemption from the Covid-19 vaccine.

66.     He understood that the Exemption Certificate did not accept the risk of Bell's Palsy recurrence as a basis for a medical exemption.

67.     On September 30, 2021, Dr. Skoly discussed his decision to not be vaccinated, and his concern about a Bell's Palsy relapse, with a journalist, who reported the conversation in a news article.

68.     On October 1, 2021, having learned of Dr. Skoly's decision, the RIDOH issued the Compliance Order at issue. The Order directed Dr. Skoly to cease acting as a "health care provider" until he had complied with the Regulation. Compliance Order, attached as Exhibit I.

## IV.    THE DECISION TO SUSPEND DR. SKOLY'S MEDICAL PRACTICE IS ARBITRARY AND IRRATIONAL

69.     After October 1, 2021, Dr. Skoly, directly and through counsel, asked the defendants to rescind the Compliance Order.

70.     Dr. Skoly requested that he be qualified for a medical exemption based on his history of Bell's Palsy, and the association of the vaccine with the onset of Bell's Palsy paralysis.

71.     The Defendants denied the request, declining to recognize the danger of recurrence of Bell's Palsy as a risk that qualified for a medical exemption. RIDOH Vaccination Requirement, FAQ, Exhibit F.

72.     To substantiate his position that he did not present a danger of infection to vulnerable patients, Dr. Skoly asked defendants to review two points.

73.     Because the masking and safety precautions he had practiced in the past had fully protected vulnerable patients from infection, masking (and other precautions) could be relied upon to protect vulnerable patients in the future.

74.      And, because he had a positive level of IgG Covid-19 antibodies, the risk he posed to vulnerable patients was no different from the risk posed by a doctor who had been vaccinated.

75.     Defendants rejected both arguments, explaining that, to protect vulnerable patients, Rhode Island does not accept masking as a substitute for being vaccinated.

76.     As for natural immunity, defendants explained that, in their view, a vulnerable patient was more likely to be infected with COVID-19 by a health care provider who had recovered from COVID-19 than by a health care provider who had been vaccinated.

77.     The Defendants' reasons for imposing the Compliance Order on Dr. Skoly, and refusing to rescind it, are arbitrary and capricious, and contrary to science.

A.  *Ninety-Nine Percent of the Adult Rhode Island Population Has Been Vaccinated*

78.     The justification for the vaccine mandate is the protection of "vulnerable populations." Paragraph 48, *infra*.

79.     As of January 15, 2022, 99.0% of Rhode Island's adult population (18 years old and above) are at least partially vaccinated, and 87.9% "have completed primary vaccine series." https://ri-department-of-health-covid-19-vaccine-data-rihealth.hub.arcgis.com/

80.   The percent of fully vaccinated Rhode Islanders above the age of sixty-five is 95%. https://covid.cdc.gov/covid-data-tracker/#county-view?list_select_state=Rhode+Island&data-type=Risk (last visited January 20, 2022).

81.   For the "vulnerable" who contract COVID-19, there is available in Rhode Island monoclonal antibody treatment which has been proven to be 90% effective in reducing hospitalization and death. https://covid.ri.gov/covid-19-prevention/treatment (last visited January 20, 2022).

82.   In discussing vaccination and the dangers of transmission, it must be noted that even CDC Director Rochelle Walensky has acknowledged that the vaccines do not stop transmission, especially in the era of the Omicron variant. *See CDC Director: Covid vaccines can't prevent transmission anymore*, MSN HEALTH (Jan. 10, 2022), *available at* https://www.msn.com/en-us/health/medical/cdc-director-covid-vaccines-cant-prevent-transmission-anymore/ar-AASDndg (last visited Jan. 20, 2022). Thus, the premise upon which the Rhode Island vaccine mandate is based—vaccines prevent transmission—is a faulty one.

83.   In any event, vulnerable people have had access to the vaccine for a year, and anyone who wants to get the vaccine may do so. There is no need to force the vaccine upon Dr. Skoly, *particularly* considering his naturally acquired immunity.

### B.  Masking Protects the Vulnerable Patient

84.   In terms of protecting vulnerable patients, despite what Defendants say in the context of Dr. Skoly, Rhode Island unqualifiedly accepts N95 masking as a substitute for vaccination.

85.   Defendants permit medically exempt health care workers to treat vulnerable patients so long as the worker is N95 masked "in the course of their employment." *See* paragraphs 55 and 56 above; Regulation section 8.3(a)(2) and (d), Exhibit D.

86.    If patient safety is the issue, the protection provided by an N95 mask is the same whether the mask is worn by one of the 365 unvaccinated (but medically exempt) health care workers or the unvaccinated Dr. Skoly. There is no rational basis on which to distinguish between the two, unless it would be in Dr. Skoly's favor based on his naturally acquired immunity.

87.    While continuing to irrationally prohibit Dr. Skoly from practicing his profession, the defendants have expanded the category of unvaccinated medical workers who may continue to work in the close physical presence of vulnerable patients.

88.    On November 12, 2021, the defendants negotiated a new contract with the Rhode Island Council 94, AFSCME, AFL-CIO, the unionized health care workers at Rhode Island's state-run facilities. These facilities include the Eleanor Slater Hospital—where, per his contract, Dr. Skoly had provided dental and surgical services. Memorandum of Tentative Agreement, attached as Exhibit J.

89.    The union contract creates a vaccine mandate exemption based on religious objections. As with the 365 medical exemptions that defendants have already granted, the employment of the religiously exempt is conditioned on the exempt worker wearing a mask. Memorandum of Tentative Agreement, paragraph 19, Exhibit J.

90.    After the November 2021 Eleanor Slater union contract, defendant Governor McKee promised to include a religious exemption from the vaccine mandate in all future contracts between a union and the State of Rhode Island.

91.    Tying the religious exemption to an N95 mask requirement is consistent with the Regulation's purpose—protection of vulnerable patients from exposure to infection. Tying the religious exemption to an N95 masking requirement is a further statement by the defendants that N95 masking is an acceptable substitute for vaccination.

15

92.     Dr. Skoly is willing to wear the N95 mask, just like the exempt Eleanor Slater workers who would be standing next to him in the patient's presence. In fact, he is not only willing, but would do so if not required by the State, as he has been wearing a mask while treating patients for the past 30 years.

93.     Under these circumstances, barring Dr. Skoly from his profession is an irrational and unfair application of the Regulation.

94.     Defendants have even further acknowledged that N95 masking is an acceptable protection of the vulnerable patient.

95.     In RIDOH's updated (December 31, 2021) health worker guidelines, astonishingly, Defendants revised the Regulation to allow health care workers *infected with COVID-19* to work in close proximity to vulnerable patients so long as the worker wears an N95 mask.

96.     The condition of employing the infected worker is that the infected worker is vaccinated and N95 masked.

97.     The only restriction on assigning an infected worker to work in the presence of a vulnerable patient is that the infected worker who is "asymptomatic or mildly symptomatic" is to be given priority over the worker with a raging infection. COVID-19 Quarantine and Isolation Guidance by Population, "Work Restrictions for HCP with COVID-19 infection", at page 2, column 4, "Crisis: No restrictions with prioritization considerations (e.g., asymptomatic or mildly symptomatic)". Attached as Exhibit K.

98.     Among the hospitals using this new authorization to allow COVID-19 infected workers to work with vulnerable patients is the Eleanor Slater Hospital, where Dr. Skoly has been prevented from attending to patients desperately in need of surgery since October 1, 2021. "COVID positive employees can work after Eleanor Slater Hospital declares staffing 'crisis,'" THE

16

PROVIDENCE JOURNAL, January 3, 2022, attached as Exhibit L (As for the infected workers, the RIDOH spokesman noted "and of course masks are required").

99.     The reason for this remarkable Regulation that permits someone with an active COVID-19 infection to treat vulnerable patients is Rhode Island's shortage of essential health care workers. This shortage is the creation of the Defendants. They created the shortage by firing healthy health care workers who refused to get the vaccine, including those who, like Dr. Skoly, possess naturally acquired immunity.

100.    To sum up, the State's desire to punish someone like Dr. Skoly for noncompliance with its arbitrary regulation is so great that it chooses to expose vulnerable patients to infection by having them be treated by someone with an active COVID-19 infection who is also vaccinated, rather than be treated by the naturally immune and COVID-19 negative Dr. Skoly.

## V.    DR. SKOLY'S HISTORY OF BELL'S PALSY RISK WARRANTS A MEDICAL EXEMPTION

101.    The onset of Bell's Palsy paralysis is a known risk of COVID-19 vaccination. This risk has been documented in the scientific literature identified in Dr. Pappas's Declaration, Exhibit G, ¶¶ 6 to 17; *see also* Rana Shibli, *et al.*, *Association between vaccination with BNT162b2 mRNA COVID-19 vaccination and Bell's palsy: a population-based study*, LANCET REG HEALTH EUR, (Nov. 4 2021), *available at* https://pubmed.ncbi.nlm.nih.gov/34751262/ (last visited Jan. 20, 2022).

102.    The risk is also proven by Rhode Island's medical data. In Rhode Island in 2021, there were sixteen reports of an onset of facial paralysis following COVID-19 vaccination. VAERS (Vaccine Adverse Events Report), attached as Exhibit M.

103.    Although real, the risk of Bell's Palsy paralysis does not justify a general medical exemption for everyone in the population, and such a generalized exemption is not what Dr. Skoly requested.

104.    Dr. Skoly has a history of Bell's Palsy facial paralysis. Pappas Decl. ¶¶ 3 to 5; Skoly Decl.¶¶ 5 to 6.

105.    "Most scientists" believe that Bell's Palsy paralysis results from the re-activation of a virus that is "dormant" in a person's body. Pappas Decl. ¶ 10.

106.    Dr. Skoly has the paralysis virus dormant in his system.

107.    Dr. Skoly does not have a general fear of paralysis or a fear that he will suffer Bell's Palsy for a first time. Dr. Skoly has a specific fear that vaccination will re-activate the paralysis that is dormant in his body.

108.    The current scientific literature gives him no assurance. The literature does not address whether, or the extent to which, if vaccinated, paralysis would be more likely to occur were one a prior Bell's Palsy victim, such as Dr. Skoly. Nor does the literature address whether, where the paralysis is dormant (as with Dr. Skoly), a vaccine-induced recurrence will be of a similar or a greater duration than the prior paralysis, or even permanent.

109.    Bell's Palsy paralysis, as Dr. Pappas explains, may be permanent. Pappas Decl. ¶ 10, citing the research of the National Institute of Neurological Disorders and Strokes ("NIH"), https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Bells-Palsy-Fact-Sheet (last visited January 20, 2022).

110.    Dr. Skoly's fear that vaccination may re-activate his dormant paralysis is based on science: "In light of [Dr. Skoly's] history of Bell's Palsy, and his age, the COVID-19 vaccination creates the risk of a re-occurrence of his facial paralysis and the danger of a delayed resolution, in

18

effect, a possible paralysis of unknown duration. Dr. Skoly's fear is well-grounded in the existing science." Pappas Decl. ¶¶ 12 to 13.

111.    As Dr. Pappas opines, in light of Dr. Skoly's medical history, a medical exemption from vaccination is warranted: "In view of Dr. Skoly's known history of Bell's Palsy, his confirmed natural immunity from prior COVID-19 infection and known protection it provides, the potential debilitating effect a recurrent Bell's Palsy incidence can produce, and the recently observed increased incidences of Bell's Palsy related to COVID-19 vaccines, it is my medical opinion that Dr. Skoly should not get a COVID-19 vaccine." Pappas Decl. ¶ 14.

112.    "The potential significant harm to Dr. Skoly outweighs any benefit vaccination would incur to him or any patient he treats, particularly if he adheres to the strict masking protocols of dental surgery." Pappas Decl. ¶ 14.

113.    The serious and specific danger (permanent facial paralysis) the vaccine presents to Dr. Skoly is no less serious or specific than the dangers for which the defendants have granted 365 medical exemptions. Medical Immunization Exemption Certificate, attached as Exhibit E.

114.    Under these circumstances, the Defendants have acted irrationally by refusing to give Dr. Skoly the medical exemption granted to others.

115.    The Defendants have acted irrationally by giving Dr. Skoly only two choices: Be vaccinated (and assume the risk of permanent facial paralysis) or cease practicing your profession.

116.    Defendants' insistence that Dr. Skoly make this choice is particularly capricious since N95 masking—an alternative to the vaccine—is accepted by Defendants as a protective measure to be used by health care workers who are (for medical or religious reasons) exempt from the vaccine mandate.

## VI.   NATURAL IMMUNITY PROVIDES NO LESS PROTECTION TO THE VULNERABLE PATIENT THAN IMMUNITY ACQUIRED BY VACCINATION

117.    Dr. Skoly has a positive level of IgG Covid-19 antibodies. The risk that he will be re-infected with COVID-19, and then infect a vulnerable patient, is no greater than the risk that a vaccinated doctor will become infected and transmit the virus to a vulnerable patient.

118.    The effectiveness of natural immunity is recognized by most of the world's democracies.

119.    To allow for the safe and free movement among nations, the European Union ("EU") has created a COVID certificate to identify persons who, according to the present science, are at reduced risk of transmitting COVID-19.  https://ec.europa.eu/info/live-work-travel-eu/coronavirus-response/safe-covid-19-vaccines-europeans/eu-digital-covid-certificate_en   (last visited January 20, 2022).

120.    A person qualifies for the Certificate by having been vaccinated against COVID-19, having received a negative test or by having "recovered from COVID."

121.    Recovery from COVID-19 is proven by having had a positive PCR test, such as the positive PCR test taken by Dr. Skoly.

122.    The European Union Certificate is accepted by the nations of the EU (*e.g.*, France, Germany, Italy, Poland, Holland) and thirty-three other countries, including Great Britain, Israel, Switzerland, and Singapore.

123.    It is increasingly acceptable among democracies to treat similarly the two types of immunity, recovered (natural) and vaccine-induced.

124.    As the Israeli tourist website explains, "IF YOU HAVE RECOVERED: Recovered people can enter Israel, provided they carry a digital certificate of recovery that can be digitally

verified by the Israeli Ministry of Health, based on a positive result in a NAAT test (PCR and similar molecular tests}."

https://safe.israel.travel/?utm_source=NAT_travel&utm_campaign=Travel&utm_medium=email &s_src=&s_subsrc=Travel&rbref=&sfmc_j=437196&sfmc_s=82203726&sfmc_l=505&sfmc_jb =14001&sfmc_mid=(last visited January 20, 2022).

125.    The predicate of the EU Certificate is solid science:  Naturally acquired immunity developed after recovery from COVID-19 provides robust protection from subsequent SARS-CoV-2 infection. Declaration of Drs. Jayanta Bhattacharya and Martin Kulldorff, ("Joint Decl.") ¶¶ 15-24, attached as Exhibit N; 12/20/2021 Declaration of Dr. Jayanta Bhattacharya ("Bhattacharya Decl.") ¶¶ 12-31, attached as Exhibit O.

126.    Naturally acquired immunity is at least as effective as immunity acquired through vaccination. A study from Israel released several months ago found that *vaccinated* individuals had 13.1 times greater risk of testing positive, twenty-seven times greater risk of symptomatic disease, and around 8.1 times greater risk of hospitalization than unvaccinated individuals who possess naturally acquired immunity. Joint Decl. ¶ 20.

127.    Other Israeli data has found that those who had received the BioNTech vaccine were 6.72 times more likely to suffer a subsequent infection than those with natural immunity. David Rosenberg, *Natural Infection vs Vaccination: Which Gives More Protection?* ISRAELNATIONALNEWS.COM (Jul. 13, 2021), available at https://www.israelnationalnews.com/ News/News.aspx/309762 (last visited January 20, 2022).

128.    These findings of highly durable natural immunity should not be surprising, as they hold for SARS-CoV-1 and other respiratory viruses. According to a paper published in *Nature* in August 2020, 23 patients who had recovered from SARS-CoV-1 still possess CD4 and CD8 T

cells, 17 years after infection during the 2003 epidemic.[1] A *Nature* paper from 2008 found that 32 people born in 1915 or earlier still retained some level of immunity against the 1918 flu strain—some 90 years later.[2]  Bhattacharya Decl. ¶ 20.

129.    A CDC/IDSA clinician call on July 17, 2021, summarized the then-current state of the knowledge regarding the comparative efficacy of natural and vaccine immunity. The presentation reviewed three studies that directly compared the efficacy of prior infection versus mRNA vaccine treatment and concluded "the protective effect of prior infection was similar to 2 doses of a COVID-19 vaccine."

130.    New variants of COVID-19 resulting from the virus's mutation do not escape the natural immunity developed by prior infection from the original strain of the virus. Joint Decl. ¶¶ 29-33; Bhattacharya Decl. ¶ 17.

131.    When creating the Regulation, RIDOH relied on a study from Kentucky to downplay the value of natural immunity. The study suggested that those with naturally acquired immunity should still get vaccinated.

132.    The RIDOH's reliance on the Kentucky study is misdirected. As Drs. Bhattacharya and Kulldorff explain, although individuals with naturally acquired immunity who received a vaccine showed somewhat increased antibody levels, "[t]his does not mean that the vaccine increases protection against symptomatic disease, hospitalizations or deaths." Joint Decl. ¶ 37. Higher antibody levels do not necessarily translate into a clinical benefit. Nor does any study

---

[1] Le Bert, N., Tan, A. T., Kunasegaran, K., Tham, C. Y. L., Hafezi, M., Chia, A., Chng, M. H. Y., Lin, M., Tan, N., Linster, M., Chia, W. N., Chen, M. I. C., Wang, L. F., Ooi, E. E., Kalimuddin, S., Tambyah, P. A., Low, J. G. H., Tan, Y. J. & Bertoletti, A. (2020). SARS-CoV-2-specific T cell immunity in cases of COVID-19 and SARS, and uninfected control. *Nature*, 584, 457-462. doi: 10.1038/s41586-020-2550-z (last visited January 20, 2022).

[2] Yu, X., Tsibane, T., McGraw, P. A., House, F. S., Keefer, C. J., Hicar, M. D., Tumpey, T. M., Pappas, C., Perrone, L. A., Martinez, O., Stevens, J., Wilson, I. A., Aguilar, P. V., Altschuler, E. L., Basler, C. F., & Crowe Jr., J. E. (2008). Neutralizing antibodies derived from the B cells of 1918 influenza pandemic survivors. *Nature*, 455, 532-536. doi: 10.1038/nature07231(last visited January 20, 2022).

demonstrate that boosting a naturally immune person's antibody levels via vaccination reduces transmission.

133.    The Kentucky study is also problematic because it appears to be cherry-picked. The CDC gathered data on this subject from all fifty states but seems to have chosen to draw attention to the one state that yielded data that it could represent as supporting its position. Marty Makary, "The High Cost of Disparaging Natural Immunity to COVID," THE WALL STREET JOURNAL (Jan. 26, 2022) https://tinyurl.com/2fmdsurc (last visited Jan. 27, 2022).

134.    More recently, and accurately, the CDC has noted that: "[a] systematic review and meta-analysis including data from three vaccine efficacy trials and four observational studies from the US, Israel, and the United Kingdom, found no significant difference in the overall level of protection provided by infection as compared with protection provided by vaccination; this included studies from both prior to and during the period in which Delta was the predominant variant." "Science Brief: SARS-CoV-2 Infection-induced and Vaccine-induced Immunity," *CDC* (Oct. 29, 2021), *available at* https://www.cdc.gov/coronavirus/2019-ncov/science/science-briefs/vaccine-induced-immunity.html (last visited January 20, 2022).

135.    Current research continues to confirm that protection is conferred by immunization, whether from prior infection or vaccination.

136.    In a January 12, 2022 research paper posted from South Africa—the source of the current Omicron wave—South African epidemiologists concluded that "In the Omicron-driven wave, severe COVID-19 outcomes were reduced mostly due to protection conferred by prior infection and/or vaccination …" Outcomes of laboratory-confirmed SARS-CoV-2 infection in the Omicron-driven fourth wave compared with previous waves in the Western Cape Province, South

24

Africa_medRxiv, https://www.medrxiv.org/content/10.1101/2022.01.12.22269148v1.full.pdf at page 4 (last visited January 20, 2022).

137.    In its November 5, 2021, Interim Rule on COVID-19 vaccination, the Centers for Medicare & Medicaid Services (CMS) acknowledged the effectiveness of naturally acquired immunity. Referring to the "100,000 a day [who] have recovered from infection," CMS described these naturally immune people as "no longer sources of future infection." 86 FR 61555, at 61604.

138.    The context of the CMS statement was its understanding that herd immunity would be achieved through a combination of two types of immunity—that of the COVID recovered (natural immunity) and that of the vaccinated. 86 FR 61555, at 61604.

139.    CMS's acknowledgement that natural immunity is at least as effective as vaccination is a correct statement of the present status of scientific knowledge.

140.    The CDC has no documentation of even a single case of a COVID-19-recovered, unvaccinated individual spreading the virus to another person. *See* 11/5/21 Letter of Roger Andoh in Response to FOIA Request, attached as Exhibit P.

141.    In fact, mere days ago, CDC acknowledged that naturally acquired immunity provides greater protection than vaccination against reinfection. This constitutes a reversal of its previous position, refusing to recognize natural immunity and insisting (in the face of all the evidence to the contrary) that vaccination confers superior protection. *See* "COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis," *CDC* (Jan. 19, 2022), *available at https://tinyurl.com/348anr53* (last visited Jan. 20, 2022), and Marty Makary, "The High Cost of Disparaging Natural Immunity to COVID," THE WALL STREET JOURNAL (Jan. 26, 2022) https://www.wsj.com/articles/the-high-cost-of-disparaging-natural-

immunity-to-covid-vaccine-mandates-protests-fire-rehire-employment-

11643214336?mod=hp_opin_pos_2#cxrecs_s (last visited Jan. 20, 2022).

142.    When Dr. Skoly asked the RIDOH whether there was any evidence in Rhode Island

of a COVID-recovered person who was re-infected and then infected a third person, RIDOH

refused to answer. Rhode Island Department of Health Response to Request for Production of

Documents, No. 4, attached as Exhibit Q.

143.    The RIDOH reports all its data to the CDC. Therefore, it may be inferred that there

is no evidence in Rhode Island of a COVID-recovered person who was re-infected and then

infected a third person.

144.    As the current Omicron wave has shown, the vaccinated do contract COVID and

transmit COVID to third parties.

145.    Based on the currently available science, Dr. Skoly—because of his naturally

acquired immunity—poses no greater infection risk to a vulnerable patient than that posed by a

vaccinated doctor. In fact, if the vaccinated doctor in question received the Janssen vaccine (or one

of the inferior WHO-approved foreign vaccines), Dr. Skoly presents significantly less risk.

146.    The infection risk that Dr. Skoly presents is smaller than that presented by the

unvaccinated worker (exempt for medical or religious reasons), and smaller than that presented by

COVID-19 infected health care workers now working in close physical proximity to patients.

Under these circumstances, it is arbitrary and capricious to prevent Dr. Skoly from practicing

medicine while N95 masked.

## VII.   THE STATE'S CONDUCT HAS CAUSED SIGNIFICANT HARM AND THREATENS FURTHER DAMAGE

147.   That Rhode Island has barred Dr. Skoly from treating patients has significantly and adversely affected the people of Rhode Island.

148.   In a State with a desperate shortage of medical services, Dr. Skoly's distinguished medical career has been suspended, and his facility shuttered.

149.   His ten employees have been rendered unemployed.

150.   In fact, the Defendants have gone so far in their mission to punish people like Dr. Skoly, who decline the vaccine even though they are naturally immune, that Defendants are endangering vulnerable patients by permitting individuals with active COVID-19 infections to treat vulnerable patients.

151.   Defendants' policy of letting the infected treat the vulnerable is the direct result of a shortage of healthcare workers resulting from Defendants' termination of unvaccinated employees. "COVID positive employees can work after Eleanor Slater Hospital declares staffing 'crisis,'" THE PROVIDENCE JOURNAL, January 3, 2022, Exhibit L.

152.   Dr. Skoly's patients have suffered from an absence of needed medical services. The patients are numerous: Eight hundred private patients a month and dozens of state patients (the residents of Eleanor Slater Hospital and ACI).

153.   Dr. Skoly's medical practice has a backlog of hundreds of private patients suffering due to lack of treatment. In addition, Eleanor Slater and ACI have a list of twenty institutionalized patients needing immediate dental surgery. There are also charity patients whom Dr. Skoly has been prohibited from treating. Xifaras Decl. ¶¶ 23-24; McLaren Decl.; Shihadeh Decl. ¶11.

154.     The harm to these patients is the direct consequence of the Defendants not allowing Dr. Skoly to practice medicine under the same conditions as unvaccinated health care workers exempt for medical or religious reasons.

155.     Dr. Skoly seeks an order enjoining the Defendants from barring Dr. Skoly from practice.

156.     In the interim, Dr. Skoly requests a temporary restraining order to that effect.

### CLAIMS FOR RELIEF

### COUNT I: VIOLATION OF THE EQUAL PROTECTION CLAUSE AND 42 U.S.C. § 1983

157.     Plaintiff realleges and incorporates by reference the foregoing allegations as though fully set forth herein.

158.     The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state may "deny to any person within its jurisdiction the equal protection of the laws."

159.     Under the Equal Protection Clause, state and local governments and government officials may not arbitrarily discriminate among citizens, denying without justification rights or benefits to some citizens that are made available to other similarly situated citizens. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 472 U.S. 432 (1985).

160.     Defendants have violated and are violating Dr. Skoly's rights under the Equal Protection Clause by preventing Dr. Skoly from practicing medicine while allowing identically situated health care workers to be in the presence of patients.

161.     Patient protection is the exclusive stated justification for the Regulation mandating vaccines for health care workers.

28

162.    As far as patient protection is concerned, the defendants have acknowledged that a strict N95 masking mandate is an acceptable substitute for a vaccine.

163.    The defendants' acknowledgement of this fact is why unvaccinated health care workers—with medical or religious exemptions—may treat vulnerable patients.

164.    The N95 mask is supposedly such a surety of patient protection that the defendants even allow a health care worker (vaccinated) with an active COVID-19 infection to work in the close presence of vulnerable patients so long as the infected worker wears a mask.

165.    The determinative factor by which Defendants have decided to allow a health care worker to be in close proximity to a patient is not whether the worker is vaccinated or unvaccinated, or healthy or infected with COVID-19.

166.    Except for Dr. Skoly, the Defendants' determinative factor in allowing the worker to practice his profession is whether the worker is N95 masked.

167.    There is no rational basis for treating the masked, unvaccinated Dr. Skoly worse than the masked, unvaccinated health care worker with a medical or religious exemption, or the masked worker with an active infection.

168.    If the Defendants have determined that the N95 mask protects the patient when the worker is healthy or infected, there is no rational basis for defendants to act as if the N95 mask when worn by Dr. Skoly will not similarly protect the patient.

169.    Punishing someone for noncompliance with an arbitrary, irrational rule is not a valid justification for that rule.

170.    Yet, the Defendants allow the masked exempt worker, and the masked infected worker, to retain their livelihoods while imposing on Dr. Skoly a bar from practicing his profession.

171.   This arbitrary, irrational, and discriminatory treatment violates Dr. Skoly's fundamental right to equal protection of the law under the Fourteenth Amendment of the Constitution.

**COUNT II:  VIOLATION OF DUE PROCESS CLAUSE AND 42 U.S.C. § 1983**

172.   Plaintiffs reallege and incorporate by reference the foregoing allegations as if fully set forth herein.

173.   The Due Process Clause of the Fourteenth Amendment provides that no State "shall deprive any person of life, liberty, or property, without due process of law."

174.   The "touchstone of due process is protection of the individual against arbitrary action of government."  *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974).

175.   Dr. Skoly has a liberty interest in pursuing the profession in which he was trained, and that he has practiced, for forty years.

176.   The oft-cited Supreme Court case that acknowledges state police power to require vaccination also observes that the requirement may be "so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression." *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 38 (1905).

177.   The "judiciary is always competent to interfere and protect the health and life of the individual concerned," to determine if a person "is not at the time a fit subject of vaccination." *Id*. at 39.

178.   This case warrants judicial intervention.

179.   The onset of Bell's Palsy paralysis is a known risk of COVID-19 vaccination. Pappas Decl. ¶¶ 6 to 17; VAERS (Vaccine Adverse Events Report), Exhibit M (In Rhode Island in 2021, sixteen reports of an onset of facial paralysis after being vaccinated).

180.    For Dr. Skoly, paralysis is not a general risk but a specific risk. He has a history of Bell's Palsy facial paralysis. Pappas Decl. ¶¶ 3 to 5; Skoly Decl. ¶¶ 5 to 6.

181.    This means that Dr. Skoly has the paralysis virus dormant in his body. Pappas Decl. ¶ 10 ("Most scientists" believe that Bell's Palsy paralysis results from the re-activation of a virus that is "dormant" in a person's body).

182.    The specific, science-based danger confronting Dr. Skoly is that vaccination will re-awaken the paralysis dormant in his body.

183.    Were the dormant paralysis to re-occur, the re-activated paralysis could be permanent. Pappas Decl. ¶ 10, citing the research of the National Institute of Neurological Disorders and Strokes ("NIH"), https://www.ninds.nih.gov/Disorders/Patient-Caregiver-Education/Fact-Sheets/Bells-Palsy-Fact-Sheet (last visited January 20, 2022).

184.    In effect, Defendants are telling Dr. Skoly that, to continue to be a doctor in Rhode Island, he must run the risk of permanent facial paralysis.

185.    Given Dr. Skoly's history, the risk of the vaccine igniting a recurrence of his dormant facial paralysis makes Dr. Skoly not "a fit subject of vaccination." *Jacobson*, at 39.

186.    Under these circumstances, the Defendants have denied Due Process to Dr. Skoly by refusing to give him a medical exemption.

187.    Defendants' refusal to allow Dr. Skoly a medical exemption is particularly capricious since N95 masking—an alternative to the vaccine—is accepted by Defendants as a protective measure to be used by health care workers who are (for medical or religious reasons) exempt from the vaccine mandate.

188.    Defendants' refusal to grant an exemption also lacks a rational basis because it ignores Dr. Skoly's naturally acquired immunity.

189.    Because of his naturally acquired immunity, the infection risk that Dr. Skoly presents to a vulnerable patient is no greater than that presented by a vaccinated doctor, certainly smaller than that presented by the unvaccinated worker (exempt for medical or religious reasons), and drastically smaller than that presented by the COVID-19 infected health care workers now being permitted to work in close physical proximity to patients because people like Dr. Skoly are not permitted to practice medicine.

190.    Not acknowledging Dr. Skoly's risk of a Bell's Palsy recurrence as a valid basis for a medical exemption, and forcing him to forfeit his medical practice on these grounds, denies him his fundamental right to Due Process under the Fourteenth Amendment.

191.    The Defendants' conduct is so "arbitrary and oppressive" as to warrant, as the *Jacobson* court advised, the protective intervention of a court.

## PRAYER FOR RELIEF

Dr. Skoly respectfully requests that the Court enter judgment in his favor and grant the following relief:

A.    A declaration that the Compliance Order violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

B.    A declaration that the Compliance Order violates Dr. Skoly's Due Process rights under the Fourteenth Amendment of the Constitution;

C.    Injunctive relief restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)), and each of them, from enforcing the Compliance Order;

D.    Nominal damages;

E.    Attorney's fees pursuant to 42 U.S.C. § 1988; and

F.    Any other just and proper relief.

## J<span>URY</span> D<span>EMAND</span>

Plaintiffs herein demand a trial by jury of any triable issues in the present matter.

February 3, 2022

Respectfully submitted,

/s/ *Brian Rosner*
_____

Brian Rosner*
Senior Litigation Counsel
N<span>EW</span> C<span>IVIL</span> L<span>IBERTIES</span> A<span>LLIANCE</span>
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
Brian.Rosner@NCLA.legal
*Pro hac vice application forthcoming*
* Admitted only in New York. DC practice
limited to matters and proceedings before
United States courts and agencies. Practicing
under members of the District of Columbia
Bar.

/s/ *Jenin Younes*
_____

Jenin Younes*
Litigation Counsel
N<span>EW</span> C<span>IVIL</span> L<span>IBERTIES</span> A<span>LLIANCE</span>
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
jenin.younes@ncla.legal
*Pro hac vice application forthcoming*
* Admitted only in New York. DC practice
limited to matters and proceedings before
United States courts and agencies. Practicing
under members of the District of Columbia
Bar.

/s/ Gregory Piccirilli

Gregory Piccirilli, Esq., #4582
148 Atwood Ave., #302
Cranston, Rhode Island 02920
Telephone: (401) 578-3340
Facsimile: (401) 944-3250
gregory@splawri.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of February, 2022, I caused to be sent via email (with summons or waiver to follow) a true and accurate copy of the within Verified Complaint to attorneys for the following parties:

Michael Field, Esq.
Office of the Attorney General
Mfield@riag.ri.gov

Andy Hodgkin, Esq.
Executive Counsel to the Governor
Andy.Hodgkin@governor.ri.gov

Ken Alston, Esq.
RIDOH Chief Legal Counsel
kenny.alston@health.ri.gov.

Bruce D. Todesco
Senior Legal Counsel, RIDOH
bruce.todesco@health.ri.gov

/s/ Gregory Piccirilli