**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **DR. STEPHEN T. SKOLY, Jr.,** | |
| *Plaintiff,* | **C.A. 1:22-cv-00058-MSM-LDA** |
| v. | |
| **DANIEL J. McKEE, in his official capacity as the Governor of the State of Rhode Island; JAMES McDONALD, in his official capacity as the Interim Director of the Rhode Island Department of Health, and MATTHEW D. WELDON, in his official capacity as the Director of the Rhode Island Department of Labor and Training.** | **SECOND AMENDED VERIFIED COMPLAINT** **FOR DECLARATORY AND INJUNCTIVE, AND OTHER RELIEF** |
| *Defendants.* | |

Plaintiff, by and through his attorneys at the New Civil Liberties Alliance ("NCLA"),

Christy P. Durant, Esq and Gregory Piccirilli, Esq., hereby complains and alleges the following:

<u>**INTRODUCTORY STATEMENT**</u>

1.       Dr. Stephen T. Skoly, Jr., is one of Rhode Island's handful of oral and maxillofacial

surgeons.

2.       Between October 1, 2021, and March 11, 2022, the State of Rhode Island arbitrarily

and unlawfully prevented Dr. Skoly from practicing medicine, forcing him to shut down his 11-

person medical facility.

3.       In compelling the closure of Dr. Skoly's medical practice, Rhode Island violated

Dr. Skoly's rights to Equal Protection and Due Process of the law under the Fourteenth

Amendment of the U.S. Constitution.

1

4. Rhode Island also violated Dr. Skoly's First Amendment rights, and, during the period of his unemployment, improperly denied him unemployment benefits.

5. The State harmed hundreds of Rhode Island patients, including its most vulnerable (*i.e.*, residents of the State's psychiatric hospital and its prison), by depriving them of Dr. Skoly's services.

6. In this action, Dr. Skoly seeks a declaration that his rights were violated, damages for the past violations, and an injunction against future violations.

### JURISDICTION AND VENUE

7. This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the federal law claims arise under the Constitution and statutes of the United States. This action is brought pursuant to 42 U.S.C. § 1983.

8. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred in this District.

9. This Court may issue a declaratory judgment and grant permanent injunctive relief pursuant to 28 U.S.C. §§ 2201-2202.

### PARTIES

10. Plaintiff Dr. Stephen T. Skoly, Jr. ("Dr. Skoly") is an oral and maxillofacial surgeon licensed by the State of Rhode Island.

11. Defendant Daniel J. McKee is the Governor of the State of Rhode Island, entitled by Rhode Island law to promulgate, directly or through his subordinates, emergency regulations to address health emergencies such as COVID-19. He is sued in his official capacity.

2

12.     Defendant James McDonald is the Interim Director of the Rhode Island Department of Health ("RIDOH"), subordinate to and appointed by the Governor. He is sued in his official capacity.

13.     Defendant Matthew D. Weldon is the Director of the Rhode Island Department of Labor and Training, subordinate to and appointed by the Governor. He is sued in his official capacity. Collectively, Governor McKee, Director McDonald and Director Weldon are referred to as "Defendants."

## STATEMENT OF FACTS

### I.   DR. SKOLY'S DENTAL AND SURGICAL PRACTICE

14.     Prior to October 1, 2021, Dr. Skoly ran Associates in Oral and Maxillofacial Surgery, a dental and surgical practice in Cranston, Rhode Island.

15.     Dr. Skoly and his five surgical assistants treated forty patients a day, excluding emergencies, five days a week.

16.     The procedures Dr. Skoly and his staff performed ranged from simple dental extractions to complex surgical procedures.

17.     Dr. Skoly did not charge patients in need.

18.     Rhode Island retained Dr. Skoly to provide surgical services to residents of the State's institutions.

19.     In this capacity, Dr. Skoly was a dental surgeon—and for the past decade, the only dental surgeon—for the Eleanor Slater Hospital, the State's psychiatric rehabilitative hospital operated by the Rhode Island Department of Behavioral Healthcare, Developmental Disabilities & Hospitals.

20.     Eleanor Slater is an institutional facility for patients with acute and long-term physical illnesses, and patients with mental health conditions.

21.     Eleanor Slater contains a unit that houses psychiatric inmates confined under the authority of the Rhode Island Department of Corrections.

22.     Since 1998, Dr. Skoly was also the only dental surgeon at the Adult Correctional Institute ("ACI"), the State's penitentiary complex in Cranston.

23.     Dr. Skoly performed 10 to 20 procedures during his weekly visits to ACI.

24.     Complex surgeries require residents to be transported to the more sophisticated operating theatre at Dr. Skoly's Cranston medical facility.

25.     Dr. Skoly serviced an ACI patient in his Cranston office about every day.

26.     The institutionalized patients could not travel to the Cranston office by themselves but needed to be accompanied by facility staff members.

27.     Armed guards accompanied the prisoners.

28.      Dr. Skoly designed his Cranston medical facility to include a large elevator to accommodate the type of gurney transported in an ambulance.

29.     In treating the residents of Eleanor Slater and ACI, Dr. Skoly worked in prolonged and close physical contact with the institutions' health care workers and other employees.

## II.    DURING THE PANDEMIC, DR. SKOLY AND HIS STAFF CONTINUED TO SERVE

30.     When COVID-19 lockdowns began in March 2020, Dr. Skoly and his staff continued to treat patients in person, the only way that dental procedures can be performed.

31.     As a dental surgeon, Dr. Skoly and his staff engaged in scrupulous masking and other hygiene requirements.

32.     They supplemented these procedures with safety precautions and guidelines recommended by the RIDOH Provider Advisory, the CDC Health Advisory, the American Dental Association and the American Association of Oral and Maxillofacial Surgeons.

33.     Dr. Skoly and his staff held daily meetings to discuss and educate themselves about the safety precautions, and to confirm that they were being followed strictly.

34.     Dr. Skoly is not aware of any patient out of the eight hundred served monthly who tested positive for COVID-19 because of treatment at Dr. Skoly's facility.

35.     In December 2020, likely while treating a resident of the psychiatric hospital or the prisons, Dr. Skoly contracted COVID-19.

36.     After a quarantine period, Dr. Skoly returned to work.

### III.     THE TEMPORARY EMERGENCY REGULATION AND OCTOBER 1, 2021 COMPLIANCE ORDER

*a)     The First Temporary Emergency Regulation*

37.     On August 17, 2021, the Governor, through the RIDOH, promulgated a temporary emergency regulation 16-RICR-20-15-8 ("Temporary Emergency Regulation")

38.     The Temporary Emergency Regulation mandated that "all health care workers and health care providers be vaccinated against COVID-19 by October 1, 2021."

39.     The unvaccinated health care worker was forbidden to physically enter a health care facility: "As of October 1, 2021, health care facilities shall deny entrance to any health care workers who are not vaccinated, subject to a medical exemption set forth in § 8.3(D) of this Part."

40.     The justification for the vaccine mandate was the protection of "vulnerable populations."

41.     As stated on Rhode Island's government website:

Health care workers and providers interact with Rhode Island's most vulnerable populations: individuals who are immunocompromised and individuals with co-morbidities. These vulnerable populations are at risk for adverse health outcomes from COVID-19. As COVID-19 positive individuals are often asymptomatic or presymptomatic, health care workers and health care providers may unintentionally spread infection to these vulnerable patients. <u>In order to protect these vulnerable populations, RIDOH is mandating that all health care workers and health care providers be vaccinated against COVID-19 by October 1, 2021</u> (emphasis added).

42.     The vaccine mandate permitted medical exemptions for severe or immediate allergic reaction to the vaccine, or a component of the vaccine, or a history of myocarditis or pericarditis.

43.     No other medical exemption was permitted.

44.     As a condition of continued employment, the recipient of a medical exemption was "required to wear a procedure mask or higher-grade mask (*e.g.*, KN95 or N95) in the course of their employment."

45.     Other than masking, the vaccine mandate placed no restriction on the exempt worker's presence in the facility or the physical interaction between the vulnerable patient and the exempt worker.

46.     The vaccine mandate allowed the N95 masked exempt worker to interact with a patient just as a vaccinated worker would.

47.     Between October 1, 2021, and March 11, 2022, the Defendants exempted between 299 and 365 Rhode Island health care workers from the vaccine mandate.

48.     The Temporary Emergency Regulation was scheduled to expire on February 13, 2022.

b.     *Dr. Skoly's Decision to Not Be Vaccinated*

6

49.     In 2006, Dr. Skoly had contracted Lyme disease, which caused two attacks of Bell's Palsy.

50.     The palsy paralyzed the muscles around Dr. Skoly's left eye, and, subsequently, his right eye. The muscles around his right eye still display a mild residual droopiness.

51.     Dr. Skoly was aware of medical literature showing an association between COVID-19 vaccination and the onset of Bell's Palsy.

52.      In September 2021, Dr. Skoly tested positive for IgG COVID-19 antibodies,

53.     After consulting with his doctor and making a risk-benefit analysis that took into consideration his naturally acquired immunity as well as his history of Bell's palsy, Dr. Skoly determined that it was not in his medical best interests to get vaccinated.

54.     On September 30, 2021, Dr. Skoly discussed his decision with a journalist, who reported the conversation in *The Providence Journal.*

c.     *The Compliance Order*

55.     On October 1, 2021, Defendant McDonald's predecessor issued to Dr. Skoly a Notice of Violation and Compliance Order (the "Compliance Order").

56.     The Compliance Order made the factual finding that, "On October 1, 2021, the Providence Journal reported that Respondent [Dr. Skoly] stated that (a) he was not vaccinated, (b) did not meet the medical exemption incorporated in the regulation, and that he intended to directly engage in patient care or activity in which he or others would potentially be exposed to infectious agents that can be transmitted from person to person."

57.      Based on the above finding, the Compliance Order directed Dr. Skoly "to cease professional conduct as a health care provider … unless and until he has complied with the terms and conditions of 216-RICR-20-15-8."

58.     Dr. Skoly complied.

59.     He closed his private practice (two hundred patients a week) and ceased serving the residents of Eleanor Slater and ACI.

60.     Dr. Skoly terminated the employment of his five surgical assistants and other staff.

61.     Hoping to be allowed one day to rehire a staff and resume practice, he continued to pay his $7,000 monthly rent.

62.     In support of the Compliance Order, ACI posted at several locations within its buildings a poster of Dr. Skoly with the warning that he was not to be permitted on ACI's premises.

## IV.   EVENTS BETWEEN THE COMPLIANCE ORDER AND ITS MARCH 11, 2022 RESCISSION

### a)    *Dr. Skoly's suspension was a punishment for speaking publicly about the vaccine mandate*

63.     After October 1, 2021, Dr. Skoly, directly and through counsel, asked Defendants to rescind the Compliance Order.

64.     Dr. Skoly requested that he be qualified for a medical exemption based on his history of Bell's Palsy, and the association of the vaccine with the onset of Bell's Palsy paralysis.

65.     To substantiate his position that he did not present a danger of infection to vulnerable patients, Dr. Skoly asked Defendants to review two points.

66.     Because the masking and safety precautions he had practiced in the past had fully protected vulnerable patients from infection, masking (and other precautions) could be relied upon to protect vulnerable patients in the future.

67.     And, because he had a positive level of IgG Covid-19 antibodies, the risk he posed to vulnerable patients was no different from the risk posed by a doctor who had been vaccinated.

68.     Rejecting those arguments, Defendants explained that because Dr. Skoly had "opened his big mouth" by speaking to the press, he had made his suspension a political issue, not a medical issue.

69.     Therefore, Dr. Skoly was told, his choice was to submit to vaccination or to stay suspended.

b)      *Rhode Island denies Dr. Skoly unemployment benefits because he "is not actively looking for work"*

70.     After being suspended from practice, Dr. Skoly applied to the Rhode Island Department of Labor and Training ("RIDLT") for unemployment benefits.

71.     RIDLT informed Dr. Skoly that, based upon his years of employment, he had "earned enough to qualify for unemployment benefits" of $661.00 a week.

72.     RIDLT then denied Dr. Skoly's application.

73.     A prerequisite for the receipt of unemployment benefits under Rhode Island law, 28-44-12, is that the applicant is actively looking for work.

74.     In RIDLT's view, Dr. Skoly had chosen to be unemployed: "As you are refraining from vaccination, you are considered as removing yourself from the Labor Market in your chosen field of labor, the medical field."

75.     RIDLT acknowledged that the Compliance Order prevented Dr. Skoly from working as a doctor and that any non-medical potential employer—the RIDLT referee had suggested Walmart as a possibility—would not hire Dr. Skoly "aware that once reinstated, he will return to work at his practice."

76.     However, RIDLT explained, "the work search requirements under the Act do not permit the Board to consider mitigating factors such as futility."

77.     Therefore, RIDLT concluded, unemployment benefits would be denied because "the Claimant has not conducted a work search as required by Section 28-44-12 of the Act."

> c)     *Dr. Skoly files a complaint against the State Defendants*

78.     In February 2022, Dr. Skoly commenced this lawsuit against Defendants McKee and McDonald.

79.     Dr. Skoly argued that, by suspending him from practice, Defendants were violating his right to the Equal Protection of Law and Due Process.

> i)     *Denial of Equal Protection*

80.     Dr. Skoly's Equal Protection argument was predicated on the incontestable fact that, in terms of patient safety, Defendants were treating N95 masking as the equivalent of vaccination.

81.     Since the October 1, 2021 commencement of the vaccine mandate, Defendants had been permitting medically exempt health care workers to be physically present in health care facilities, and to treat vulnerable patients, so long as the worker wore an N95 mask "in the course of their employment."

82.     As a dental surgeon, Dr. Skoly always wore an N95 mask, or a better mask, when treating patients.

83.     Therefore, Dr. Skoly argued, it was capricious to treat him and the exempt worker differently, allowing the exempt worker to retain their employment while requiring Dr. Skoly to suspend his practice.

84.     Defendants' belief in the efficacy of N95 masking was so great, Dr. Skoly noted, that the State was even allowing vaccinated health care workers *infected with COVID-19* to work in close proximity to vulnerable patients so long as they wear an N95 mask.

*ii)     Denial of Due Process*

85.     Dr. Skoly also argued that the State was violating his right to due process of law by refusing to issue him a medical exemption based on his history of Bell's Palsy paralysis.

86.     That Bell's Palsy is a risk factor for COVID-19 vaccination has been documented in the scientific literature, including the CDC's VAERS Report.

87.     Dr. Skoly feared that vaccination would re-activate the Bell's Palsy paralysis that, according to the scientific literature, is dormant in his body.

88.     In the medical opinion of Dr. Pappas, cited in the Complaint, Dr. Skoly's fear was "well-grounded in the existing science."

89.     Dr. Pappas opined, "In view of Dr. Skoly's known history of Bell's Palsy, his confirmed natural immunity from prior COVID-19 infection and known protection it provides, the potential debilitating effect a recurrent Bell's Palsy incidence can produce, and the recently observed increased incidences of Bell's Palsy related to COVID-19 vaccines, it is my medical opinion that Dr. Skoly should not get a COVID-19 vaccine.   The potential significant harm to Dr. Skoly outweighs any benefit vaccination would incur to him or any patient he treats, particularly if he adheres to the strict masking protocols of dental surgery."

*d)     Subsequent Proceedings*

90.     Upon Dr. Skoly's motion, the Court scheduled a Preliminary Injunction Hearing for February 23, 2022.

91.     The Temporary Emergency Order was scheduled to expire on February 13, 2022.

92.     On February 11, 2022, State Defendant McKee issued an Executive Order extending the Temporary Emergency Order to March 13, 2022.

93.     The substance of the extended order was identical to the original order: To be physically present in a health care facility, or work near patients, health care workers had to be vaccinated, except for the medically exempt, who were permitted to be in the building and work in close proximity to patients so long as they were N95 masked.

94.     On February 18, 2022, Dr. Skoly filed an Amended Verified Complaint containing the new allegation that the original Temporary Emergency Order had been replaced.

95.     Based upon the new filing, the Court adjourned the Preliminary Injunction Hearing to March 15, 2022.

96.     On February 24, 2022, the Defendants proposed a permanent vaccine regulation to replace the Extended Temporary Emergency Regulation.

97.     Defendants proposed that health care workers be given the choice of vaccination or N95 masking.

98.     The specific proposed language was that "health care workers [are] to be up to date with a SARS-CoV-2 vaccine OR wear a medical grade N95 mask when the [COVID-19] prevalence rate is high" (emphasis added).

99.     "High" prevalence was defined as "greater than fifty (50) cases per one hundred thousand (100,000) people per week, as reported by the Department."

100.    No vaccination or masking would be required when the COVID-19 prevalence rate was low—less than fifty cases per one hundred thousand people per week.

101.    As Defendants explained, "Individuals' beliefs must be respected and thus vaccination mandates must not be imposed *capriciously*. Thus, a reasonable alternative to being up to date [with vaccines] is to wear a medical grade N95 mask …" (emphasis added).

102.    That the Defendants were treating N95 masking as the equivalent of vaccination was a predicate of the constitutional arguments presented in Dr. Skoly's Amended Verified Complaint.

103.    On March 3, 2022, Dr. Skoly moved for a TRO to allow Dr. Skoly to resume practice so long as he was N95 masked.

104.    Defendants opposed the motion.

105.    They explained that, when saying that they would be acting "capriciously" to deny employment to the N95 masked health care worker, they were speaking speculatively with no intent of describing a present reality.

106.    The Court merged consideration of the motion into the pending March 15th Preliminary Injunction Hearing.

107.    On March 11, 2022, four days prior to the scheduled hearing, Defendants promulgated a New Temporary Emergency Rule to replace the existing one.

108.    The New Temporary Emergency Rule was entitled "Requirement for Protection Against COVID-19 for Health Care Workers in Licensed Health Care Facilities."

107.    The new rule adopted the language of the Proposed Permanent Rule: To work in the proximity of patients, a health care worker had to be vaccinated or N95 masked.

108.    With the promulgation of the new rule, Defendants acknowledged how (with the exception of Dr. Skoly) they had acted since October 1, 2011: In terms of patient protection, Defendants were treating N95 masking and vaccination as equivalent.

109.    On March 11, 2022, Defendants withdrew the Compliance Order.

110.    The same day, Dr. Skoly began the laborious process of trying to re-assemble a staff and resume practice.

111.   Dr. Skoly withdrew his motion for a preliminary injunction.

## CLAIMS FOR RELIEF

### COUNT I: VIOLATION OF THE EQUAL PROTECTION CLAUSE AND 42 U.S.C. § 1983 (AGAINST DEFENDANTS MCKEE AND MCDONALD)

112.   Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

113.   The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state may "deny to any person within its jurisdiction the equal protection of the laws."

114.   Under the Equal Protection Clause, state and local governments and government officials may not arbitrarily discriminate among citizens, denying without justification rights or benefits to some citizens that are made available to other similarly situated citizens.

115.   Between October 1, 2021, and March 11, 2022, Defendants violated Dr. Skoly's rights under the Equal Protection Clause.

116.   In this period, they prevented Dr. Skoly from practicing medicine while allowing identically situated health care workers to practice medicine.

117.   Patient protection was the exclusive stated justification for the various Temporary Emergency Regulations prohibiting health care workers from being present in a health care facility, or working in close proximity with a patient, unless vaccinated.

118.   Nonetheless, between October 2021 and March 2022, Defendants permitted hundreds of unvaccinated health care workers who had obtained medical exemptions to work in close proximity to patients so long as they, the workers, wore an N95 mask.

119.   By granting these exemptions, the Defendants implicitly accepted the proposition

14

that, in terms of patient safety, Defendants considered N95 masking to be an acceptable safety alternative to vaccination.

120.    Defendants considered the N95 mask such a surety of patient protection that they allowed health care workers (vaccinated) with active COVID-19 infections to work in the close presence of vulnerable patients so long as the infected worker wore an N95 mask.

121.    There was no rational basis to treat the masked, unvaccinated Dr. Skoly differently from the masked, unvaccinated worker with a medical exemption, *especially* the masked worker with an active infection.

122.    Defendants' current temporary emergency regulation (adopted March 11, 2022) accepts that the masked, unvaccinated worker and the vaccinated worker are to be treated equally.

123.    Defendants admit they were acting "capriciously" when they denied employment to the unvaccinated N95 masked worker while permitting the vaccinated worker to retain his livelihood.

124.    By finally treating Dr. Skoly the same as an unvaccinated exempt worker— allowing the masked Dr. Skoly to resume practice—Defendants have made pre-trial relief unnecessary.

125.    What remains to be determined is Dr. Skoly's entitlement to a declaration that Defendants violated his constitutional right to Equal Protection of the Laws, a permanent injunction, and damages (nominal, as pleaded).

126.    As Rhode Island's COVID-19 experience (and the rest of the country's for that matter) has established, it is probable that new COVID-19 variants will arise, requiring that current COVID-19 rules be supplemented or amended.

127.     Absent the relief sought, Dr. Skoly does not have any assurance that he will not be subjected to the same unreasonable treatment in the future as he was subjected to in the past.

128.     Especially in light of Defendants' history of targeting him and treating him unreasonably, he is entitled to an assurance that, in the future, he will be treated equally under the law.

129.     Dr. Skoly requests a permanent injunction requiring that, in applying current and future COVID-19 safety regulations for health care workers, Dr. Skoly be treated no differently than any other worker with a medical reason to be exempted from vaccination.

### COUNT II:  VIOLATION OF DUE PROCESS CLAUSE AND 42 U.S.C. § 1983 (AGAINST DEFENDANTS MCKEE AND MCDONALD)

130.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

131.     The Due Process Clause of the Fourteenth Amendment provides that no State "shall deprive any person of life, liberty, or property, without due process of law."

132.     The touchstone of due process is protection of the individual against arbitrary government action.

133.     Dr. Skoly has a liberty interest in pursuing the profession in which he was trained (and has practiced) for 40 years, a property interest in his practice, and a liberty interest in not undergoing an unnecessary medical procedure that poses a risk of harm to him.

134.     Between October 1, 2021, and March 11, 2022, the Defendants denied Due Process to Dr. Skoly by refusing to give him a medical exemption from vaccination.

135.     Defendants refused to acknowledge Dr. Skoly's legitimate, medically-based fear that COVID-19 vaccination might re-ignite his Bell's Palsy paralysis.

136.    Defendants ignored that Dr. Skoly was always willing to be N95 masked—a protective measure that Defendants had been accepting as an alternative to vaccination.

137.    Defendants ignored the science of naturally acquired immunity.

138.    In preparation for the March 15th hearing, Dr. Skoly had identified to the Defendants two medical experts—one doctor had treated hundreds of COVID-19 patients, the other doctor was a renowned researcher and CDC-award recipient—who were prepared to testify on natural immunity.

139.    The experts would have testified that, based on the unequivocal science as currently understood, COVID-recovered immunity is more long-lasting, and more effective against more variants, than vaccination immunity, and there was no scientific basis to require that Dr. Skoly be vaccinated.

140.    They would have testified that Dr. Skoly always presented a lower risk of infecting his patients than a vaccinated healthcare worker who was not COVID-recovered, than an unvaccinated not naturally immune healthcare worker, or than a COVID-19 infected healthcare worker permitted (while N95 masked) to work in close physical proximity to patients.

141.    By ending Dr. Skoly's unfair suspension prior to the scheduled preliminary injunction hearing, Defendants delayed determination of the issue of natural immunity—whether there is a scientific basis to require the COVID-19 recovered Dr. Skoly to ever be forced to take a COVID-19 vaccine.

142.    Dr. Skoly's natural immunity, and the necessity of a vaccine mandate in light of that immunity, remains an issue between Defendants and Dr. Skoly—one that is likely to recur.

143.    COVID-19 is constantly evolving.

144.    There will be new variants that will lead to new temporary emergency measures to replace or supplement the current vaccine and masking rules.

145.    So long as the Defendants refuse to acknowledge the science of natural immunity, it is likely that Dr. Skoly will face a new vaccine rule that again requires him to be vaccinated or give up his job.

146.    And the cycle will repeat: Dr. Skoly will be suspended; he will lay off his staff; he will retain counsel and commence a lawsuit; a hearing will be scheduled, and expert testimony prepared.

147.    It cannot be presumed that, if unfairly suspended again (however briefly), Dr. Skoly will again be able to re-assemble his team and resume practice were he to win re-instatement in a future court proceeding.

148.    Whether natural immunity warrants an exemption from vaccination is an issue that is likely to occur again, and it merits resolution now.

### COUNT III:  VIOLATION OF THE FIRST AMENDMENT AND 42 U.S.C. § 1983 (AGAINST DEFENDANTS MCKEE AND MCDONALD)

149.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

150.    The First Amendment prohibits the government from taking adverse action against a citizen for making public statements that displease the State.

151.    That prohibited retaliation is what occurred here.

152.    Based on his history of Bell's Palsy paralysis, and the proof of his enduring Covid-19 recovered immunity, Dr. Skoly made the medical decision to not be vaccinated.

153.    On September 30, 2021, Dr. Skoly discussed his decision to not be vaccinated with a journalist.

154.    The journalist reported the conversation in *The Providence Journal*.

155.    The next day—October 1, 2021—Defendants issued the Compliance Order suspending Dr. Skoly from practice "unless and until he has complied with the terms and conditions of 216-RICR-20-15-8 [the vaccine mandate]".

156.    After October 1, 2021, Dr. Skoly, directly and through counsel, asked the defendants to rescind the Compliance Order.

157.    After all, he argued, Defendants were permitting hundreds of unvaccinated, medically exempt workers to keep their jobs and work in close proximity to vulnerable patients.

158.    These exempt workers were wearing, as patient protection, a mere N95 mask, a safety precaution inferior to Dr. Skoly's extreme masking, face shielding, and other safety measures.

159.    If patient protection was the issue, Defendants were asked why Dr. Skoly was being treated differently from the unvaccinated exempt worker.

160.    Defendants explained that because Dr. Skoly had "opened his big mouth" by speaking to the press, he made his suspension a political issue, not a medical issue, so he either had to submit to vaccination or remain barred from practicing.

161.    Defendants suspended Dr. Skoly, and maintained that suspension, not for reasons of medicine or science, but as punishment for his speaking out on a public topic in a manner with which they disapproved—that is they discriminated against him based on the content of his speech.

19

162.     If there is any principle of the Constitution that more imperatively calls for attachment, it is the principle of free thought—not freedom of thought for those who agree with us, but freedom of thought for those with whom we disagree.

163.     That freedom to think as you will and to speak as you think is—the Founders believed—indispensable to the discovery and spread of political truth.

164.     Dr. Skoly is entitled to a declaration that Defendants' retaliatory actions violated his First Amendment rights; nominal damages; and a permanent injunction that Defendants do not again violate his First Amendment right to speak out against government policy.

## COUNT IV:  VIOLATION OF DUE PROCESS CLAUSE AND 42 U.S.C. § 1983
### (AGAINST ALL DEFENDANTS)

165.     Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

166.     After being suspended from practice, Dr. Skoly applied to the Rhode Island Department of Labor and Training ("RIDLT") for unemployment benefits.

167.     RIDLT informed Dr. Skoly that, based upon his years of contributing to the unemployment fund, he had "earned enough to qualify for unemployment benefits" of $661.00 a week.

168.     RIDLT denied the application.

169.     In RIDLT's view, Dr. Skoly had chosen to be unemployed by "refraining from vaccination … [and] removing [him]self from the Labor Market in [his] chosen field of labor, the medical field."

170.     Though acknowledging that the Compliance Order made it a "futility" for Dr. Skoly to search for work, RIDLT nonetheless denied him unemployment benefits because he "has not conducted a work search as required by Section 28-44-12 of the Act."

171.     Dr. Skoly was entitled to be employed in his chosen field.

172.     Dr. Skoly did not choose unemployment.

173.     Defendants imposed unemployment upon him.

174.     As alleged in Counts One to Three, Defendants imposed that unemployment in violation of Dr. Skoly's First Amendment rights, and rights to Equal Protection and Due Process of Law.

175.     Having created the conditions making Dr. Skoly unemployed (and unemployable in the medical field), and making it futile for him to try to obtain employment, Defendants violated Dr. Skoly's rights to Due Process by denying him unemployment benefits.

176.     Dr. Skoly is entitled to payment of unemployment benefits for the period October 1, 2021, to March 11, 2022, and an injunction against future unlawful denial of benefits.

## PRAYER FOR RELIEF

Dr. Skoly respectfully requests that the Court enter judgment in his favor and grant the following relief:

A.     A declaration that the vaccine mandate as applied to Dr. Skoly violated the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution;

B.     A declaration that the vaccine mandate as applied to Dr. Skoly violated Dr. Skoly's Due Process rights under the Fourteenth Amendment of the Constitution;

C.      A declaration that in suspending Dr. Skoly, and maintaining that suspension, Defendants violated Dr. Skoly's First Amendment rights under the Fourteenth Amendment of the Constitution;

D.      A declaration that Defendants violated Dr. Skoly's Due Process rights under the Fourteenth Amendment of the Constitution by making him unemployed and then denying him unemployment benefits;

E.      Injunctive relief restraining and enjoining Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them (*see* Fed. R. Civ. P. 65(d)(2)), and each of them, from enforcing any vaccine mandate against Dr. Skoly that treats him differently from a person with an accepted medical exemption to the mandate, from violating his First Amendment rights, and from improperly denying him unemployment benefits;

F.      Nominal damages on Counts I, II and III;

G.      The payment of the unemployment benefits to which he is entitled (about $15,300);

H.      Attorney's fees pursuant to 42 U.S.C. § 1988; and

I.      Any other just and proper relief.

### JURY DEMAND

Plaintiffs herein demand a trial by jury of any triable issues in the present matter.

April 26, 2022

Respectfully submitted,

/s/ *Brian Rosner*

Brian Rosner*
Senior Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
Brian.Rosner@NCLA.legal
* Admitted only in New York. DC practice
limited to matters and proceedings before
United States courts and agencies. Practicing
under members of the District of Columbia Bar.

/s/ *Jenin Younes*

Jenin Younes*
Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
jenin.younes@ncla.legal
* Admitted only in New York. DC practice
limited to matters and proceedings before
United States courts and agencies. Practicing
under members of the District of Columbia Bar.

/s/ Gregory Piccirilli

Gregory Piccirilli, Esq., #4582
148 Atwood Ave., #302
Cranston, Rhode Island 02920
Telephone: (401) 578-3340
gregory@splawri.com

/s/ Christy B. Durant

Christy P. Durant, Esq. #7128
875 Centerville Road
Building 4, Unit #12
Warwick, RI 02886
Telephone: (401) 524-6971
Facsimile: (401) 825-7722

*Attorneys for Plaintiff*

23

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I filed the within via the ECF filing system and that a copy is available for viewing and downloading. I have also caused a copy to be sent via the ECF System to counsel of record on this 26th day of April, 2022.

/s/Gregory Piccirilli