## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **DR. STEPHEN T. SKOLY, Jr.,** | |
| *Plaintiff,* | **C.A. 1:22-cv-00058-MSM-LDA** |
| v. | |
| **DANIEL J. McKEE, sued in his official and individual capacities as the Governor of the State of Rhode Island; NICOLE ALEXANDER-SCOTT, sued in her official and individual capacities as the former Director of the Rhode Island Department of Health; JAMES McDONALD, sued in his official and individual capacities as the former Interim Director of the Rhode Island Department of Health; UTPALA BANDY, sued in her official and individual capacities as the current Interim Director of the Rhode Island Department of Health; MATTHEW D. WELDON, sued in his official and individual capacities as the Director of the Rhode Island Department of Labor and Training; the STATE OF RHODE ISLAND; the RHODE ISLAND DEPARTMENT OF HEALTH; and the RHODE ISLAND DEPARTMENT OF LABOR AND TRAINING.** | **THIRD AMENDED COMPLAINT** |
| *Defendants.* | |

Plaintiff, by and through his attorneys at the New Civil Liberties Alliance ("NCLA") and Gregory Piccirilli, Esq., hereby complains and alleges the following:

### INTRODUCTORY STATEMENT

1.    Dr. Stephen T. Skoly, Jr., is one of Rhode Island's handful of oral and maxillofacial surgeons.

1

2.      By means of a Notice of Violation and Compliance Order in effect between October 1, 2021, and March 11, 2022, Rhode Island state officers, under color of state law, arbitrarily and unlawfully prevented Dr. Skoly from practicing dentistry, forcing him to shut down his 11-person dental facility.

3.      In compelling the closure of Dr. Skoly's dental practice, the state officers deprived Dr. Skoly of his rights to Equal Protection and Due Process of Law secured by the Fourteenth Amendment of the U.S. Constitution.

4.      The state officers also deprived Dr. Skoly of his First Amendment rights, and, during the period of his unemployment, improperly denied him unemployment benefits.

5.      The state officers harmed hundreds of Rhode Island patients, including its most vulnerable (*i.e.*, residents of the State's psychiatric hospital and its prison), by depriving them of Dr. Skoly's services.

6.      In this action, Dr. Skoly seeks damages for the past violations, declarations that the current vaccine mandate deprives him of his constitutional rights, and injunctions against current and future deprivations.

## JURISDICTION AND VENUE

7.      This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because the federal law claims arise under the Constitution and statutes of the United States. This action is brought pursuant to 42 U.S.C. § 1983.

8.      Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because the events giving rise to the claim occurred in this District.

9.      This Court may issue a declaratory judgment and grant permanent injunctive relief pursuant to 28 U.S.C. §§ 2201-2202.

**PARTIES**

10.     Plaintiff Dr. Stephen T. Skoly, Jr. ("Dr. Skoly") is an oral and maxillofacial surgeon licensed to practice in the State of Rhode Island.

11.     Defendant Daniel J. McKee is the Governor of the State of Rhode Island, authorized by the state's law to promulgate and implement, directly or through his subordinates, emergency regulations to address health emergencies such as COVID-19. He is sued in his individual and official capacities.

12.     Defendant Nicole Alexander-Scott is the former Director of the Rhode Island Department of Health, subordinate to and appointed by the Governor. She is sued in her individual and official capacities. For the period from October 1, 2021 to January 27, 2022, when her term ended, she was responsible for the issuance and maintenance of the Notice of Violation and Compliance Order that prohibited Dr. Skoly from practicing his trade.

13.     Defendant James McDonald is the former Interim Director of the Rhode Island Department of Health, subordinate to and appointed by the Governor. He is sued in his individual and official capacities. He was responsible for the maintenance of the Notice of Violation and Compliance Order after Director Alexander-Scott's resignation. His term ended June 29, 2022.

14.     Defendant Utpala Bandy is the current Interim Director of the Rhode Island Department of Health (following the departure of Defendant McDonald), subordinate to and appointed by the Governor. She is sued in her individual and official capacities.

15.     Defendant Matthew D. Weldon is the Director of the Rhode Island Department of Labor and Training, subordinate to and appointed by the Governor. He is sued in his individual and official capacities.

16.     The State of Rhode Island is the sovereign State of Rhode Island.

17.     The Rhode Island Department of Health ("RIDOH") is an agency of the State of Rhode Island.

18.     The Rhode Island Department of Labor and Training ("RIDLT") is an agency of the State of Rhode Island.

19.     Collectively, Governor McKee, Directors Alexander-Scott, McDonald, Utpala and Weldon, Rhode Island, RIDOH and RIDLT are referred to as "Defendants."

## STATEMENT OF FACTS

### I.     DR. SKOLY'S DENTAL AND SURGICAL PRACTICE

20.     Prior to October 1, 2021, Dr. Skoly operated Associates in Oral and Maxillofacial Surgery, a private dental and surgical practice in Cranston, Rhode Island.

21.     Dr. Skoly and his five surgical assistants treated forty patients a day, excluding emergencies, five days a week.

22.     The procedures Dr. Skoly and his staff performed ranged from simple dental extractions to complex surgical procedures.

23.     Dr. Skoly did not charge patients in need.

24.     In addition to his private practice, which comprised approximately 95% of his patients, Dr. Skoly was retained by the State of Rhode Island to provide oral and maxillofacial services to residents of the State's institutions.

25.     In this capacity, Dr. Skoly was an oral and maxillofacial surgeon—and for the past 17 years, the only oral and maxillofacial surgeon—contracted to provide services for residents of the Eleanor Slater Hospital, the State's psychiatric rehabilitative hospital operated by the Rhode Island Department of Behavioral Healthcare, Developmental Disabilities & Hospitals.

4

26.     Eleanor Slater is an institutional facility for patients with acute and long-term physical illnesses, and patients with mental health conditions.

27.     Eleanor Slater contains a unit that houses psychiatric inmates confined under the authority of the Rhode Island Department of Corrections.

28.     Since 1990, Dr. Skoly was also the only oral and maxillofacial surgeon at the Adult Correctional Institute ("ACI"), the State's penitentiary complex in Cranston.

29.     Dr. Skoly performed 10 to 20 procedures during his weekly visits to ACI.

30.     Complex surgeries required Eleanor Slater and ACI residents to be transported to the more sophisticated operating theatre at Dr. Skoly's Cranston oral and maxillofacial facility.

31.     Dr. Skoly serviced an institutionalized patient in his Cranston office about every day.

32.     The institutionalized patients could not travel to the Cranston office by themselves. They needed to be accompanied by facility staff members.

33.     Armed guards accompanied the prisoners.

34.     Dr. Skoly designed his Cranston dental facility to include a large elevator to accommodate the type of gurney transported in an ambulance so that patients being brought from Eleanor Slater Hospital could easily and safely access the oral and maxillofacial operatories.

35.     In treating the residents of Eleanor Slater and ACI, Dr. Skoly worked in prolonged and close physical contact with the institutions' health care workers and other employees. They were accustomed to this work environment and trained to utilize the strictest measures of infection control even prior to the pandemic.

## II.    DURING THE PANDEMIC, DR. SKOLY AND HIS STAFF CONTINUED TO SERVE HIS COMMUNITY

36.    When COVID-19 lockdowns began in March 2020, Dr. Skoly and his staff continued to treat patients in person, the only way that dental procedures can be performed.

37.    As an oral and maxillofacial surgeon, Dr. Skoly and his staff engaged in scrupulous masking and other hygiene requirements.

38.    They supplemented these procedures with safety precautions and guidelines recommended by the RIDOH Provider Advisory, the CDC Health Advisory, OSHA, the American Dental Association and the American Association of Oral and Maxillofacial Surgeons.

39.    Dr. Skoly and his staff held daily meetings to discuss and educate themselves about the safety precautions, and to confirm that they were being followed strictly.

40.    Dr. Skoly is not aware of any patient out of the eight hundred served monthly who tested positive for COVID-19 because of treatment at Dr. Skoly's facility.

41.    In November 2020, likely while treating a resident of the psychiatric hospital or the prison, Dr. Skoly contracted COVID-19.

42.    After a quarantine period, Dr. Skoly returned to work.

## III.    THE TEMPORARY EMERGENCY REGULATION AND OCTOBER 1, 2021 COMPLIANCE ORDER

### A)    The First Temporary Emergency Regulation

43.    On August 17, 2021, the Governor, through the RIDOH, promulgated a temporary emergency regulation 216-RICR-20-15-8 ("Temporary Emergency Regulation") mandating that "all health care workers and health care providers be vaccinated against COVID-19 by October 1, 2021."

6

44.     The Temporary Emergency Regulation applied to Dr. Skoly, who, under Rhode Island law, is a "health care provider." Although licensed to provide healthcare services, Dr. Skoly is not a "healthcare worker," who is someone who works in a healthcare facility, not a private dental office such as Dr. Skoly's.

45.     The justification for the vaccine mandate was the protection of "vulnerable populations."

46.     As stated on Rhode Island's government website:

Health care workers and providers interact with Rhode Island's most vulnerable populations: individuals who are immunocompromised and individuals with co-morbidities. These vulnerable populations are at risk for adverse health outcomes from COVID-19. As COVID-19 positive individuals are often asymptomatic or presymptomatic, health care workers and health care providers may unintentionally spread infection to these vulnerable patients. In order to protect these vulnerable populations, RIDOH is mandating that all health care workers and health care providers be vaccinated against COVID-19 by October 1, 2021 (emphasis added).

47.     The vaccine mandate permitted medical exemptions for severe or immediate allergic reaction to the vaccine, or a component of the vaccine, or a history of myocarditis or pericarditis.

48.     No other medical exemption was permitted.

49.     As a condition of continued employment, the recipient of a medical exemption was "required to wear a procedure mask or higher-grade mask (*e.g.*, KN95 or N95) in the course of their employment."

50.     Other than masking, the vaccine mandate placed no restriction on the medically exempt worker's presence in the facility or the physical interaction between the vulnerable patient and the medically exempt worker.

51.     The vaccine mandate allowed the N95 masked medically exempt worker to interact with a patient just as a vaccinated worker would.

52.     Between October 1, 2021, and March 11, 2022, the Defendants medically exempted between 299 and 365 Rhode Island health care workers from the vaccine mandate.

*B)     Dr. Skoly's Decision to Not Be Vaccinated*

53.     In 2006, Dr. Skoly contracted Lyme disease, which caused two attacks of Bell's Palsy.

54.     The palsy paralyzed the muscles around Dr. Skoly's eyes. The muscles around his right eye still display a mild residual droopiness that worsens when Dr. Skoly is experiencing fatigue.

55.     Dr. Skoly was aware of medical literature demonstrating an association between COVID-19 vaccination and the onset of Bell's Palsy.

56.      In September 2021, Dr. Skoly tested positive for IgG COVID-19 antibodies.

57.     After consulting with his doctor and making a risk-benefit analysis that took into consideration his naturally acquired immunity as well as his history of Bell's Palsy, Dr. Skoly determined that it was in his medical best interests not to get vaccinated at that time.

58.     On September 30, 2021, Dr. Skoly discussed his decision with a journalist, who reported the conversation in *The Providence Journal.*

*C)     The Compliance Order*

59.     On October 1, 2021, pursuant to Rhode Island Statutes § 23-1-20, Defendant Alexander-Scott issued Dr. Skoly a Notice of Violation and Compliance Order.

60.     The Notice of Violation and Compliance Order made the factual finding that, "On October 1, 2021, the Providence Journal reported that Respondent [Dr. Skoly] stated that (a) he

8

was not vaccinated, (b) did not meet the medical exemption incorporated in the regulation, and that he intended to directly engage in patient care or activity in which he or others would potentially be exposed to infectious agents that can be transmitted from person to person."

61.     Based on the above finding, the Notice of Violation and Compliance Order directed Dr. Skoly "to cease professional conduct as a health care provider … unless and until he has complied with the terms and conditions of 216-RICR-20-15-8."

62.     Dr. Skoly complied.

63.     He closed his private practice (two hundred patients a week) and ceased serving the residents of Eleanor Slater and ACI.

64.     Dr. Skoly terminated the employment of his five surgical assistants and other staff.

65.     Hoping one day to be allowed to rehire a staff and resume practice, he continued to pay his $7,000 monthly rent and other overhead.

66.     In support of the Notice of Violation and Compliance Order, Defendants caused ACI to post at several locations within its buildings a poster of Dr. Skoly with the warning that he was not to be permitted on ACI's premises.

### IV.   EVENTS BETWEEN THE NOTICE OF VIOLATION AND COMPLIANCE ORDER AND ITS MARCH 11, 2022 RESCISSION

*A)    State Officers Suspend Dr. Skoly, and Maintain the Suspension Until March 2022, as Punishment for His Publicly Questioning the Vaccine Mandate*

67.     Per the governing statute, Rhode Island Statutes § 23-1-20, the Notice of Violation and Compliance Order includes a proposed Compliance Order. The Order does not become permanent ("effective" in the words of the statute) unless found to have been properly issued after an administrative hearing.

68.     After his October 1, 2021 suspension, Dr. Skoly promptly commenced a Rhode Island administrative proceeding to prevent the proposed order from becoming effective.

69.     Among other things, Dr. Skoly argued that he should be allowed to practice while unvaccinated, just like the medically exempt health workers who were being allowed to practice while unvaccinated so long as they wore N95 masks in the course of treating patients. Defendants Alexander-Scott, McDonald and McKee were urged to review Dr. Skoly's request in the context of Rhode Island's critical shortage of health care providers and the suspension's adverse impact on Dr. Skoly's numerous patients (including those in the middle of treatment or at the state institutions), many of whom were unable to obtain alternative dental services.

70.     Dr. Skoly requested that he be qualified as medically exempt based on his medical history of Bell's Palsy, as the vaccine was linked to Bell's Palsy paralysis.

71.     He explained that he did not present any greater danger of infection to vulnerable patients than the unvaccinated medically exempt worker.

72.     His dental practice implemented the extreme masking and safety precautions required by the dental profession, he explained. These practices had succeeded in fully protecting his vulnerable patients from infection in the past, so they could reasonably be relied upon to protect his vulnerable patients in the future.

73.     Dr. Skoly further explained that he was fully N95 masked, just like the several hundred unvaccinated medically exempt (and, it was noted, the infected but vaccinated health care workers allowed to work due to the health practitioner shortage).

74.     And Dr. Skoly explained that he had natural immunity. Because of his prior

10

infection, he had a positive level of IgG Covid-19 antibodies. The scientific literature was unequivocal that, as a COVID-recovered individual, the risk of infection he posed to a vulnerable patient was no greater than the risk posed by a vaccinated doctor.

75.     Defendants Alexander-Scott, McDonald and McKee rejected Dr. Skoly's arguments.

76.     Dr. Skoly was told, with the knowledge and approval of Defendants Alexander-Scott, McDonald, and McKee, that the issue was not about safety, science or medicine.

77.     Rather, Dr. Skoly was informed that, because he had "opened his big mouth" by speaking to the press, he had made his suspension a political issue, not a medical one. Therefore, with the knowledge and approval of Defendants Alexander-Scott, McDonald and McKee—who could have rescinded the Notice of Violation and Compliance Order—Dr. Skoly was told that his choice was to submit to vaccination or to stay suspended.

*B)   Rhode Island Denies Dr. Skoly Unemployment Benefits Because He "Is Not Actively Looking for Work"*

78.     Dr. Skoly applied to the Rhode Island Department of Labor and Training ("RIDLT") for unemployment benefits following his suspension from practice.

79.     RIDLT informed Dr. Skoly that, based upon his years of employment, he had "earned enough to qualify for unemployment benefits" of $661.00 a week.

80.     RIDLT denied Dr. Skoly's application.

81.     A prerequisite for the receipt of unemployment benefits under Rhode Island law, § 28-44-12, is that the applicant be actively looking for work.

82.     In RIDLT's view, Dr. Skoly had chosen to be unemployed: "As you are refraining from vaccination, you are considered as removing yourself from the Labor Market in your chosen field of labor, the medical field."

11

83.     RIDLT acknowledged that the Notice of Violation and Compliance Order prevented Dr. Skoly from working as a doctor and that any non-medical potential employer—the RIDLT referee had suggested Walmart as a possibility—would not hire Dr. Skoly "aware that once reinstated, he will return to work at his practice."

84.     However, RIDLT explained, "the work search requirements under the Act do not permit the Board to consider mitigating factors such as futility."

85.     Therefore, RIDLT concluded, unemployment benefits would be denied because "the Claimant has not conducted a work search as required by Section 28-44-12 of the Act."

*C)     Dr. Skoly Files a Complaint Against the State Defendants*

86.     In February 2022, Dr. Skoly commenced this lawsuit.

87.     Dr. Skoly argued that, by suspending him from practice, the state actors were violating his right to the Equal Protection of Law and Due Process.

*i)      Denial of Equal Protection*

88.     Dr. Skoly's Equal Protection argument was predicated on the incontestable fact that, in terms of patient safety, the state actors were treating N95 masking as the equivalent of vaccination.

89.     Since the October 1, 2021 commencement of the vaccine mandate, the state actors had permitted medically exempt health care workers to be physically present in health care facilities, and treat vulnerable patients, so long as the workers wore an N95 mask "in the course of their employment."

90.     As an oral and maxillofacial surgeon, Dr. Skoly always wore an N95, or a better mask, when treating patients during the pandemic.

12

91.     Therefore, Dr. Skoly argued, it was capricious to treat him and the medically exempt worker differently—allowing the medically exempt worker to be employed while requiring Dr. Skoly to suspend his practice.

92.     The state actors' belief in the efficacy of N95 masking was so great, Dr. Skoly noted, that they even allowed vaccinated health care workers *currently infected with COVID-19* to work in close proximity to vulnerable patients so long as the worker wore an N95 mask.

*ii)     Denial of Due Process*

93.     Dr. Skoly also pleaded that the State was violating his right to Due Process of Law by refusing to issue him a medical exemption based on his history of Bell's Palsy paralysis and his prior COVID infection.

94.     That Bell's Palsy is a risk factor for COVID-19 vaccination has been documented in the scientific literature, including the CDC's VAERS Report.

95.     Dr. Skoly feared that vaccination would re-activate the Bell's Palsy paralysis that, according to the scientific literature, is dormant in his body.

96.     In the medical opinion of Dr. Pappas, cited in the Complaint, Dr. Skoly's fear was "well-grounded in the existing science."

97.     Dr. Pappas opined, "In view of Dr. Skoly's known history of Bell's Palsy, his confirmed natural immunity from prior COVID-19 infection and known protection it provides, the potential debilitating effect a recurrent Bell's Palsy incidence can produce, and the recently observed increased incidences of Bell's Palsy related to COVID-19 vaccines, it is my medical opinion that Dr. Skoly should not get a COVID-19 vaccine.  The potential significant harm to Dr.

Skoly outweighs any benefit vaccination would incur to him or any patient he treats, particularly if he adheres to the strict masking protocols of dental surgery."

98.     The Complaint further argued that, because of his naturally acquired immunity, the infection risk that Dr. Skoly presented to a vulnerable patient was no greater than that presented by a vaccinated doctor, certainly smaller than that presented by the unvaccinated worker (exempt for medical or religious reasons), and drastically smaller than that presented by the COVID-19 infected health care workers being permitted to work in close physical proximity to patients (because of the shortage created by not permitting people like Dr. Skoly to practice medicine).

> D)     *The Scheduled Hearings and Revised Vaccine Mandates*

99.     Upon Dr. Skoly's motion, the Court scheduled a Preliminary Injunction Hearing for February 23, 2022.

100.    On February 11, 2022, State Defendant McKee extended the Temporary Emergency Order, which had been set to expire on February 13, to March 13, 2022.

101.    The substance of the Extended Temporary Emergency Order was identical to the original Temporary Emergency Order.

102.    On February 18, 2022, Dr. Skoly filed an Amended Verified Complaint to address the extension of the Emergency Order.

103.    Based upon the new filing, the Court adjourned the Preliminary Injunction Hearing to March 15, 2022.

104.    On February 24, 2022, Defendants McDonald and McKee proposed a permanent vaccine regulation ("Proposed Permanent Vaccine Regulation") to replace the Extended Temporary Emergency Regulation.

105.    The Proposed Permanent Vaccine Regulation accepted two core arguments that Dr. Skoly and his counsel had advanced in urging that Dr. Skoly be allowed to practice while unvaccinated.

106.    First, the Proposed Permanent Vaccine Mandate applied only to "health care workers," not "health care providers" who worked in a private practice, such as Dr. Skoly.

107.    By excluding private dental practices from the vaccine mandate, Defendants implicitly acknowledged, as Dr. Skoly and counsel had argued, that a vaccine mandate was not necessary for private dental practices because of the already extreme safety precautions in place at such practices.

108.    Second, the Proposed Permanent Vaccine Mandate permitted the health care worker to choose to be vaccinated or N95 masked.

109.    The proposed language was "health care workers [are] to be up to date with a SARS-CoV-2 vaccine OR wear a medical grade N95 mask when the [COVID-19] prevalence rate is high" (emphasis added). "High" prevalence was defined as "greater than fifty (50) cases per one hundred thousand (100,000) people per week, "as reported by the Department." No vaccination or masking would be required when the COVID-19 prevalence rate was low—less than fifty cases per one hundred thousand people per week.

110.    That patient safety would be maintained by allowing workers to be either vaccinated or N95 masked is the premise of the Equal Protection argument advanced by Dr. Skoly to this Court: Since patients are protected by N95 masking, it was a denial of equal protection to allow some unvaccinated, N95 masked workers to be employed (the medically exempt) while denying employment to the unvaccinated, N95 masked Dr. Skoly.

111.    In promoting the "vaccination or N95 masking" rule, Defendants McDonald and McKee even used legal language that Dr. Skoly had advanced to this Court.

112.    Defendants' memorandum in support of the "vaccination or N95 masking" rule explained that "Individuals' beliefs must be respected and thus vaccination mandates must not be imposed *capriciously*. Thus, a reasonable alternative to being up to date [with vaccines] is to wear a medical grade N95 mask …" (emphasis added).

113.    Arbitrary and capricious is how the Complaint described the Defendants' continued suspension of a Dr. Skoly willing to be N95 masked.

114.    Based on Defendants' admission that the continued suspension of Dr. Skoly constituted "capricious" action on their part, on March 3, 2022, Dr. Skoly moved for a TRO to resume practice immediately.

115.    Defendants McDonald and McKee opposed the motion.

116.    They claimed that when talking about acting "capriciously," they were speaking prospectively only, and they had no intent to describe a present reality.

117.    Defendant McKee's and McDonald's opposition to Dr. Skoly's immediate reinstatement continued the deprivation of Dr. Skoly's rights.

118.    Defendants' opposition was at odds with their written acknowledgement of the arbitrariness of denying the ability to practice to unvaccinated but N95 masked health care workers, like Dr. Skoly. The only logical explanation of Defendants' opposition was a continuation of their desire to punish Dr. Skoly for publicly opposing the vaccine mandate.

119.    The Court merged consideration of the TRO motion into the pending March 15th Preliminary Injunction Hearing.

120.    At the March 15th hearing, Dr. Skoly planned to introduce testimony about natural immunity from two experts, an Emergency Room doctor who had treated hundreds of COVID-19 patients, and a renowned researcher and CDC-award recipient.

121.    These experts would have testified that, based on the unequivocal science as currently understood, COVID-recovered immunity is more long-lasting, and more effective against more variants, than vaccination immunity, so there was no scientific basis to require that Dr. Skoly be vaccinated.

122.    They would have testified further that Dr. Skoly always presented a lower risk of infecting his patients than a vaccinated healthcare worker who was not COVID-recovered, than an unvaccinated not naturally immune healthcare worker, or than a COVID-19 infected healthcare worker permitted (while N95 masked) to work in close physical proximity to patients.

123.    On March 11, 2022, four days prior to the scheduled hearing, Defendants replaced the Extended Temporary Emergency Order with the New Temporary Emergency Rule, "Requirement for Protection Against COVID-19 for Health Care Workers in Licensed Health Care Facilities."

124.    The New Temporary Emergency Rule adopted the language of the Proposed Permanent Rule.

125.    As applied to practitioners such as Dr. Skoly, the vaccine mandate had been rescinded.

126.    On March 11, 2022, Dr. Skoly and Defendants ended the state administrative proceeding that was determining the validity of the Notice of Violation and Compliance Order.

127.    Per a stipulation, Defendants withdrew the Compliance Order ("The Compliance Order is withdrawn by RIDOH"), and Dr. Skoly withdrew his request for an administrative hearing.

128.    The proposed Compliance Order had not, and would never, become "effective" per the governing Rhode Island statute.

129.    Dr. Skoly began the laborious process of re-assembling a staff to resume practice.

130.    In this Court, Dr. Skoly withdrew his motion for a preliminary injunction.

131.    In April 2022, Dr. Skoly moved to file a Second Amended Complaint to, among other things, bring to the Court's attention the terms of what was thought to be the final vaccine mandate (the March 2022 New Temporary Emergency Rule). The Court approved the motion on June 2, 2022.

132.    In the interim, however, on May 25, 2022, Rhode Island promulgated its permanent COVID vaccine mandate ("Permanent Vaccine Mandate"), effective June 15, 2022. 216-RICR-20-15-7: "Immunization, Testing, and Health Screening for Health Care Workers"

133.    As does the New Temporary Emergency Rule and the Proposed Permanent Vaccine Regulation, the June 2022 Permanent Vaccine Mandate applies to "health care workers" only, not "health care providers" such as Dr. Skoly. 216-RICR-20-15-7.6.1(B).

134.    And, as far as Dr. Skoly may ever be considered a "health care worker" if he works physically at the premises of the "health care facilities" Eleanor Slater or ACI, the Permanent Vaccine Regulation requires either vaccination or, during high COVID prevalence, N95 masking. 216-RICR-20-15-7.6.1(B)(1) and (2).

135.    However, the Permanent Vaccine Regulation adds a newly formulated, not-publicly-discussed third section: "In accordance with the [Centers for Medicare and Medicaid

18

Services] (CMS) 86 FR 61555, all Medicare and Medicaid certified providers, suppliers, and healthcare workers are required to receive the primary series (e.g., two (2) doses of Pfizer or Moderna, or one (1) dose of Johnson & Johnson) of a COVID-19 vaccine." 216-RICR-20-15-7.6.1(B)(3).

136.     The CMS interim final rule, 86 FR 61555, allows for limited medical exemptions, not including Bell's Palsy.

137.     Thus, for CMS facilities, the Permanent Vaccine Regulation's new third section, 7.6.1(B)(3), rescinds the "vaccination or N95 masking" rule and reimposes the arbitrary discrimination that violates Equal Protection.

138.     This rule prevents Dr. Skoly from resuming his practice at the physical premises of the "Health Care Facilities" Eleanor Slater and ACI.

139.     As did the previous Rhode Island mandate, the new third section of the Permanent Vaccine Mandate irrationally discriminates between different types of unvaccinated health care workers—the preferred unvaccinated (those with accepted medical exemptions) are allowed to wear N95 masks and work, and the unpreferred (those with a not accepted medical condition, or natural immunity, or a religious belief) are compelled to suffer loss of livelihood however willing to be N95 masked.

140.     Defendants' deprivations of Dr. Skoly's rights continue to harm him.

141.     The Compliance Order in effect between October 1, 2021 and March 11, 2022 was a proposed order. It was not permanent or "effective" until found to be valid after a state administrative hearing.

19

142.    In March 2022, the parties agreed that the proposed Order would never become "effective": Dr. Skoly stipulated to withdraw his request for a hearing in exchange for Defendants' agreement to withdraw the proposed Order.

143.    To Dr. Skoly's detriment, Defendants have not honored the agreement.

144.    The "licensing" section of Defendants' RIDOH website contains a page entitled "Find Disciplinary Actions and Orders." https://health.ri.gov/lists/disciplinaryactions/ (last visited August 18, 2022).

145.    The website page identifies Rhode Island professionals who have been the subject of final disciplinary action.

146.    Proposed actions are not included on this website: "Actions/orders that are under investigation are not posted." https://health.ri.gov/lists/disciplinaryactions/ (last visited August 18, 2022).

147.    Nonetheless, at present, the website posts the October 1, 2021 Notice of Violation and Compliance Order as a final disciplinary action against Dr. Skoly.

148.    Defendants' posting is false. The Compliance Order against Dr. Skoly was proposed, never final or (in the statute's words) "effective"; and the proposed order was, per the stipulation ending the administrative hearing, withdrawn.

149.    Defendants' false posting has caused and continues to cause, financial and reputational harm to Dr. Skoly.

150.    The Defendants identify Dr. Skoly as a practitioner who has been subject to professional discipline. Patients seeking professional assistance visit this website to learn about practitioners. The false information about Dr. Skoly causes the viewer to think that Dr. Skoly is not a reputable practitioner and deters that viewer from choosing Dr. Skoly as his dental surgeon.

151.    Insurance carriers have visited the website and informed Dr. Skoly that the adverse information listed there requires that they not reimburse him for services he has performed. The false listing that he is a disciplined practitioner also raises the possibility of his being delisted by insurers as a practitioner permitted to be reimbursed by insurance.

152.    Though requested to do so, Defendants have refused to correct the RIDOH website.

### CLAIMS FOR RELIEF

#### COUNT I: VIOLATION OF THE EQUAL PROTECTION CLAUSE AND 42 U.S.C. § 1983 (AGAINST DEFENDANTS MCKEE, ALEXANDER-SCOTT, MCDONALD AND BANDY)

153.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

154.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state may "deny to any person within its jurisdiction the equal protection of the laws."

155.    Under the Equal Protection Clause, state and local governments and government officials may not arbitrarily discriminate among citizens, denying without justification rights or benefits to some citizens that are made available to other similarly situated citizens.

156.    Between October 1, 2021, and March 11, 2022, Defendants McKee, Alexander-Scott and McDonald deprived Dr. Skoly of his rights under the Equal Protection Clause by preventing him from practicing medicine, while allowing other healthcare workers who presented no lesser risk to the public to treat patients.

157.    Patient protection was stated as the sole justification for the various Temporary

Emergency Regulations prohibiting healthcare workers and providers from being present in a health care facility, or working in close proximity to a patient, unless vaccinated.

158.   Nonetheless, between October 2021 and March 2022, Defendants McKee, Alexander-Scott and McDonald permitted hundreds of medically exempt unvaccinated health care workers to work in close proximity to patients provided they wore N95 masks.

159.   By granting these exemptions, Defendants McKee, Alexander-Scott and McDonald implicitly accepted the proposition that, in terms of patient safety, N95 masking was an acceptable safety alternative to vaccination.

160.   Indeed, they considered the N95 mask such a surety of patient protection that they allowed vaccinated, N95 masked health care workers with active COVID-19 infections to work with vulnerable patients.

161.   Between October 1, 2021 and March 11, 2022, Defendants McKee, Alexander-Scott and McDonald had no rational basis on which to treat the masked, unvaccinated Dr. Skoly differently from (and worse than) the masked, unvaccinated medically exempt worker, or the masked vaccinated worker with an active infection.

162.   Defendants McKee, Alexander-Scott and McDonald deprived Dr. Skoly of his right to equal protection of the laws and caused him to suffer financial damages, in an amount to be calculated at trial, consisting of, among other things, lost income and uncompensated expenses, such as rent and equipment leasing.

163. Injunctive relief is also necessary.

164.   Rhode Island's COVID vaccine mandate in effect from October 1, 2021 to March 11, 2022 violated equal protection by allowing the unvaccinated, N95 masked, medically exempt

workers to keep their jobs while forcing unemployment on the N95 masked, unvaccinated Dr. Skoly.

165.    Although that vaccine mandate is no longer in effect, for a subset of workers ("Medicare and Medicaid certified providers, suppliers, and healthcare workers"), the Permanent Vaccine Regulation rescinds the "vaccination or N95 masking" rule and reimposes the distinction between the medically exempt unvaccinated (allowed to work) and the not medically exempt unvaccinated (not allowed to work).    216-RICR-20-15-7.6.1(B)(3).

166.    Thus, this new vaccine mandate—enforced by Defendant Bandu as the current Interim RIDOH Director—violates Equal Protection for all the reasons previously argued.

167.    This rule prevents Dr. Skoly from resuming his practice at the physical premises of the "Health Care Facilities" Eleanor Slater and ACI.

168.    Dr. Skoly requests a declaration that section 7.6.1(B)(3) violates his right to Equal Protection of the laws, and a permanent injunction that, in the application of the Permanent Vaccine Regulation, he be treated no differently than the unvaccinated medically exempt worker.

169.    Dr. Skoly also requests relief for the damage caused by Defendants' RIDOH website posting of the Notice of Violation and Compliance Order after March 1, 2022.

170.    Dr. Skoly requests damages (compensatory, nominal and for reputational harm) and a permanent injunction removing the website posting.

### COUNT II:  VIOLATION OF DUE PROCESS CLAUSE AND 42 U.S.C. § 1983
### (AGAINST DEFENDANTS MCKEE, ALEXANDER-SCOTT, MCDONALD AND BANDY)

171.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

172.    The Due Process Clause of the Fourteenth Amendment provides that no State "shall

deprive any person of life, liberty, or property, without due process of law."

173.    The touchstone of due process is protection of the individual against arbitrary government action.

174.    Dr. Skoly has a liberty interest in pursuing the profession in which he was trained (and has practiced) for 38 years, a property interest in his practice, and a liberty interest in not undergoing an unnecessary medical procedure that poses a risk of harm to him. Notably, that risk of harm from an unnecessary medical procedure is greater for Dr. Skoly than it is for the average individual given Dr. Skoly's medical history of Bell's Palsy.

175.    Between October 1, 2021, and March 11, 2022, Defendants McKee, Alexander-Scott and McDonald denied Dr. Skoly Due Process by refusing to exempt him from vaccination.

176.    Defendants refused to acknowledge Dr. Skoly's legitimate, medically-based fear that COVID-19 vaccination might re-ignite his Bell's Palsy paralysis.

177.    Defendants ignored that Dr. Skoly was always willing to be N95 masked—a protective measure that Defendants otherwise accepted as an alternative to vaccination.

178.    Defendants ignored the science of naturally acquired immunity, which establishes that Dr. Skoly has no greater risk of infecting patients (and quite likely a lesser risk) than the vaccinated but not naturally immune healthcare worker.

179.    At the March 15th hearing, Dr. Skoly had planned to introduce testimony about natural immunity from two experts, an Emergency Room doctor who had treated hundreds of COVID-19 patients, and a renowned researcher and CDC-award recipient.

180.    The experts would have testified that, based on the unequivocal science as currently understood, COVID-recovered immunity is more long-lasting, and more effective against more

variants, than vaccination immunity, so there was no scientific basis to require that Dr. Skoly be vaccinated.

181.   They would have testified that Dr. Skoly always presented a lower risk of infecting his patients than a vaccinated healthcare worker who was not COVID-recovered, than an unvaccinated not naturally immune healthcare worker, or than a COVID-19 infected healthcare worker permitted (while N95 masked) to work in close physical proximity to patients.

182.   They would have testified it is utterly irrational to distinguish between the two immunities—permitting the vaccinated to be employed while imposing unemployment on the COVID-recovered, naturally immune.

183.   The science today is even more conclusive than it was in March 2022: In terms of duration, effectiveness, and risk of infecting others, COVID-recovered immunity (natural immunity) is absolutely, at minimum, the equivalent of vaccine immunity. Goldberg, *et al*., Protection and Waning of Natural and Hybrid Immunity to SARS-CoV2 (June 9, 2022), New England Journal of Medicine, https://www.nejm.org/doi/full/10.1056/NEJMoa2118946 (last visited August 18, 2022); Altarawneh, *et al*., Effects of Previous Infection and Vaccinations on Symptomatic Omicron Infections (July 7, 2022), New England Journal of Medicine, 387, 21-23. https://www.nejm.org/doi/full/10.1056/NEJMoa2203965 (last visited August 18, 2022).

184.   Even the CDC has finally admitted that it makes no sense to distinguish between vaccine immunity and natural immunity. As CDC's Dr. Greta Massetti has explained, "Both prior infection and vaccination confer some protection against severe illness, and so it makes the most sense to not differentiate with our guidance or recommendations based on vaccination status at this time." "U.S. CDC no longer recommends students quarantine for COVID-19 exposure,"

Reuters, August 11, 2022, https://www.reuters.com/world/us/us-cdc-no-longer-recommends-students-quarantine-covid-19-exposure-2022-08-11/ (last visited August 18, 2022).

185.    There is not, and never was, any scientific basis to require that Dr. Skoly be vaccinated in order to protect vulnerable patients from infection.

186.    By refusing to allow the naturally immune, Bell's Palsy-prone, Dr. Skoly to work unless vaccinated, Defendants McKee, Alexander-Scott and McDonald deprived Dr. Skoly of his right to Due Process of Law.

187.    This deprivation inflicted financial damage on Dr. Skoly, in an amount to be calculated at trial, consisting of, among other things, lost income and uncompensated expenses, such as rent and equipment leasing. Dr. Skoly also suffered reputational injury as a result of being prohibited from practicing his profession.

188.    Injunctive relief is also warranted.

189.    The newly promulgated Permanent Vaccine Regulation—enforced by Defendant Bandu as the current Interim RIDOH Director—does not affect the bulk of Dr. Skoly's practice. The Permanent Vaccine Regulation does not apply to "health care providers."

190.    However, a portion of his former practice consisted of providing services at "health care facilities" (specifically, Eleanor Slater and ACI) which are subject to a vaccine mandate. 216-RICR-20-15-7.6.1(B)(3).

191.    Section 7.6.1(B)(3) has prevented the unvaccinated (and naturally immune) Dr. Skoly from resuming work on the premises of "health care facilities" Eleanor Slater and ACI.

192.    It is ignorant obscurantism—on the order of claiming the earth is flat, or the sun revolves around the earth—to claim that the COVID-recovered Dr. Skoly presents any greater risk of infection to the vulnerable patient than a vaccinated health care worker.

26

193.    Dr. Skoly requests a declaration that section 7.6.1(B)(3) violates his right to Due Process of Law.

194.    A permanent injunction is also requested. In light of the Permanent Vaccine Regulation's ignorant refusal to acknowledge the science of natural immunity, Defendants should be enjoined from treating the naturally immune Dr. Skoly any differently than the vaccinated worker.

195.    Dr. Skoly also requests relief for the damage caused by Defendants' RIDOH website posting of the Notice of Violation and Compliance Order after March 1, 2022.

196.    Dr. Skoly requests damages (compensatory, nominal and for reputational harm) and a permanent injunction removing the website posting.

### COUNT III: VIOLATION OF THE FIRST AMENDMENT AND 42 U.S.C. § 1983 (AGAINST DEFENDANTS MCKEE, ALEXANDER-SCOTT AND MCDONALD)

197.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

198.    The First Amendment to the United States Constitution prohibits Congress from making laws "abridging the freedom of speech." U.S. Const., amend. I.

199.    "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

200.    As the Supreme Court has recognized, "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more." *Packingham v. North Carolina*, 127 S.Ct. 1730, 1735 (2017).

27

201.    "[A]s a general matter, … government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 573 (2002).

202.    The First Amendment prohibits the government from taking adverse action against a citizen for making public statements that displease the State.

203.    That prohibited retaliation is what occurred here.

204.    Based on his history of Bell's Palsy paralysis, and the proof of his enduring Covid-19 recovered immunity, Dr. Skoly made the medical decision to remain unvaccinated.

205.    On September 30, 2021, Dr. Skoly discussed his decision with a journalist, who reported the conversation in *The Providence Journal*.

206.    The next day—October 1, 2021—Defendant Alexander-Scott issued the Compliance Order suspending Dr. Skoly from practice "unless and until he has complied with the terms and conditions of 216-RICR-20-15-8 [the vaccine mandate]".

207.    Dr. Skoly challenged the Order, pointing out the critical shortage of health care providers and the suspension's adverse impact on Dr. Skoly's numerous patients, many (including those in the middle of treatment or at the State institutions) unable to obtain alternative dental services.

208.    Dr. Skoly requested that he be qualified for a medical exemption based on his history of Bell's Palsy.

209.    Next, he explained, as detailed extensively above, why he did not present any greater danger of infection to vulnerable patients than the unvaccinated medically exempt worker.

210.    As stated earlier, Dr. Skoly was expressly informed that he was being punished for having "opened his big mouth" by speaking to the press.

211.    Defendants McKee, Alexander-Scott and McDonald suspended Dr. Skoly, and maintained that suspension, not for reasons of medicine or science, but as punishment for his speaking out on a public topic in a manner with which they disapproved—that is, they discriminated against him based on the viewpoint expressed in and content of his speech.

212.    "The First Amendment itself ensures the right to respond to speech we do not like, and for good reason.  Freedom of speech and thought flows not from the beneficence of the state but from the inalienable rights of the person.  And suppression of speech by the government can make exposure of falsity more difficult, not less so.  Society has the right and civic duty to engage in open, dynamic, rational discourse.  These ends are not well served when the government seeks to orchestrate public discussion through content-based mandates." *United States v. Alvarez*, 567 U.S. at 718 (2012).

213.    By levying severe punishment (and exacting financial retribution) upon Dr. Skoly for voicing his opinion on vaccine mandates—including depriving him of the ability to earn a living in the field in which he trained and practiced for decades—Defendants McKee, Alexander-Scott and McDonald are responsible for violating his First Amendment right to speak freely.

214.    Dr. Skoly is entitled to compensatory damages caused by the deprivation of his First Amendment rights and a permanent injunction ensuring that he is not deprived of his First Amendment right to speak out against government policy in the future.

### COUNT IV:  VIOLATION OF DUE PROCESS CLAUSE AND 42 U.S.C. § 1983
### (AGAINST DEFENDANTS MCKEE, ALEXANDER-SCOTT, MCDONALD AND WELDON)

215.    Plaintiff realleges and incorporates by reference the foregoing allegations as if fully set forth herein.

216.   After being suspended from practice, Dr. Skoly applied to the Rhode Island Department of Labor and Training ("RIDLT") for unemployment benefits.

217.   RIDLT informed Dr. Skoly that, based upon his years of contributing to the unemployment fund, he had "earned enough to qualify for unemployment benefits" of $661.00 a week.

218.   RIDLT denied the application.

219.   In RIDLT's view, Dr. Skoly had chosen to be unemployed by "refraining from vaccination … [and] removing [him]self from the Labor Market in [his] chosen field of labor, the medical field."

220.   Though acknowledging that the Compliance Order made it a "futility" for Dr. Skoly to search for work, RIDLT nonetheless denied him unemployment benefits because he "has not conducted a work search as required by Section 28-44-12 of the Act."

221.   Dr. Skoly was entitled to be employed in his chosen field, especially since, as discussed extensively above, there was no good reason to prevent him from practicing his profession.

222.   Dr. Skoly did not choose unemployment; rather, Defendants imposed unemployment upon him.

223.   As alleged in Counts One to Three, Defendants imposed that unemployment in violation of Dr. Skoly's First Amendment rights, and rights to Equal Protection and Due Process of Law.

224.   Having created the conditions making Dr. Skoly unemployed (and unemployable in the medical field), and making it futile for him to try to obtain other employment, Defendants violated Dr. Skoly's rights to Due Process of Law by denying him unemployment benefits.

225.    Dr. Skoly is entitled to payment of unemployment benefits for the period October 1, 2021, to March 11, 2022, and an injunction against future unlawful denial of benefits.

### PRAYER FOR RELIEF

Dr. Skoly respectfully requests that the Court enter judgment in his favor and grant the following relief:

A.    Under Count I, compensatory and nominal damages in an amount to be determined at trial, a declaration that the Permanent Vaccine Regulation section 7.6.1(B)(3) as applied to Dr. Skoly violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, and a permanent injunction against the application of section 7.6.1(B)(3) to Dr. Skoly and removing the Notice of Violation and Compliance Order from the Defendants' RIDOH website;

B.    Under Count II, compensatory and nominal damages in an amount to be determined at trial, a declaration that the Permanent Vaccine Regulation section 7.6.1(B)(3) as applied to Dr. Skoly violates Dr. Skoly's Due Process rights under the Fourteenth Amendment of the Constitution, and a permanent injunction against the application of section 7.6.1(B)(3) to Dr. Skoly and removing the Notice of Violation and Compliance Order from Defendants' RIDOH website;

C.    Under Count III, compensatory and nominal damages in an amount to be determined at trial, and a permanent injunction that he not again be deprived of his First Amendment right to speak out against government policy;

D.    Under Count IV, damages in the amount of Dr. Skoly's unpaid unemployment benefits and an injunction against future unlawful denial of benefits.

E.    Attorney's fees pursuant to 42 U.S.C. § 1988; and

F.    Any other just and proper relief.

## JURY DEMAND

Plaintiff hereby demands a trial by jury of any triable issues in the present matter.

August 18, 2022

Respectfully submitted,

/s/ *Brian Rosner*

Brian Rosner*
Senior Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
Brian.Rosner@NCLA.legal
* Admitted only in New York. DC practice
limited to matters and proceedings before United
States courts and agencies. Practicing under
members of the District of Columbia Bar.

/s/ *Jenin Younes*

Jenin Younes*
Litigation Counsel
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
jenin.younes@ncla.legal
* Admitted only in New York. DC practice
limited to matters and proceedings before United
States courts and agencies. Practicing under
members of the District of Columbia Bar.

/s/ Gregory Piccirilli

Gregory Piccirilli, Esq., #4582
148 Atwood Ave., #302
Cranston, Rhode Island 02920
Telephone: (401) 578-3340
Facsimile: (401) 944-3250
gregory@splawri.com


/s/ Christy B. Durant

Christy P. Durant, Esq. #7128
875 Centerville Road
Building 4, Unit #12
Warwick, RI 02886
Telephone: (401) 524-6971
Facsimile: (401) 825-7722

*Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 18th day of August 2022, I caused to be sent via email (with summons or waiver to follow) a true and accurate copy of the within Second Amended Verified Complaint to attorneys for the Defendants:

Michael Field, Esq.
Office of the Attorney General
<u>Mfield@riag.ri.gov</u>


Chrisanne Wyrzykowski
Office of the Attorney General
CWyrzykowski@riag.ri.gov



_____
Brian Rosner

34