UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| _____ : | |
| DR. STEPHEN T. SKOLY, Jr.  : | |
|  : | |
| Plaintiff,  : | |
|  : | |
| vs.  : | C.A. 1:22-cv-00058-JJM-LDA |
|  : | |
| DANIEL J. MCKEE, in his individual and  : | |
| official capacity as the Governor of the State  : | |
| of Rhode Island, et al.  : | |
|  : | |
|  : | |
| Defendants.  : | |
| _____ | |

## DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. PRO. 12(B)(6)

This case concerns Rhode Island's former requirement that certain healthcare professionals be vaccinated against COVID-19.  While this vaccination requirement was effective, Dr. Stephen Skoly (hereafter "Skoly") refused to comply, yet in violation of the applicable Emergency Regulation continued to treat patients in-person.  On October 1, 2022, the Rhode Island Department of Health (hereafter "RI DOH") issued a "Notice of Violation and Compliance Order," directing Skoly to cease in-person treatment, which he did until the Emergency Regulation was no longer effective and the "Notice of Violation and Compliance Order" lifted.  Since March 11, 2022, there has been legal impediment to Skoly returning to his practice unvaccinated, and upon information and belief, Skoly has returned to his practice unvaccinated.  Through

1

this lawsuit, Skoly seeks damages for injuries he alleges were sustained as a result of these events, as well as certain injunctive relief.

## THE RI DOH REGULATIONS

Three different regulations place this case in its proper perspective.

1. <u>The Original Emergency Regulation: October 1, 2021 to March 11, 2022</u>

When this case was originally filed in February 2022, a RI DOH Emergency Regulation (hereafter "the Emergency Regulation" or "216-RICR-20-15-8") was effective and required that "all health care workers and health care providers must be vaccinated [against COVID-19], subject to a medical exemption set forth in Section 8.3(D) of this Part."[1]  *See* Exhibit B.  There is no dispute that Skoly did not qualify

---

[1] A "health care worker" was defined to mean "any person who is temporarily or permanently employed by or at, or who serves as a volunteer in, or has an employment contract with, a health care facility, and has or may have direct contact with a patient in that health care facility.  This may include, but not be limited to, a physician, physician assistant, nurse, nursing assistant, therapist, technician, clinician, behavioral analyst, social worker, occupational, physical or speech therapist, phlebotomist, emergency medical service practitioner, dental personnel, pharmacist, laboratory personnel, autopsy personnel, students and trainees, contractual staff not employed by the health-care facility; other health care providers, including those who have privileges at, but are not employed by, the health care facility; and persons (e.g., clerical, dietary, housekeeping, laundry, security, maintenance, administrative, billing, and volunteers) not directly involved in patient care but potentially exposed, in the course of employment, to infectious agents that can be transmitted from person to person.  This term shall not apply to a patient's family member or friend who visits or otherwise assists in the area of that patient in a health care facility."  216-RICR-20-15-8(8.2.A.5).

A "health care provider" was defined to mean "any person licensed by the Department to provide or otherwise lawfully providing health care services, including, but not limited to, a physician, dentist, nurse, optometrist, podiatrist, physical therapist, social worker, pharmacist, emergency medical service practitioner, or psychologist, provided such person is either directly involved in patient care or potentially exposed to infectious agents that can be transmitted from person to person."  216-RICR-20-15-8(8.2.A.6).

for the medical exemption, which will be discussed, *infra*.  The Emergency Regulation was effective from October 1, 2021 to March 11, 2022.  Third Amended Complaint, ¶ 43.

2.  The Second Emergency Regulation: March 11, 2022 to June 15, 2022

Hours before 216-RICR-20-15-8 was set to expire by operation of law, the RI DOH promulgated a new emergency regulation (hereafter "216-RICR-20-15-9"), which became effective on March 11, 2022.  *See* Exhibit C.  This (second) emergency regulation differed from the original Emergency Regulation in two important respects: (1) it  applied to "health care workers,"[2]  but not health care providers (like Skoly) and (2) it required health care workers to be up to date with all Centers for Disease Control and Prevention (hereafter "CDC") recommended vaccine doses **_or_** to wear a medical grade N95 mask at each health care facility when the COVID-19 prevalence rate in the State is greater than or equal to 50 cases per 100,000 people

---

[2] A "health care worker" was defined as "any person who (A)(i) is temporarily or permanently employed by a health care facility, (ii) serves as a volunteer in a health care facility, or (iii) is compensated by a third (3rd) party that has an agreement with the health care facility to provide staffing services and (B) has or may have direct patient contact in that health care facility.  This may include but not be limited to, a physician, physician  assistant, nurse, nursing assistant, therapist, technician, clinician, behavioral analyst, social worker, occupational, physical or speech therapist, phlebotomist, emergency medical service personnel, dental personnel, pharmacist, laboratory personnel, autopsy personnel, students and trainees, contractual staff not employed by the health-care facility; other health care providers, including those who have privileges at, but are not employed by, the health care facility; and persons (e.g., clerical, dietary, housekeeping, laundry, security, maintenance, administrative, billing, and volunteers) not directly involved in patient care but potentially exposed to infectious agents that can be transmitted from person to person.  This term shall not apply to a patient's family member or friend who visits or otherwise assists in the care of that patient in a health care facility."

per week.  Under this (second) emergency regulation, Skoly was able to return to his practice and remain unvaccinated against COVID-19.

    3.  <u>The Permanent Regulation:  June 15, 2022 to present</u>

On or about June 15, 2022, Emergency Regulation 216-RICR-20-15-9 was replaced with the Permanent Regulation, 216-RICR-20-15-7 (hereafter "Permanent Regulation" or "216-RICR-20-15-7"), which in relevant part tracks the vaccination ***or*** N95 mask requirement of 216-RICR-20-15-9.  *See* Exhibit D.  The Permanent Regulation also incorporates the Center for Medicaid and Medicare Services (hereafter "CMS") requirement that all Medicare and Medicaid certified providers, suppliers, and healthcare workers are required to receive the primary series (e.g., two (2) doses of Pfizer or Moderna, or one (1) dose of Johnson & Johnson) of a COVID-19 vaccine, unless exempt for medical or religious reasons.  *See* 216-RICR-20-15-7 (§7.6.1.B.3).  *See also Biden v. Missouri*, 142 S.Ct. 647, 650 (2022) (recognizing medical and religious exemptions) (application for stay).  Pursuant to this Permanent Regulation, Skoly was able to continue his practice and remain unvaccinated.

## FACTUAL BACKGROUND

On August 17, 2021, the RI DOH promulgated Emergency Regulation (216-RICR-20-15-8), requiring "all health care workers and health care providers be vaccinated against COVID-19 by October 1, 2021."  Third Amended Complaint, ¶ 43.  Skoly refused to comply with the Emergency Regulation and on October 1, 2021, under the authority of R.I. Gen. Laws § 23-1-20, the RI DOH issued a "Notice of

Violation and Compliance Order."[3]  Third Amended Complaint, ¶ 59.  The "Notice of

Violation and Compliance Order" stated, in relevant part:

> On October 1, 2021, the Providence Journal reported that Respondent
> [Dr. Skoly] stated that (a) he was not vaccinated, (b) did not meet the
> medical exemption incorporated in the regulation, and that he intended
> to directly engage in patient care or activity in which he or others would
> potentially be exposed to infectious agents that can be transmitted from
> person to person.  Third Amended Complaint, ¶ 60.

The "Notice of Violation and Compliance Order" directed Skoly "to cease professional

conduct as a health care provider * * * unless and until he has complied with the

terms and conditions of 216-RICR-20-15-8."  Third Amended Complaint, ¶ 61.  Skoly

refused to comply with 216-RICR-20-15-8 and he ceased providing medical services.

Third Amended Complaint, ¶ 62.  On its website, the RI DOH regularly identifies

Rhode Island licensed professions subject to disciplinary or other enforcement action;

---

[3] Skoly contends that the "Notice of Violation and Compliance Order" did not become
effective "unless found to have been properly issued after an administrative hearing."
Third Amended Complaint, ¶ 67.  This averment does not comport with R.I. Gen.
Laws § 23-1-20, which provides:

> [w]henever the director determines that there are reasonable grounds to believe that
> there is a violation of any law administered by him or her or of any rule or regulation
> adopted pursuant to authority granted to him or her, the director may give notice of
> the alleged violation to the person responsible for it. The notice shall be in writing,
> shall set forth the alleged violation, shall provide for a time within which the alleged
> violation shall be remedied, and shall inform the person to whom it is directed that a
> written request for a hearing on the alleged violation may be filed with the director
> within ten (10) days after service of the notice. The notice will be deemed properly
> served upon a person if a copy of the notice is served upon him or her personally, or
> sent by registered or certified mail to the last known address of that person, or if that
> person is served with notice by any other method of service now or later authorized in
> a civil action under the laws of this state. *If no written request for a hearing is
> made to the director within ten (10) days of the service of notice, the notice
> shall automatically become a compliance order.*  (Emphasis added).

Skoly does not plead that he requested a hearing on the "Notice of Violation and
Compliance Order."

the RI DOH website posted the "Notice of Violation and Compliance Order" issued against Skoly.[4]  Third Amended Complaint, ¶¶ 144-147.

While the "Notice of Violation and Compliance Order" was effective, Skoly applied to the Rhode Island Department of Labor and Training (hereafter "RI DLT") for unemployment benefits.  Third Amended Complaint, ¶ 78.  Under Rhode Island law, an applicant seeking unemployment benefits must actively be searching for work.  Third Amended Complaint, ¶ 81 (referencing R.I. Gen. Laws § 28-44-12).  Skoly's complaint represents that he was denied unemployment benefits because, according to the RI DLT, "the Claimant has not conducted a work search as required by Section 28-44-12 of the Act."[5]  Third Amended Complaint, ¶ 85.

---

[4] The "Notice of Violation and Compliance Order" has since been removed from the RI DOH website.  Accordingly, Skoly's demand for injunctive relief on this point is moot.  *See* Third Amended Complaint, ¶¶ 170, 196 (demanding removal of posting from RI DOH website).

[5] This quotation is taken from the Board of Review decision denying Skoly's appeal of the denial of unemployment benefits.  *See* Exhibit A.  Typically exhibits may not be included within a motion to dismiss, however, "courts have made narrow exceptions for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiff's claim; or for documents sufficiently referred to in the complaint."  *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).  All of these exceptions apply in this case.  Most notably, Skoly quoted from the Board of Review's decision, and therefore, has incorporated the Board of Review's decision into the Third Amended Complaint.  *Compare* Third Amended Complaint, ¶ 86 (stating that RI DLT denied unemployment benefits because "the Claimant has not conducted a work search as required by Section 28-44-12 of the Act") *with* Exhibit A (stating in the conclusion "the Claimant has not conducted a work search as required by Section 28-44-12 of the Act").  *See also* F. Evid. R. 106 ("If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part – of any other writing or recorded statement – that in fairness ought to be considered at the same time.").

With the days 216-RICR-20-15-8 would be effective dwindling, on February 24, 2022, the RI DOH proposed a permanent regulation to replace 216-RICR-20-15-8. Third Amended Complaint, ¶ 104.  Unlike 216-RICR-20-15-8, which required health care workers and health care providers to vaccinate (unless medically exempt), the proposed permanent regulation required health care workers – but not health care providers – to "be up to date with a SARS-CoV-2 vaccine OR wear a medical grade N95 mask when the [COVID-19] prevalence rate is high."  Third Amended Complaint, ¶ 109 (emphasis and alterations in original).  "High" prevalence is defined as "greater than fifty (50) cases per one hundred thousand (100,000) people per week, as reported by the Department."  Third Amended Complaint, ¶ 109.  Dr. Skoly makes clear that he is a "health care provider," not a "health care worker."  Third Amended Complaint, ¶ 106 ("the Proposed Permanent Vaccine Mandate applied only to 'health care workers,' not 'health care providers' who worked in a private practice, such as Dr. Skoly").

On March 11, 2022 – one day before 216-RICR-20-15-8 was scheduled to expire and with the proposed permanent regulation still going through the regulatory process required under the Administrative Procedures Act – RI DOH promulgated a new Emergency Regulation, which replaced the soon-to-expire 216-RICR-20-15-8. Third Amended Complaint, ¶ 123.  The "new" Emergency Regulation was designated 216-RICR-20-15-9 and became effective on March 11, 2022.  Third Amended Complaint, ¶ 123.  Emergency Regulation 216-RICR-20-15-9 "adopted the language of the Proposed Permanent Regulation[.]" Third Amended Complaint, ¶ 124.  In other

words, as of March 11, 2022 – and pursuant to Emergency Regulation 216-RICR-20-15-9 – when the COVID-19 prevalence rate is equal to or greater than 50 persons per 100,000 over a seven day period in Rhode Island, health care workers – but not health care providers – must either be vaccinated against COVID-19 **or** wear an N95 mask.

With Skoly no longer required to vaccinate against COVID-19, on March 11, 2022, RI DOH withdrew the "Notice of Violation and Compliance Order" and Skoly resumed his medical practice.  Third Amended Complaint, ¶ 126.  Having returned to practice without a COVID-19 vaccination, Skoly acknowledged, in his Second Amended Complaint, that "pre-trial relief [is] unnecessary."  Second Amended Complaint, ¶ 124.  On June 15, 2022, the proposed Permanent Regulation was enacted (216-RICR-20-15-7), which superseded Emergency Regulation 216-RICR-20-15-9.     https://rules.sos.ri.gov/regulations/part/216-20-15-7.     The Permanent Regulation (216-RICR-20-15-7) maintains the vaccination **or** N95 mask requirement when the COVID-19 prevalence rate in Rhode Island is equal to or greater than 50 cases, per 100,000 people, within a seven-day period.  The Permanent Regulation also incorporates the CMS federal law requirement that all Medicare and Medicaid certified providers, suppliers, and healthcare workers are required to receive the primary series (e.g., two (2) doses of Pfizer or Moderna, or one (1) dose of Johnson & Johnson) of a COVID-19 vaccine, unless exempt for medical or religious reasons.  216-RICR-20-15-7 (§7.6.1.B.3).

The operative complaint (the Third Amended Complaint filed on September 29, 2022), names Governor Daniel J. McKee, former RI DOH Director Nicole

Alexander-Scott, former-Interim RI DOH Director James McDonald, RI DOH Director Utpala Bandy, RI DLT Director Matthew D. Weldon, all in their individual and official capacities. The Third Amended Complaint also names the State of Rhode Island, the RI DOH, and the RI DLT as defendants. Collectively, all defendants will be referenced as the "State Defendants." The complaint seeks the following relief:

I:  Equal Protection Clause and 42 U.S.C. § 1983 against McKee, Alexander-Scott, McDonald, and Bandy

Skoly alleges from October 1, 2021 through March 11, 2022, McKee, Alexander-Scott, and McDonald violated the Equal Protection Clause by "preventing him from practicing medicine, while allowing other healthcare workers who presented no lesser risk to the public to treat patients." Third Amended Complaint, ¶ 156. Skoly adds that during this time period, McKee, Alexander-Scott, and McDonald had "no rational basis on which to treat the masked, unvaccinated Dr. Skoly differently from (and worse than) the masked, unvaccinated medically exempt worker, or the masked vaccinated worker with an active infection." Third Amended Complaint, ¶ 161.

Skoly also complains that for "a subset of workers ('Medicare and Medicaid certified providers, suppliers, and healthcare workers')," the Permanent Regulation imposes the federal CMS requirement that these individuals be required to vaccinate, subject to a medical exemption. Third Amended Complaint, ¶ 165. Skoly contends that the CMS requirement, as incorporated into the Permanent Regulation, violates the Equal Protection Clause and "prevents Dr. Skoly from resuming his practice at the physical premises of the 'Health Care Facilities' Eleanor Slater and [the Adult

Correctional Institution]." Third Amended Complaint, ¶¶ 166-167. Skoly seeks damages relating to the "Notice of Violation and Compliance Order;" damages relating to RI DOH's posting of the "Notice of Violation and Compliance Order" on its website after March 11, 2022; a declaration that the CMS requirement violates the Equal Protection Clause; and injunctive relief enjoining the CMS requirement. Third Amended Complaint, ¶¶ 162-170.

II. <u>Due Process Clause and 42 U.S.C. § 1983 against McKee, Alexander-Scott, McDonald, and Bandy</u>

Skoly contends that he has a liberty interest in pursuing the profession in which he was trained, a property interest in his practice, and a liberty interest in not being vaccinated. Third Amended Complaint, ¶ 174. Skoly relates that from October 1, 2021 to March 11, 2022, McKee, Alexander-Scott, and McDonald denied Skoly his due process rights by "refusing to exempt him from vaccination." Third Amended Complaint, ¶ 175. While Skoly acknowledges that the Permanent Regulation "does not affect the bulk of Dr. Skoly's practice" – because it does not pertain to "health care providers" – Skoly avers that "a portion of his former practice consisted of providing services at 'health care facilities' (specifically, Eleanor Slater and ACI) which are subject to a vaccine mandate," i.e., the CMS requirement.[6] Third Amended Complaint, ¶190. In Count II, Skoly seeks relief similar to that demanded in Count I. Third Amended Complaint, ¶¶ 187, 193-196.

---

[6] When Skoly references his "former" practice including providing services at "health care facilities," it is unclear whether Skoly's present practice would include providing services at "health care facilities," absent the CMS requirement.

III:  <u>First Amendment and 42 U.S.C. § 1983 against McKee, Alexander-Scott, and McDonald</u>

Skoly complains that on October 1, 2021, then-RI DOH Director Alexander-Scott "issued the Compliance Order suspending Dr. Skoly from the practice 'unless and until he has complied with the terms and conditions of 216-RICR-20-15-8[.]" Third Amended Complaint, ¶ 206.  Despite focusing on Alexander-Scott's actions in issuing the "Notice of Violation and Compliance Order," Skoly – in a broad and conclusionary manner – also sues Governor McKee and former Interim Director McDonald, in their official and individual capacities.  Skoly contends that the "Notice of Violation and Compliance Order" was issued and maintained against him because "he was being punished for having 'opened his big mouth' by speaking to the press." Third Amended Complaint, ¶ 210.  Based upon this unattributed quotation, Skoly alleges that "Defendants McKee, Alexander-Scott and McDonald suspended Dr. Skoly, and maintained that suspension, not for reasons of medicine or science, but as punishment for his speaking out on a public topic in a manner with which they disapproved[.]"  Third Amended Complaint, ¶ 211.  Skoly seeks damages and a "permanent injunction ensuring that he is not deprived of his First Amendment right to speak out against government policy in the future."  Third Amended Complaint, ¶ 214.

IV:  <u>Due Process Clause and 42 U.S.C. § 1983 against McKee, Alexander-Scott, McDonald, and Weldon</u>

Skoly challenges the RI DLT's determination that under state law, he is not entitled to unemployment compensation benefits, and the denial of such benefits

11

violated the Due Process Clause.  Third Amended Complaint, ¶ 224.  Skoly seeks this Court's order that he is entitled to unemployment benefits from October 1, 2021 to March 11, 2022, and a permanent injunction "against future unlawful denial of benefits."  Third Amended Complaint, ¶ 224.  Skoly does not allege that the actions of McKee, Alexander-Scott, McDonald, or Weldon in any way contributed to the RI DLT's allegedly unlawful denial of unemployment benefits.

## STANDARD OF REVIEW

In the context of a Rule 12(b)(6) motion to dismiss, a complaint must allege "a plausible entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (2007).  Thus, a plaintiff's "well-pleaded facts must possess enough heft to show that [they are] entitled to relief." *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008). In evaluating whether a plaintiff's claims are entitled to relief, the court must accept as true all well-pleaded facts and indulge all reasonable inferences in plaintiff's favor. *Twombly*, 550 U.S. at 557. However, the court is not compelled to accept legal conclusions set forth as factual allegations in the complaint. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677–79 (2009). In other words, "[a] plaintiff is not entitled to 'proceed perforce' by virtue of allegations that merely parrot the elements of the cause of action." *Ocasio–Hernandez v. Fortuño–Burset*, 640 F.3d 1, 12 (1st Cir. 2011). Only a complaint that states a plausible claim for relief can survive a motion to dismiss. *Iqbal*, 556 U.S. at 679.

**LEGAL ANALYSIS**

**I.   SKOLY MAY NOT RECOVER DAMAGES AGAINST "THE STATE"**

Skoly's request for damages against the State of Rhode Island, the RI DLT, the RI DOH, as well as the State Defendants sued in their official capacities, is barred because these Defendants cannot be liable for damages in an action brought pursuant to Section 1983.  *See Will v. Michigan*, 491 U.S. 58, 71 (1989).

The United States Supreme Court has made clear that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983."  *Will*, 491 U.S. at 71.  "Based on the Supreme Court's holding in *Will*, it is clear that neither the State of Rhode Island nor any of its officials acting in their official capacities, are 'persons' that can be held liable under § 1983." *Jones v. State of Rhode Island*, 724 F. Supp. 25, 28 (D.R.I. 1989) (dismissing plaintiffs' claims under § 1983 which were brought against the State of Rhode Island or an individual sued in his official capacity as an employee of the State).  Accordingly, Skoly's Section 1983 claims for damages against these Defendants fails as a matter of law on all counts.

**II.   SKOLY IS NOT ENTITLED TO MONETARY RELIEF AGAINST THE INDIVIDUAL DEFENDANTS**

In Counts I and II, Skoly seeks monetary damages from the State Defendants, in their individual capacities, for issuing and maintaining the "Notice of Violation and Compliance Order" in violation of the Due Process and Equal Protection Clauses. Skoly also demands monetary damages from the State Defendants for maintaining the "Notice of Violation and Compliance Order" on the RI DOH website, after March

11, 2022.[7]  Moreover, even though Skoly acknowledges that he failed to comply with the Emergency Regulation, he contends in Count III that the "Notice of Violation and Compliance Order" was issued and maintained "not for reasons of medicine or science, but as punishment for his speaking out on a public topic in a manner with which [McKee, Alexander-Scott, and McDonald] disapproved."  Third Amended Complaint, ¶ 211.  Lastly, in Count IV, Skoly claims that the RI DLT's denial of unemployment benefits violated the Due Process Clause and he seeks monetary damages.

## A.   The State Defendants did not Violate the Due Process or Equal Protection Clause

Skoly contends that the Emergency Regulation requiring him to vaccinate – and the absence of an exemption for a person who previously had Bell's Palsy and/or previously had COVID-19 – violated his due process and equal protection rights.  As a result of refusing to vaccinate, but continuing to treat patients in-person, the RI DOH issued the "Notice of Violation and Compliance Order" requiring Skoly to cease his practice, which Skoly submits violated his liberty rights to pursue his chosen profession and to be free from vaccination, as well as a property interest in his

---

[7] Skoly does not allege that any State Defendant, in their individual capacity, had involvement with the decision to continue the website posting after March 11, 2022. Indeed, Dr. Alexander-Scott had retired from the RI DOH prior to March 11, 2022, and Dr. Bandy did not become Interim Director until after March 11, 2022.  There are no allegations that Governor McKee or then-Interim Director McDonald had any involvement with the continued posting.   On this basis, Skoly fails to plead a cognizable cause of action against the State Defendants, in their individual capacities, for the continued posting of the "Notice of Violation and Compliance Order" after March 11, 2022.

practice.  Third Amended Complaint, ¶ 174.  Skoly also contends that the State Defendants violated his equal protection rights by "preventing him from practicing medicine, while allowing other healthcare workers who presented no lesser risk to the public to treat patients."  Third Amended Complaint, ¶ 156.

In conducting the due process and equal protection review, the legal analyses for both constitutional inquiries converge.  *See Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 470 n. 20, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) (remarking that if statute does not violate equal protection, "it follows *a fortiori* that [it] does not violate the Fourteenth Amendment's Due Process Clause"); *Montalvo–Huertas v. Rivera–Cruz,* 885 F.2d 971, 976 n. 7 (1st Cir.1989) (noting that "the type and kind of scrutiny applied, and the result, would be no different on either theory").

### 1.   *The Right to be Free from Vaccination is not included in the Due Process Clause*

The Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).  The substantive due process analysis has two features. First, substantive due process cases require a "careful description" of the asserted fundament right. *Id*. at 721.  Second, the Due Process Clause protects those fundamental rights and liberties, which are objectively, "deeply rooted in this Nation's history and tradition," such that "neither liberty nor justice would exist if they were sacrificed." *Id*. at 720-21.  Constitutional claims that do not implicate "fundamental" rights are entitled to rational basis review.

It is beyond peradventure that a state may require its citizens to vaccinate against diseases.   Over a century ago, in *Jacobson v. Commonwealth of Massachusetts*, the Supreme Court concluded that a mandatory vaccination requirement does not "invade[] any right secured by the Federal Constitution."  197 U.S. 11, 38 (1905).   Although *Jacobson* pre-dated the modern tiers of scrutiny, *Jacobson* "essentially applied rational basis review."   *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 70 (2020) (Gorsuch, J., concurring).  Since *Jacobson*, state and federal courts consistently have upheld vaccine requirements as a valid exercise of a state's police power. *See e.g., Zucht v. King*, 260 U.S. 174, 176-177 ("A long line of decisions by this court had also settled that in the exercise of the police power reasonable classification may be freely applied, and that regulation is not violative of the equal protection clause[.]"); *Cude v. State*, 237 Ark. 927, 932, 377 S.W.2d 816, 819 (Ark. 1964) ("According to the great weight of authority, it is within the police power of the State to require [vaccination] and that such requirement does not violate the constitutional rights of anyone, on religious grounds or otherwise"). *See also Dr. T. v. Alexander-Scott*, 2022 WL 79819 at * 5 (D.R.I. 2022) ("Courts in this country have held for over a century that mandatory vaccination laws are a valid exercise of a state's police powers, and such laws have withstood constitutional challenges.").

Based upon the foregoing, there can be no credible argument that requiring vaccination during a pandemic implicates a fundamental right "deeply rooted in this Nation's history and tradition."  *Glucksberg,* 521 U.S. at 720.  Indeed, even Skoly

seemingly agrees that rational basis review is the applicable constitutional standard. *See* Third Amended Complaint, ¶ 161 ("Defendants McKee, Alexander-Scott and McDonald had *no rational basis* on which to treat the masked, unvaccinated Dr. Skoly differently from (and worse than) the masked, unvaccinated medically exempt worker, or the masked vaccinated worker with an active infection") (emphasis added).

Skoly additionally claims that enforcement of the Emergency Regulation infringed upon his constitutional right to practice his chosen profession, along with a related property right in his practice from October 1, 2021 to March 11, 2022, when the "Notice of Violation and Compliance Order" was effective.   Third Amended Complaint, ¶ 175.  But these claimed constitutional deprivations – which necessarily flow from Skoly's refusal to vaccinate in accordance with the Emergency Regulation – quickly dissipate since the Supreme Court has never held an unfettered fundamental right to practice one's profession.  Instead, the Court has "indicated that the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, *but a right which is nevertheless subject to reasonable government regulation*."  *Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999) (emphasis added).  For instance, the Supreme Court long ago upheld a requirement of a license before a person can practice medicine. *Dent v. West Virginia*, 129 U.S. 114 (1889).  More recently, this Circuit has recognized that "[t]he right to 'make a living' is not a 'fundamental right,' for either equal protection or substantive due process purposes.'"  *Medeiros v. Vincent*, 431 F.3d 25,32 (1st Cir. 2005), rev'd on other grounds, *Bond v. United States*, 564 U.S. 211

(2011) (standing issue).  *See also Mulero-Carrillo v. Roman-Hernandez*, 790 F.3d 99,

107 (1st Cir. 2015) ("Plaintiffs do not allege that they belong to a suspect category or

that obtaining a license to practice medicine is a fundamental constitutional right.").

As such, Skoly's constitutional claims must be viewed through rational basis

review.

### 2.   *The Vaccination Requirement Did Not Violate the Equal Protection Clause*

The Equal Protection Clause provides that no state shall "deny to any person

within its jurisdiction the equal protection of the laws." U.S. Const., Amend. XIV.

This command is essentially a direction that all persons similarly situated should be

treated alike. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985).

To reconcile the Equal Protection Clause requirements with the practical

reality that most legislation classifies for one purpose or another, the Court has stated

that it will uphold a law that neither burdens a fundamental right nor targets a

suspect class so long as the legislative classification bears a rational relationship to

some independent and legitimate legislative end. *Romer v. Evans*, 517 U.S. 620, 623

(1996) (citing *Heller v. Doe*, 509 U.S. 312, 319-320 (1993)).

The Supreme Court has repeatedly recognized that a rational basis review in

equal protection analysis "is not a license for courts to judge the wisdom, fairness, or

logic of legislative choices." *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313

(1993); *see also Dandridge v. Williams*, 397 U.S. 471, 486 (1970). Nor does it authorize

"the judiciary [to] sit as a super-legislature to judge the wisdom or desirability of

legislative policy determinations made in areas that neither affect fundamental

rights nor proceed along suspect lines." *New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (*per curiam*). This standard of review is a paradigm of judicial restraint. *Beach Communications*, 508 U.S. at 314. "The Constitution presumes that, absent some reason to infer antipathy, even improvident decisions will eventually be rectified by the democratic process and that judicial intervention is generally unwarranted no matter how unwisely we may think a political branch has acted." *Id*. For these reasons, a classification that neither burdens a fundamental right nor targets a suspect class is accorded a strong presumption of validity. *See, e.g., Beach Communications,* 508 U.S. at 314-15; *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 462 (1988).

### 3. *The Emergency Regulation Passes Rational Basis Review*

"The general rule is that legislation is presumed to be valid and will be sustained if the classification drawn . . . is rationally related to a legitimate state interest." *Id*. "The challenger has the devoir of persuasion and must negate any and all conceivable bases upon which the challenged regulation might appropriately rest." *Id*. "[T]he regulation must be upheld even if it is drawn from 'rational speculation unsupported by evidence or empirical data." *Id*. (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993). The Emergency Regulation – as well as any challenged actions that flowed from the violation of the Emergency Regulation – easily pass this test.

"Stemming the spread of COVID-19 is unquestionably a compelling interest[.]" *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). *See also*

*Gonzalez-Droz*, 660 F.3d at 10 (states "have a profound interest in assuring the health of the public and, thus, in regulating the practice of medicine"); *Dr. T.*, 2022 WL 79819 * 8 ("There is no dispute that reducing the number of unvaccinated healthcare workers who can expose vulnerable patients to a potentially deadly disease is a legitimate government interest."). The only remaining question is whether Rhode Island's requirement (from October 1, 2021 to March 11, 2022) that certain healthcare professionals vaccinate against COVID-19 – and that a person who previously had Bell's Palsy and/or COVID-19[8] are not medically exempt – is rationally based. This question easily answers itself.

Unless medically exempt, Rhode Island has long required its healthcare professionals to be immunized against certain communicable diseases. *See Dr. T.*, 2022 WL 79819 * 7. As this Court observed in previously examining the Emergency Regulation, the objective of the vaccination requirement "is public health." *Id.* Requiring vaccination among healthcare workers makes sense – particularly during a pandemic spread through respiratory droplets and/or aerosols – because the nature of healthcare services requires a treating physician to be in close physical contact with a patient. And, by virtue of the services rendered, many healthcare professionals treat patients who are already medically vulnerable – adding a potentially fatal and communicable disease to an already medically vulnerable person can be catastrophic. Rhode Island's vaccination requirement – which applied only to

---

[8] Dr. Skoly pled that he acquired COVID-19 in November 2020, approximately 11 months prior to the vaccination requirement. Third Amended Complaint, ¶ 41.

in-person circumstances and did not require healthcare professionals to vaccinate if they were not treating patients in-person – was rationally related to stemming the spread and severity of COVID-19.

Dr. Skoly's practice provides a prime example. As an oral surgeon, Skoly must treat patients in close physical contact, and moreover, when being examined or treated, a patient cannot wear a mask, thus eliminating one common mitigation measure. Even more so, Skoly treated patients institutionalized at Eleanor Slater Hospital and the Adult Correctional Institution. A patient infected with COVID-19 could easily pass the virus to other institutionalized and vulnerable persons, thus causing widespread infection at an institution.

Rhode Island's imposition of a COVID-19 vaccination requirement in August 2021 as the Delta variant became the dominant virus out of concern that the more contagious and more virulent disease would cripple health care services and infect (and possible kill) vulnerable patients easily passes the rational basis test. *See e.g., Doe v. Mills*, 16 F.4h 20, 32 (1st Cir. 2021) ("The rule is generally applicable. And it easily satisfies rational basis review."); *Dr. T.*, 2022 WL 79819 * 8 ("Because rational basis review applies and the Regulation passes that test, the Court does not proceed to analyze whether the Regulation would survive a test of strict scrutiny."). *See also Biden v. Missouri*, 142 S.Ct. 647, 653 (2022) ("Healthcare workers around the country are ordinarily required to be vaccinated for diseases such as hepatitis B, influenza, and measles, mumps, and rubella.") (application to stay preliminary injunction).

### 4. *Rhode Island's Decision to Follow CDC Guidelines and Not Provide Medical Exemptions for Bell's Palsy and/or a Prior COVID-19 Infection is Rationally Related*

Dr. Skoly does not appear to challenge Rhode Island's vaccination requirement on facial grounds.  Rather, Skoly claims that preventing him from practicing medicine while wearing a mask – while allowing other healthcare workers to continue to practice medicine under a recognized (narrow) medical exemption while wearing a mask – violates his equal protection and/or due process rights.  In other words, Skoly submits that if Rhode Island accommodates any medical exemption, it must accommodate all claims for medical exemptions.[9]  For equal protection purposes, Skoly focuses on two situations, yet in neither is he similarly situated.

First, Skoly contends that Rhode Island allowed healthcare workers to continue in-person care if they were medically exempt and wore a mask, but not him. Under the Emergency Regulation, Rhode Island limited medical exemptions to those "in accordance with Advisory Committee on Immunization Practices (ACIP) guidelines and determined as acceptable by the facility."[10]   216-RICR-20-15-8 (§

---

[9] Similar reasoning was rejected by this Court and the Court of Appeals with respect to the argument that if a medical exemption was provided, the State must also provide a religious exemption. *See Doe v. Mills*, 16 F.4th 20, 31 (1st Cir. 2021) ("Unlike the medical exemption, a religious exemption would not advance the three interests Maine has articulated."); *Dr. T.*, 2022 WL 79819.

[10] The ACIP Guidelines are developed by a Committee of the CDC and are intended to help clinicians and other health care providers who vaccinate patients in varied settings: (1) assess vaccine benefits and risks, (2) use recommended administration practices, (3) understand the most effective strategies for ensuring high vaccination coverage in the population, and (4) communicate the importance of vaccination to reduce the effects of vaccine-preventable disease. *Goe v. Zucker*, 43 F.4th 19, 24 n.1 (2nd Cir. 2022).

8.3.D.1).   Exhibit B.  While Skoly admits he did not fall within the ACIP guidelines for an exemption, Skoly submits that during the applicable timeframe, between 299 and 365 Rhode Islanders were medically exempt and continued to practice medicine while wearing a mask.  Not granting Skoly a similar exemption – he contends – violated his equal protection rights.  Third Amended Complaint, ¶ 52.  Skoly is not similar situated to the narrow class of medical professionals for whom vaccination was contraindicated by ACIP guidelines.  A recent case from the Second Circuit affirms this principle.

In *Goe v. Zucker*, the Second Circuit Court of Appeals examined a near-analogous New York state law that required all children to be immunized against certain diseases in order to attend school for more than fourteen days.  43 F.4th 19, 24 (2nd Cir. 2022).  The New York law had allowed exemptions for medical and non-medical reasons, but in 2019 (following a measles outbreak), New York repealed the non-medical exemption and adopted a new regulation narrowing the medical exemption.  *Id*. at 24.  The amended regulation – similar to 216-RICR-20-15-8 – limited the medical exemption to "cases consistent with guidelines issued by the Advisory Committee on Immunization Practices (the 'ACIP' and the 'ACIP Guidelines') of the Centers for Disease Control and Prevention (the 'CDC') or with other nationally recognized evidence-based standards of care."  *Id*. at 24.  Because the plaintiffs did not fall within the amended (more narrow) medical exemption, they sued.

The Court of Appeals rejected the argument that New York was "forcing any

child to be vaccinated against her parents' will." *Id*. at 30-31.  The Court explained,
the "new regulations continue to permit a medical exemption (as required by the
statute), and they clarify when an exemption is appropriate and specify how parents
may seek an exemption.  *Id*. at 31.  "By requiring a physician to certify that a child
'has a medical contraindication or precaution to a specific immunization consistent
with ACIP guidance or other nationally recognized evidence-based standard of care,'
* * * the new regulations require requests to comply with evidence-based national
standards for the purpose of ensuring that physicians do not recommend medical
exemptions in conclusory fashion or for non-medical reasons."  *Id*. at 31.

The Second Circuit further recognized that plaintiffs' argument is that they
have a 'fundamental right' to obtain a medical exemption "based solely on the
recommendation – or say so – of a child's treating physician."  *Id*.  The Second Circuit
rejected this argument and explained:

> no court has ever held that there is a right to a medical exemption from
> immunization based solely on the recommendation of a physician.  Nor
> has any court held that such a right is 'implicit in the contempt of ordered
> liberty, or deeply rooted in this Nation's history and tradition.'  * * *
> Indeed, in *Jacobson v. Massachusetts*, the Supreme Court explained that
> medical exemptions from mandatory immunization laws may be limited
> to cases in which it is 'apparent or can be shown with reasonable
> certainty' that the vaccine would be harmful.'  *Id*.  Based upon these
> considerations, the Court of Appeals rejected the application of strict
> scrutiny and determined that rationale basis review should apply.

*Id*. at 31.  The amended regulation limiting medical exemptions to ACIP guidelines
or other nationally recognized evidence-based standards of care passed the rational
basis test.

While Skoly seeks to classify himself among those for whom a medical

exemption is recognized, the CDC Guidelines relied upon by Rhode Island placed Skoly outside the medical contraindication line and it was reasonable for Rhode Island to rely upon these Guidelines and allow a medical exemption only where contraindicated according to the CDC. *See Beach Communications*, 508 U.S. at 315-16 ("Defining the class of persons subject to a regulatory requirement – much like classifying governmental beneficiaries – 'inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial consideration.") (alteration in original). *See also Mulero-Carrillo*, 790 F.3d at 107 ("[r]emedial choices made by . . . regulatory bod[ies] are . . . rebuttable only where the party challenging the . . . regulation can establish that 'there exists no fairly conceivable set of facts that could ground a rational relationship between the challenged classification and the government's legitimate goals'") (alternations in original); *Gonzalez-Droz*, 660 F.3d at 11 ("[W]here individuals in the group affected by a law have distinguishing characteristics relevant to interests the State has the authority to implement, the courts have been very reluctant, as they should be in our federal system and with our respect for the separation of powers, to closely scrutinize legislative choices as to whether, how, and to what extent those interests should be pursued.").

While Skoly seeks an exemption only for himself, the rule Skoly advances would have far-reaching application. As an example, the *Dr. T* plaintiffs sought only a religious exemption for themselves, but establishing that exemption would have

allowed any person to seek an exemption for a religious reason.  Here, Skoly invites this Court to redraw the classification recognized by Rhode Island health officials (who relied upon CDC Guidelines) and to grant medical exemptions not recognized by the CDC Guidelines.  While this matter concerns the recurrence of Bell's Palsy and/or a prior COVID-19 infection (11 months prior to vaccination requirement), the rule Skoly seeks to establish is that Rhode Island and other states must grant medical exemptions not recognized by the CDC Guidelines.  Rhode Island has chosen to follow the CDC Guidelines in this respect and the State Defendants are unaware of legal authority that such a determination fails rational basis review.  *See e.g., S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (2020) (Roberts, C.J., concurring in denial of injunctive relief) ("When those officials 'undertake[ ] to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.' …Where those broad limits are not exceeded, they should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people.") (internal citation omitted).

Second, Dr. Skoly is not similarly situated to those healthcare workers that might have been working despite testing COVID-19 positive.  In this respect, Rhode Island again followed CDC guidance.  These guidelines pertained ***only to healthcare personnel at hospitals and skilled nursing homes***, and applied ***only when those facilities were designated to be in a staffing "crisis."*** https://www.cdc.gov/coronavirus/2019-ncov/hcp/guidance-risk-assesment-hcp.html.

A "crisis" staffing level means, "there are no longer enough staff to provide safe patient/resident care." *Id*.  Faced with a decision to provide unsafe staffing levels at hospitals and skilled nursing homes or to provide adequate staffing – some of whom may be COVID-19 positive and must wear a mask – the CDC recommended that hospitals and skilled nursing homes provide adequate staffing.  Whatever might be said of the CDC's guidance to choose from the lesser of two evils, Skoly provides no evidence or argument that he fell within the CDC guidance and is therefore, not similarly situated.  Again, Rhode Island's reliance on CDC guidance was rationally related and reasonable.

Lastly, it should be noted that not only is Rhode Island's decision to follow the CDC guidance rationally related to a compelling state interest, but as this Court has observed, recognizing "additional exemptions, including a broader medical exemption, would as Dr. Alexander-Scott puts it, 'defeat' RIDOH's purpose in promulgating the Regulation, which is to ensure as best as possible the continued health and well-being of health care workers and health care providers, as well as those treated by health care workers and health care providers, as the COVID-19 pandemic continues." *Dr. T.*, 2022 WL 79819 * 7.  Or, as the Second Circuit recently recognized, "[w]e doubt that, as an epidemiological matter, the number of people seeking exemptions is somehow excluded from the factors that the State must take into account in assessing the relative risks to the health of healthcare workers and the efficacy of its vaccination strategy in actually preventing the spread of disease." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 287 (2nd Cir. 2021).  Dr. Skoly is

simply not similarly situated to the narrow class of persons falling within the CDC guidelines and allowing additional unvaccinated healthcare workers to treat patients in-person where vaccination was not contraindicated and/or where a hospital or skilled nursing home did not have a staffing crisis would have unnecessarily placed vulnerable patients and healthcare facilities at risk and was inconsistent with Rhode Island's goal to stem the spread of COVID-19 and protect its citizens.[11]

**B.    The State Defendants Did Not Violate the First Amendment by Issuing the "Notice of Violation and Compliance Order"**

On October 1, 2021, then-Director Alexander-Scott issued a "Notice of Violation and Compliance Order," directing Skoly to cease practice "unless and until he has complied with the terms and conditions of 216-RICR-20-15-8." Third Amended Complaint, ¶ 206; Exhibit E.  According to the Complaint, Skoly avers that he was "expressly informed that he was being punished for having 'opened his big mouth' by speaking to the press."  Third Amended Complaint, ¶ 210.  The quotation used by Skoly – "opened his big mouth" – is not attributed to any person.  Although the Complaint references only then-Director Alexander-Scott's decision to issue the "Notice of Violation and Compliance Order," Skoly contends that "Defendants McKee, Alexander-Scott and McDonald suspended Dr. Skoly, and maintained that suspension, not for reasons of medicine or science, but as punishment for his speaking out on a public topic in a manner with which they disapproved[.]"  Third Amended

---

[11] While the Third Amended Complaint extols the COVID-19 precautionary measures taken by Skoly and his staff including wearing N95 masks, it is noteworthy that Dr. Skoly believes that he contracted COVID-19 in November 2020 while treating a patient.  Third Amended Complaint, ¶ 41.

Complaint, ¶ 211.  Under First Circuit precedent, the State Defendants are absolutely immune.

In *Goldstein v. Galvin*, the Court of Appeals considered a complaint filed by an investor alleging that the Massachusetts' Secretary of the Commonwealth initiated an investigation and filed a complaint in retaliation for protected speech.  719 F.3d 16, 21 (1st Cir. 2013).  While the plaintiff acknowledged the Secretary had broad enforcement powers, the plaintiff nonetheless contended that the Secretary's decision to bring an enforcement action was retaliatory in violation of the First Amendment. *Id.* at 25.  The Court of Appeals determined the Secretary was absolutely immune.

Here, the State Defendants' vehement denial that the "Notice of Violation and Compliance Order" was issued and maintained for retaliatory reasons is of no moment since "[t]he protection afforded by an absolute immunity endures even if the official 'acted maliciously and corruptly' in exercising his judicial or prosecutorial functions." *Id.* at 24.  "In determining whether an official qualified for absolute immunity, an inquiring court must examine the particular functions that the official performs." *Id.* at 24.  Importantly, the First Circuit's framing of the issue in *Goldstein* mirrors the issue raised by Skoly: "The retaliation alleged in this case involves the Secretary's actions in choosing to bring, and actually bringing, the enforcement action." *Id.* at 25.

The *Goldstein* Court recognized the "baseline rule is that a state official who performs prosecutorial functions, *including the initiation of administrative*

*proceedings that may result in legal sanctions*, is absolutely immune from damages actions." *Id.* at 26 (emphasis added).  The State Defendants fit this description.

The "Notice of Violation and Compliance Order" was issued pursuant to R.I. Gen. Laws § 23-1-20, which provides;

> [w]henever the director determines that there are reasonable grounds to believe that there is a violation of any law administered by him or her or of any rule or regulation adopted pursuant to authority granted to him or her, *the director may give notice of the alleged violation to the person responsible for it*. The notice shall be in writing, shall set forth the alleged violation, *shall provide for a time within which the alleged violation shall be remedied, and shall inform the person to whom it is directed that a written request for a hearing on the alleged violation may be filed with the director within ten (10) days after service of the notice*. The notice will be deemed properly served upon a person if a copy of the notice is served upon him or her personally, or sent by registered or certified mail to the last known address of that person, or if that person is served with notice by any other method of service now or later authorized in a civil action under the laws of this state. *If no written request for a hearing is made to the director within ten (10) days of the service of notice, the notice shall automatically become a compliance order.* (Emphases added).

Rhode Island law also provides the RI DOH Director authority to enforce a Compliance Order.  *See* R.I. Gen Laws § 23-1-23 ("Whenever a compliance order has become effective, whether automatically where no hearing has been requested, where an immediate compliance order has been issued, or upon decision following a hearing, the director may institute injunction proceedings in the superior court of the state for enforcement of the compliance order and for appropriate temporary relief[.]").  This authority is akin to the authority held to constitute a prosecutorial function in *Goldstein*.  *See* 719 F.3d at 26 (administering and enforcing act, instituting proceedings, and determining whether grounds exist to believe that "any person has violated ... any provision of" the Act).  To the extent Skoly contends any State

Defendant retaliated against his free speech by initiating and maintaining the "Notice of Violation and Compliance Order," these actions "comprise the pursuit of an enforcement action [and] fit snugly within the realm of traditional prosecutorial functions."[12] *Id.* at 26.

Relatedly, Skoly's claim (in Counts I and II) that the continued posting on the RI DOH website of the "Notice of Violation and Compliance Order" after March 11, 2022, fails to state a cause of action under the Due Process Clause or Equal Protection Clause. On this point, Skoly fails to attribute to any State Defendant conduct that would warrant personal liability. This Court should hold Skoly to the *Iqbal-Twombly* pleading standard, particularly when he seeks to impose personal liability on the State Defendants through conduct not attributed to them. Additionally, the continued posting of truthful information does not implicate the constitution. *See also Goldstein*, 719 F.3d at 31 ("Allowing a plaintiff to weave a First Amendment retaliation claim out of something so mundane as a government official's issuance of

---

[12] Independent of prosecutorial immunity, Skoly's claim still fails because of the undisputed fact that his refusal to vaccinate, but continue treating patients in-person, violated the Emergency Regulation. "A party seeking to establish a claim of retaliation under the First Amendment must show that the conduct in which he engaged was a 'substantial' or 'motivating factor' in the challenged decision." *Gonzalez-Droz*, 660 F.3d at 16. "[A] defendant may avoid liability in a retaliation case by showing it would have reached the same decision absent the protected speech." *Id.* As the First Circuit noted in *Gonzalez-Droz*, "[t]he plaintiff does not dispute that his actions (continuing to advertise and perform cosmetic surgery) contravened the Regulation. The Board's decision was based on those actions (which under the Regulation constituted illegal practice). It is therefore, clear beyond hope of contradiction that the Board would have reached the same conclusion regardless of the [protected speech]." *Id.* Skoly stands in a similar position.

a true statement, not couched in inflammatory terms, about a matter of public concern would trivialize the Constitution.").

**C.**     **The State Defendants Did Not Violate the Due Process Clause by Denying Unemployment Benefits**

In Count IV, Skoly seeks to impose personal liability against Governor McKee, former Director Alexander-Scott, former Interim Director McDonald, and RI DLT Director Weldon for the denial of unemployment benefits by the RI DLT.  Again, Skoly seeks to impose personal liability but never alleges how any of these State Defendants were involved in the denial of benefits.  The failure to plead that Governor McKee, Director Alexander-Scott, Director McDonald, or Director Weldon had any personal involvement in the denial of unemployment benefits is fatal under *Iqbal-Twombly*.

Skoly's due process claim against the State Defendants, in their individual capacities, is also barred by the doctrine of quasi-judicial immunity, which "provides absolute immunity for public officials, including agency officials, who perform quasi-judicial functions." *Coggeshall v. Mass. Bd. of Registration of Psychologists*, 604 F.3d 658, 662 (1st Cir. 2010) (citing *Butz v. Economou*, 438 U.S. 478, 508, 512-13 (1978)); *see Bettencourt v. Bd. of Registration In Med. of Mass.*, 904 F.2d 772, 782 (1st Cir. 1990).  The availability of quasi-judicial immunity turns on the "'nature of the function performed,' not the identity of the actor who performed it." *Knowlton v. Shaw*, 704 F.3d 1, 5 (1st Cir. 2013) (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 269 (1993)).  For example, in *Bettencourt*, the First Circuit concluded that members of a state medical board of registration were entitled to absolute immunity by considering three questions:

32

First, does [the official], like a judge, perform a traditional 'adjudicatory' function, in that he decides facts, applies law, and otherwise resolves disputes on the merits (free from direct political influence)?

Second, does [the official], like a judge, decide cases sufficiently controversial that, in the absence of absolute immunity, he would be subject to numerous damages actions?

Third, does [the official], like a judge, adjudicate disputes against a backdrop of multiple safeguards designed to protect a [claimant]'s constitutional rights? *Bettencourt*, 904 F.2d at 783 (citing *Butz*, 438 U.S. at 510-13).

Applying this type of functional analysis, multiple courts have granted absolute immunity to "state Labor Commissioners who are sued in their individual capacities for money damages arising out of benefit determinations[.]" *Emiabata v. Bartolomeo*, No. 3:21-CV-00776 (OAW), 2022 WL 4080348, at *9 (D. Conn. Jan. 3, 2022), report and recommendation adopted sub nom, *Emiabata v. Westby*, No. 3:21-CV-776 (OAW), 2022 WL 3909176 (D. Conn. Aug. 31, 2022); *see Witzke v. Ferguson*, 795 F. App'x 120, 123 (3d Cir. 2020) ("This scheme for reviewing unemployment insurance claims demonstrates that the role of an appeals referee is functionally comparable to that of a judge."); *Calderon v. Connecticut*, No. CIV.A. 3:07CV1476, 2007 WL 3124717, at *3 (D. Conn. Oct. 24, 2007) ("In Connecticut, review of claims for unemployment benefits is a quasi-judicial process."); *Howard v. Food Lion, Inc.*, 232 F. Supp. 2d 585, 595 (M.D.N.C. 2002) (recognizing defendant's "absolute quasi-judicial immunity in his function as an appeals referee" for state Employment Security Commission).

While Skoly pleads no facts that implicate any State Defendant in the denial of unemployment benefits, a state employee involved in such a determination is

entitled to quasi-judicial immunity from any Section 1983 claim.  First, a person reviewing whether to grant or deny unemployment benefits performs a fundamentally adjudicatory role by applying the relevant law to the facts of each claimant's case and issuing written decisions. *See Coggeshall*, 604 F.3d at 663.  Once a claim is filed, the RI DLT Director must "promptly notify the most recent employer and all employers for whom the claimant states he or she performed services and earned wages during his or her base period" to obtain the "information required to determine the claimant's benefit rights." R.I. Gen. Laws § 28-44-38.  The Director must then decide "(i) Whether or not the claimant has met the eligibility requirements set forth in § 28-44-11" and "(ii) Whether or not the claimant is disqualified under any of the provisions of §§ 28-44-7, 28-44-12, 28-44-13, 28-44-16 -- 28-44-21, 28-44-61, 28-44-62, 28-42-62.1, 28-44-63, 28-44-66 through 28-44-70, and 28-42-68." R.I. Gen. Laws § 28-44-39(a)(1).  C*f. Calderon*, 2007 WL 3134717 at \*4 ("Thus, the unemployment proceedings of the [Department of Labor] . . . rely on precedent and have precedential effect[.]").  The Director must provide his decisions, and his reasoning, to the claimant in writing. R.I. Gen. Laws § 28-44-39(a).

Second, the resolution of benefits claims is "sufficiently controversial" as to subject an official to an ever-present risk of litigation. *Bettencourt*, 904 F.2d at 783.  Under state law, "interested parties" with the right to appeal from the Director's benefits determination include the claimant and any employers who have furnished "information that might affect either the validity of the claim or the right of the claimant to waiting period credit or benefits[.]" R.I. Gen. Laws § 28-44-38(c), 39(a)(2),

39(c); *see* R.I. Gen. Laws § 28-44-43.  In some instances, unemployment disputes may proceed all the way to the Rhode Island Supreme Court. *See Beagan v. R.I Dep't of Lab. & Training*, 162 A.3d 619 (R.I. 2017); *Baker v. Dep't of Emp. & Training Bd. of Rev.*, 637 A.2d 360 (R.I. 1994).  It is almost inevitable that this process will sometimes result in claimants—and employers—who are dissatisfied seeking collateral litigation against the RI DLT and its officials. *Cf. Witzke*, 795 F. App'x at 123 (citing *Forrester v. White*, 484 U.S. 219, 223 (1988)) ("In ruling on cases involving adverse parties, an appeals referee must be able to function without fear of harassment by disappointed applicants.").

Third, the Director's adjudicatory decisions are made "against a backdrop of multiple safeguards[,]" including an extensive appeals process. *Bettencourt*, 904 F.2d at 783.  A claimant may appeal from the initial adverse determination to an "appeal tribunal," which is empowered to "affirm, modify, or reverse the director's determination" based on its own "findings and conclusions[.]"  R.I. Gen. Laws § 28-44-46.   An appeal tribunal must afford all interested parties a "reasonable opportunity for a fair hearing" and must "inquire into and develop all facts bearing on the issues and shall receive and consider evidence without regard to statutory and common law rules." R.I. Gen. Laws § 28-44-44.  "Any party in interest, including the director, shall be allowed an appeal to the board of review from the decision of an appeal tribunal." R.I. Gen. Laws § 28-44-47.

Even after the board of review stage, a dissatisfied claimant is still not without recourse.  State law then provides for a process of judicial review under the state's

Administrative Procedures Act to the Rhode Island District Court, which includes an inquiry into whether the claimant's substantial rights were prejudiced by administrative decisions made "[i]n violation of constitutional or statutory provisions[.]" *See* R.I. Gen. Laws § 42-35-15; *see* R.I. Gen. Laws § 28-44-52.  And state law provides for a final review to the Rhode Island Supreme Court through a petition for a writ of certiorari.  *See* R.I. Gen. Laws § 28-44-55 (incorporating appeals procedure of § 28-35-29).  Together with the procedures inherent at each stage, the multi-tiered level of the appeals process provides "enough checks on malicious action" to "'protect against unconstitutional conduct without reliance on private damages lawsuits.'" *Bettencourt*, 904 F.2d at 783 (quoting *Horwitz v. Bd. of Med. Examiners of Colo.*, 822 F.2d 1508, 1515 (10th Cir. 1987)); *cf. Witzke*, 795 F. App'x at 123–24 ("[T]he adversarial nature of the proceedings and the multiple layers of appellate review that are available to correct any errors provide safeguards that minimize the need for private damages actions to curb unconstitutional conduct.").

In short, even if Skoly alleged sufficient facts against the State Defendants, they would be entitled to quasi-judicial immunity because the risk that they will commit unconstitutional acts while performing adjudicatory functions "is clearly outweighed by the importance of preserving [their] independent judgment[.]" *Butz*, 438 U.S. at 514.  If Skoly complains that the denial of his unemployment benefits was in error, he "must seek agency or judicial review." *Id.*

**D.**    **The State Defendants, in their individual capacities, are entitled to Qualified Immunity**

"The qualified immunity doctrine provides defendant public officials an immunity from suit and not a mere defense to liability." *Maldonado v. Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009). In order to overcome qualified immunity, a plaintiff must "mak[e] out a violation of a constitutional right and, second, establish[ ] that the right was 'clearly established' at the time of the defendant's alleged violation." *Id.* "The 'clearly established' step comprises two subparts: first, whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right,' and second, 'whether in the specific context of the case, 'a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.'" *Id.* (quoting *Mosher v. Nelson*, 589 F.3d 488, 493 (1st Cir. 2009)). For all the reasons discussed above, Skoly cannot demonstrate that any allegation violates a constitutional right. Moreover, even if such an allegation did implicate a constitutional right, no such right was "clearly established" in October 2021 through March 11, 2022. The Supreme Court has "repeatedly told courts * * * not to define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

The Emergency Regulation at issue – 216-RICR-20-15-8 – is consistent with *Jacobson* and *Zucker*. The medical exemption was described in the Emergency Regulation as:

> [a] health care worker or health care provider shall be medically exempt from being required to be vaccinated provided that a licensed physician, physician assistant or advanced practice registered nurse signs a medical exemption stating that the health care worker or health care

37

provider is exempt from the COVID-19 vaccine because of medical reasons, *in accordance with Advisory Committee on Immunization Practices (ACIP) guidelines* and determined as acceptable by the facility.

216-RICR-20-15-8, (§ 8.3(D)(1)) (emphasis added).  There is no dispute that Skoly does not fall within the medical exemption recognized by the ACIP Guidelines.

At the time this case arose – as well as presently – the CDC's Guidelines for COVID-19 vaccination addressed Bell's Palsy.  The CDC advised:

> [r]are cases of Bell's palsy (acute peripheral facial nerve palsy) were reported following vaccination of participants in the mRNA COVID-19 vaccine clinical trials, but FDA was not able to determine whether these cases were causally related to vaccination. *People with a history of Bell's palsy may receive any currently FDA-approved or FDA-authorized COVID-19 vaccine: mRNA (i.e., Moderna or Pfizer-BioTech) and Novavax COVID-19 vaccines are recommended for the primary series and an age-appropriate mRNA vaccine is recommend[ed] for the booster dose.*

https://www.cdc.gov/vaccines/covid-19/clinical-considerations/faq.html (last visited, October 18, 2022) (emphasis added).  The State Defendants reliance on ACIP and/or CDC guidance – as well as a century of precedent that mandatory vaccination laws do not violate the Constitution – entitles them to qualified immunity.

Most notably, on September 30, 2021 – the day before the "Notice of Violation and Compliance Order" issued against Skoly – this Court denied a temporary restraining order sought by healthcare professionals who argued that the same Emergency Regulation violated their First and Fourteenth Amendment rights by not allowing a religious exemption.  This Court soundly rejected that argument, noting that "courts have held for over a century that mandatory vaccination laws are a valid exercise of a state's police powers, and such laws have withstood constitutional challenges."  *Dr. T.*, 2021 WL 4476784 * 2.

38

Several months later, on January 7, 2022 – while the "Notice of Violation and Compliance Order" was still effective against Skoly – this Court denied a preliminary injunction to the same health care professionals and concluded "additional exemptions, including a broader medical exemption, would as Dr. Alexander-Scott puts it, 'defeat RIDOH's purpose in promulgating the Regulation, which is to ensure as best as possible the continued health and well-being of health care workers and health care providers, as well as those treated by health care workers and health care providers, as the COVID-19 pandemic continues." *Dr. T.*, 2022 WL 79819 * 7. Although *Dr. T.* concerned recognition of a religious exemption – while this case seeks a broader medical exemption – nothing in this Court's prior decisions "clearly established" that the State Defendants would run afoul of a person's constitutional rights by following the CDC's guidance and not recognizing a medical exemption for Bell's Palsy or a prior (11 months ago) COVID-19 infection. Indeed, for qualified immunity purposes, the State Defendants were entitled to rely upon this Court's observation that a "broader medical exemption" would undermine RI DOH's public health considerations. Other cases further support this position.

As noted, *supra*, subsequent to this Court's decisions in *Dr. T.*, New York's similarly narrow medical exemption to vaccination was upheld as limited to ACIP Guidelines or other nationally recognized evidence-based standard of care. *Goe*, 43 F.4th at 33.

In *America's Frontline Doctors v. Wilcox*, 2021 WL 4546923 (C.D. Cal., July 30, 2021), the district court examined a university policy requiring vaccination

against COVID-19, but for limited exemptions based on medical, disability, or religious objections. *Id*. at * 2.  The university also provided a temporary 90-day exemption for persons recently diagnosed with COVID-19 and/or who had an antibody test that showed they had natural immunity.  With respect to the temporary exemption, the Food and Drug Administration provided guidance: "a positive result from an antibody test does mean you have a specific amount of immunity or protection from SARS-Co-V-2 infection . . . . Currently authorized SARS-CoV-2 antibody tests are not validated to evaluate specific immunity or protection from SARS-CoV-2 infection." *Id*. at * 2.  The plaintiffs challenged the COVID-19 vaccination requirement on the ground that because they had acquired natural immunity, they should be entitled to an exemption for more than 90-days, and the policy "does not respect their right to work with their doctors to assess their natural immunity to COVID-19 beyond 90 days." *Id*. at * 2.  Similar to Skoly's argument, the plaintiffs requested the district court enjoin enforcement of the vaccination policy "unnecessarily rushing COVID-19 vaccination upon already immune students without their informed consent and without the opportunity of their doctors to protect them from risk of physical injury and death." *Id*. at * 3.

The District Court applied rational basis scrutiny, observed the plaintiffs' argument amounted to "disputes over the most reliable science," and concluded that the "Court will not intervene 'as long as [Defendants'] process is rational in trying to achieve public health.'" *Id*. at * 5.  In declining to require an expanded exemption for those claiming natural immunity, the court observed that the CDC has indicated

that:

> the currently authorized COVID-19 vaccines can be given safely to people with evidence of a prior SARS-CoV-2 infection. Viral testing to assess for acute SARS-CoV-2 infection or serologic testing to assess for prior infection is not recommended for the purposes of vaccine decision-making. . . .While there is no recommended minimum interval between infection and vaccination, current evidence suggests that the risk of SARS-CoV-2 reinfection is low in the months after initial infection but may increase with time due to waning immunity.

*Id*. at * 5.   Based upon the foregoing, the District Court concluded that "there is clearly a rational basis for Defendants to institute the Policy requiring vaccination, including for individuals who previously had COVID-19." *Id*.

In *Harris v. University of Massachusetts*, 2021 WL 3848012 (D. Mass., August 27, 2021), the District Court reviewed a policy requiring students to be vaccinated before returning to campus, subject to a medical or religious exemption.   In formulating the policy, UMASS "relied upon CDC guidance 'that COVID-19 vaccines are safe and the most effective way to prevent the spread of COVID-19[.]'"   *Harris*, 2021 WL 3848012 * 4.   The District Court applied rational basis review and upheld the policy against a due process challenge, explaining:

> [c]ontrary to Plaintiffs' assertion that the Vaccine Policy is arbitrary or not based in science, the Defendants based the decision upon both medical and scientific evidence and research and guidance * * * and thus is at least rationally related to these legitimate interests.   Defendants' affidavits attest that the Vaccine Policy was supported by, among other things, CDC guidance and research that the vaccines were safe and effective at reducing the incidence and severity of COVID-19[.]

*Id*. at *6.   As the Court recognized, "rational basis does not allow courts to second-guess the wisdom of these asserted reasons, so long as they are, as here, properly asserted." *Id*.

In *Valdez v. Grisham*, 559 F. Supp. 3d 1161 (D.N.M. 2021), the District Court considered a vaccination policy requiring, in relevant part, "hospital workers . . . to be fully vaccinated against COVID-19 unless they qualify for an exemption." *Id.* at 1168. Plaintiffs, including a registered nurse, did not fall within an exemption and sought an injunction. In seeking to enjoin enforcement, Plaintiffs framed the due process challenge similar to Skoly's argument: "Plaintiffs generally allege that they 'have [constitutionally] protected liberty interests' 'in their right to live without governmental interference,' their right 'to bodily integrity,' their right 'to raise their children as they see fit,' and their right 'to engage in their chosen professions[.]' *Id.* at 1172.

In determining whether the Plaintiffs alleged a substantive due process violation, the District Court considered the *Glucksberg* test and noted that Plaintiffs failed to explain how "the right to work in a hospital * * * unvaccinated and during a pandemic is 'deeply rooted in this Nation's history and tradition." *Id.* The District Court continued that in promulgating the vaccine requirement, the Defendants relied upon various medical and scientific sources, including the ACIP and CDC, and determined that the three vaccines were "the best tool we have to protect individuals and protect communities from [COVID-19]." *Id.* at 1176.

To be sure, similar to Skoly, the plaintiffs challenged the "technocratic selective science" relied upon to develop the policy, but the District Court rejected the invitation to scrutinize the competing science arguments and instead explained:

> [p]laintiffs' 'disputes over the most reliable science' are of no moment to the instant analysis, as 'the court doesn't intervene so long as

[Defendants'] process is rational in trying to achieve public health.' *Klaassen I*, 549 F. Supp. 3d at 888 (citing *Phillips v. City of New York*, 775 F.3d 538, 542 (2d Cir. 2015) ('[P]laintiffs argue that a growing body of scientific evidence demonstrates that vaccines cause more harm to society than good, but as *Jacobson* makes clear, that is a determination for the [policymaker], not the individual objectors.')). As did the Court in *Jacobson*, this Court assumes that Defendants are aware of 'opposing theories' on the safety and efficacy of vaccines; and as did the Court in *Jacobson*, this Court finds, as it must, that it is for Defendants, and not the Court, to determine what '[is] likely to be the most effective [mode] for the protection of the public against disease.' *Jacobson*, 197 U.S. at 30, 25 S.Ct. 358. Indeed, this is so regardless of whether 'science may yet show' Defendants' belief in the efficacy of the COVID-19 vaccines 'to be wrong,' as Defendants have the right to enact orders 'adapted to prevent the spread of contagious diseases.' *Id.*

*Valdez v. Grisham*, 559 F. Supp. 3d 1161, 1177 (D.N.M. 2021), *aff'd,* 2022 WL 2129071 (10th Cir., June 14, 2022).  In sum, the *Valdez* Court concluded that "by failing to accommodate Plaintiffs' (or their doctors') views on the COVID-19 vaccines, the [policy] does not lack a rational relationship to a legitimate government purpose" and to hold otherwise would "practically strip [Defendants] of [their] function to care for the public health and the public safety when endangered by epidemics of disease." *Id.* at 1175.

Similarly, seven days after the "Notice of Violation and Compliance Order" issued, the Western District of Michigan rejected a motion for a preliminary injunction sought by a university employee challenging the constitutionality of the school's COVID-19 vaccination requirement on the basis that he had acquired natural immunity.  *See Norris v. Stanley*, 2021 WL 4738827 (W.D. Mich., October 8, 2021).  After rejecting plaintiff's fundamental right argument, *see supra*, the district court applied rational basis review and determined the university's vaccination

requirement satisfied this burden.  The court recognized that it heard "the battle of the experts, and they essentially presented that there is ongoing scientific debate about the effectiveness of naturally acquired immunity versus vaccine immunity."

*Id*. at * 3.  Despite this "ongoing scientific debate," the district court observed that:

> [i]n creating its vaccine policy, Defendants relied on guidance from the CDC, FDA, MDHHS, and other federal and state agencies that have extensively studied the COVID-19 vaccine.  Put plainly, even if there is a vigorous ongoing discussion about the effectiveness of natural immunity, it is rational for [the university] to rely on present federal and state guidance in creating its vaccine mandate.

*Id*. at * 3.

Here, Dr. Skoly argues that the Emergency Regulation promulgated by RI DOH, in reliance on CDC guidelines, was erroneously applied to him due to his medical history. For qualified immunity purposes, however, the question this Court must confront is not whether Dr. Skoly should have been granted a medical exemption, but rather whether during the applicable time period, "in the specific context of the case, 'a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.'" *Mosher*, 589 F.3d 488 (1st Cir. 2009)). As the case law demonstrates, *see supra*, Rhode Island officials were well-justified to promulgate a vaccination requirement for healthcare professionals that relied upon CDC guidance and did not recognize medical exemptions for Bell's Palsy or a prior COVID-19 infection.

## III.   SKOLY IS NOT ENTITLED TO INJUNCTIVE OR DECLARATORY RELIEF

Skoly does not seek injunctive relief with respect to the Emergency Regulation, which has long since lapsed.   Nor does Skoly challenge the current regulation's requirement that a "health care worker" be current with all COVID-19 vaccinations OR wear an N95 mask when the COVID-19 prevalence rate is equal or greater than fifty (50) cases per one hundred thousand people per week.   216-RICR-20-15-7, (§7.6.1.B.1 & 2).   Rather, Skoly asks this Court to enjoin the provision in the Permanent Regulation that provides:

> [i]n accordance with the Center for Medicaid and Medicare Services (CMS) 86 FR 61555, all Medicare and Medicaid certified providers, suppliers, and healthcare workers are required to receive the primary series (e.g., two (2) doses of Pfizer or Moderna, or one (1) dose of Johnson & Johnson) of a COVID-19 vaccine.

216-RICR-20-15-7, (§ 7.6.1.B.3).   Skoly additionally asks this Court to issue a "permanent injunction ensuring that he is not deprived of his First Amendment right to speak out against government policy in the future" and that this Court issue an injunction "against future unlawful denial of [unemployment] benefits."   Third Amended Complaint, ¶¶ 214, 225.[13]

A party seeking to invoke "the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983).   An

---

[13] Skoly had also sought an injunction that the "Notice of Violation and Compliance Order" be removed from the RI DOH website, but this action has already been accomplished, thus injunctive relief is not necessary.

abstract injury is insufficient; rather Skoly must "show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Id*. at 101-02. "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id*. at 102 (ellipsis in original). Skoly fails to plead "any continuing, present adverse effects." *Id*.

### A. **Skoly's Claim for Injunctive Relief is Non-Justiciable Because This Court Cannot Grant Effective Relief**

Skoly asks this Court to enjoin 216-RICR-20-15-7, (§ 7.6.1.B.3,) *i.e.*, the CMS vaccine requirement. According to Skoly, although the "vaccine mandate is no longer in effect, for a subset of workers ('Medicare and Medicaid certified providers, suppliers, and healthcare workers'), the Permanent Vaccine Regulation rescinds the 'vaccination or N95 masking rule and reimposes the distinction between the medically exempt unvaccinated (allowed to work) and the not medically exempt unvaccinated (not allowed to work)." Third Amended Complaint, ¶ 165. Although Skoly is permitted to resume his practice without being vaccinated – since the CMS vaccination requirement generally does not apply to his practice – Skoly maintains the CMS vaccination requirement prevents him from "resuming his practice at the physical premises of the 'Health Care Facilities' Eleanor Slater and ACI." Third Amended Complaint, ¶ 167. It is unclear whether Skoly would resume practicing at the physical premises of the Eleanor Slater Hospital and/or the Adult Correctional Institution, even if the CMS requirement was withdrawn. Because the Permanent

Regulation merely incorporates the federal CMS vaccine requirement – and because federal law preempts state law – Skoly's argument is misplaced.[14]

In *Valdez v. Grisham*, 2022 WL 2129071 (10th Cir., 2022), the Court of Appeals considered a similar issue where New Mexico issued a Public Health Order ("PHO") requiring, among others, all congregate care and hospital workers to be vaccinated. As the Court of Appeals explained, however, "the PHO is not the only COVID-19 vaccine mandate that applies" to plaintiffs; rather the "Center for Medicare and Medicaid Services ('CMS') also issued an interim final rule with comment period ('IFC') requiring staff at Medicare and Medicaid-certified hospitals to be vaccinated." *Id*. at * 2.  Because the plaintiffs were covered by the PHO and the CMS requirement, the Court of Appeals concluded it lacked jurisdiction to consider the issue because even if the Court were "to grant a preliminary injunction against the PHO today, [the plaintiff] would still be required to be vaccinated to work at Presbyterian because of * * * the IFC."  *Id*. at *2.  *See also Sczesny v. State of New Jersey*, 2022 WL 2047135 * 16 (D. N.J. 2022) (unpublished) ("If Hunderdon is subject to the CMS Rule, enjoining the enforcement of the Executive Orders may not alter whether Plaintiff must be 'up to date' with their vaccinations.").

Similarly, Skoly's attempt to enjoin § 7.6.1.B.3 provides him absolutely no relief because § 7.6.1.B.3 incorporates the federal CMS requirement, which would

---

[14] To the extent Skoly seeks to invalidate the CMS requirement set forth in 86 Fed. Reg. 61555 (2021), Skoly also fails to join an indispensable party, the United States. The claim for injunctive relief should additionally be dismissed for failure to join an indispensable party.

still govern.  Even if this Court enjoined § 7.6.1.B.3, the CMS mandate would still govern.  *See e.g.*, *Dr. T.*, 2022 WL 79819 * 9 ("The Court interprets this language as precluding a broader exemption than the IFC, which provides that health care employers must make accommodations for an individual seeking an exemption including religious exemptions.").  Because Skoly cannot receive effective relief, the claim for injunctive relief is non-justiciable.  *See e.g.*, *Oakville Dev. Corp. v. F.D.I.C.*, 986 F.2d 611, 613 (1st Cir. 1993) ("It is well established that, in circumstances where a court cannot provide effectual relief, no justiciable case remains and the court must dismiss the appeal as moot.").

**B.**     **Skoly's Claim for Injunctive Relief is Non-Justiciable Because he Seeks to Enjoin Future Unknown Events that May Never Occur**

With respect to Counts III and IV, Skoly asks this Court to enjoin what he contends ***may become a future*** violation of federal law.[15]  "[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects."  *City of Los Angeles*, 461 U.S. at 102   Of course, the facts and circumstances of any such future violation – assuming such facts or circumstances even arise – are unknown even to Skoly.  Nonetheless, Skoly invites this Court to enjoin the State Defendants: (1) from violating his First Amendment rights, and (2) from improperly denying him unemployment benefits.  Third Amended Complaint, ¶¶ 214, 225.  The request to enjoin future unknown conduct should not be entertained by this Court.

---

[15] For the reasons discussed, *supra*, there never was an initial violation of federal law.

In *Town of Portsmouth v. Lewis*, the Town requested injunctive relief to enjoin the collection of tolls, despite enacted legislation repealing the challenged tolls.  813 F.3d 54, 58 (1st Cir. 2016).  Similar to Skoly, the Town suggested injunctive relief was still necessary to prevent the possibility of future tolling.  The Court of Appeals disagreed, explaining that it "generally consider[s] the law as it exists at the time of our review," and "not as it might speculatively exist in the future."  *Id*. at 59.  The First Circuit continued, [t]hus, even if we were permitted to issue an advisory opinion on hypothetical conduct, which we are not, we would decline to do so."  *Id.  See also New England Regional Council of Carpenters v. Kinton*, 284 F.3d 9, 18 (1st Cir. 2002) ("it would be pointless either to enjoin the enforcement of a regulation that is no longer in effect or to declare its constitutional status").

Here, Skoly cannot sustain his burden of invoking this Court's jurisdiction and demonstrating that he is "'immediately in danger of sustaining some direct injury' as the result of the challenged official conduct," nor can Skoly demonstrate that any injury or threat of injury is "both 'real and immediate,' not 'conjectural' or 'hypothetical.'"  *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983).  Skoly's complaint is devoid of any such allegation and the actions he seeks to enjoin – future retaliatory conduct and the denial of future unemployment benefits – is untethered to any State Defendant, two of whom are no longer in state government.

To be sure, "[t]he dynamic nature of both the virus that has given rise to this pandemic and the public health response to it all but ensures" unpredictability, and even if future COVID-19 restrictions are imposed, they are likely to be based upon

"at least somewhat different facts and considerations." *Bayley's Campground Inc. v. Mills*, 985 F.3d 153, 157 (1st Cir. 2021).  But the justiciability issue before this Court is not whether Skoly might be subject to a vaccination requirement at some future date – and violate that requirement – but rather whether Skoly presently faces a "real and immediate" threat of injury sufficient to invoke this Court's Article III jurisdiction. *City of Los Angeles*, 461 U.S. at 102.  This question must be answered, "no."

First, the COVID-19 vaccination requirement previously recognized has not been effective since March 11, 2022.  As discussed, *supra*, Rhode Island has taken no steps toward such a future requirement, thus Skoly faces no "real and immediate" threat of injury. *City of Los Angeles*, 461 U.S. at 102.  To the extent Skoly complains about the CMS vaccination requirement, federal law preempts state law, regardless of whether the CMS vaccination requirement is recognized in the Permanent Regulation.

Second, whether Rhode Island ever re-imposes a COVID-19 vaccination requirement – and what the medical exemptions to such a future vaccination requirement might be – at this point, is guess-work. What is clear, however, is that the medical exemptions previously recognized were not arbitrary but were based on specific CDC guidance and the scientific knowledge available at that time. *See supra*.

Skoly also asks this Court to enjoin the State Defendants from infringing upon his First Amendment rights.  This request stems from the allegation that the October 1, 2021 "Notice of Violation and Compliance Order" was issued not because of a

50

"medical issue," but because Skoly "opened his big month."[16]   Third Amended Complaint, ¶ 210.  Notwithstanding this allegation concerning past-conduct, Skoly's complaint makes no allegation that it is RI DOH policy or practice to retaliate against Skoly (or someone in Skoly's position), nor has Skoly demonstrated that he "'is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct[.]'" *City of Los Angeles*, 461 U.S. at 102.  The requested injunction ignores at least two points.

First, Skoly does not contest that 216-RICR-20-15-8 required him to vaccinate against COVID-19, that he did not vaccinate against COVID-19, and that he continued to treat patients in-person in violation of 216-RICR-20-15-8.  As such, while Skoly contends that the medical exemptions set forth in 216-RICR-20-15-8 were overly narrow, Skoly does not contest that 216-RICR-20-15-8 applied to him and does not contest that his actions violated the Emergency Regulation.

Second, in seeking an injunction against RI DOH from allegedly committing future retaliatory actions in violation of Skoly's First Amendment rights, Skoly assumes that the October 1, 2021 "Notice of Violation and Compliance Order" was the result of his free-speech, rather than an uncontested violation of 216-RICR-20-15-8.  *But see Gonzalez-Droz*, 660 F.3d at 16.  Regardless of this assumption, Skoly

---

[16] Undermining Skoly's retaliatory argument, Skoly is not the only person who was subjected to a "Notice of Violation and Compliance Order" due to unvaccinated health care workers or health care providers violating 216-RICR-20-15-8.  *See Dr. T. v. Alexander-Scott*, 2022 WL 79819 * 10 (D.R.I. 2022) (noting issuance of "Notice of Violation and Compliance Order").

makes no effort to demonstrate that an injunction is necessary because he "has sustained or is immediately in danger of sustaining some direct injury as a result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *City of Los Angeles*, 461 U.S. at 102.

Lastly, Skoly seeks injunctive relief "against future unlawful denial of benefits." Third Amended Complaint, ¶ 225. As background, after the "Notice of Violation and Compliance Order" issued, Skoly ceased working and subsequently applied for unemployment benefits. According to Skoly, the RI DLT denied the unemployment benefits claim because Skoly had "not conducted a work search as required by Section 28-44-12 of the Act." Third Amended Complaint, ¶ 220. Skoly provides no allegation or suggestion that this determination has been overruled.

Skoly's underlying premise – that he was unlawfully denied unemployment benefits – fails as a matter of law. Under Rhode Island law, collateral estoppel applies when there is "an identity of issues[,] the prior proceeding *** [has] resulted in a final judgment on the merits[,] and the party against whom the collateral estoppel is sought must be the same as or in privity with the party in the prior proceedings." *Lee v. Rhode Island Council 94*, 796 A.2d 1080, 1084 (R.I. 2002). All three elements are satisfied, therefore, Skoly may not claim in this lawsuit that the RI DLT determination was unlawful.[17]

---

[17] The collateral estoppel argument applies equally to the claim for monetary damages as a result of the alleged unlawful denial of benefits.

In *East Providence School Committee v. Rhode Island Council, 94, AFSCME,*
2005 WL 374271 (R.I. Superior, Jan. 11, 2005), an employee was terminated for
misconduct.  The employee applied to RI DLT for unemployment benefits, which the
agency granted.  *Id*. at * 1.  The School Committee appealed the RI DLT decision,
which was reversed on the basis that the employee was discharged for misconduct.
Subsequently, the employee appealed that decision, which was affirmed by the Board
of Review.  *Id*.  Although the employee could have sought additional review (as of
right) to the Rhode Island District Court, no further appeal ensued and the Board of
Review decision became final.  *Id*.  Separately, the employee also filed a grievance
wherein an arbitrator ordered the employee to be reinstated.  *Id*.  The School
Committee appealed the arbitrator's decision to the Rhode Island Superior Court.  *Id*.

While the Rhode Island Superior Court determined that the arbitrator had the
authority to modify the discipline, the Superior Court simultaneously concluded that
the non-appealed Board of Review's determination that the employee was discharged
for misconduct was a final determination that could not be collaterally attacked.
Citing Rhode Island Supreme Court precedent, the Superior Court explained:

> the Court has recently declared that res judicata may attach to review
> board decisions as long as the tribunal acted in a quasi judicial capacity.
> … 'An administrative tribunal acts in a quasi judicial capacity when it
> affords the parties substantially the same rights as those available in a
> court of law, such as the opportunity to present evidence, to assert legal
> claims and defenses, and to appeal from an adverse decision.' … Here,
> [RI DLT] allowed the parties to present evidence and testimony in
> support of their legal arguments. Furthermore, the Board's decision
> expressly stated that Defendant had thirty days to appeal [RI DLT's]
> decision to the District Court before it became a final judgment-an
> option which Defendant chose not to pursue. Because the proceeding
> before [RI DLT] involved an administrative agency acting in a quasi-

> judicial capacity, res judicata precludes Defendant from relitigating issues that were argued before and decided by the Board.

*Id*. at * 3 (citations omitted).  *See also Department of Corrections v. Tucker*, 657 A.2d 546, 550 (R.I. 1995) ("Since the decision of the board was not appealed, it became a final decision and was binding on both Tucker and the department.").

Based on these facts, Skoly is precluded from contesting the Board of Review's final decision that Skoly is not entitled to unemployment compensation benefits pursuant to collateral estoppel.  Exhibit A makes clear that similar to the employee in *East Providence School Committee*, Skoly availed himself of the opportunity to present evidence and argument and had the opportunity to appeal the Board of Review decision to the Rhode Island District Court.  It is the State Defendants understanding that Skoly has filed an appeal to the Rhode Island District Court, which remains pending at the time of this filing.  Rhode Island law is clear that an appeal of a lower tribunal decision does "not prevent the * * * invocation of res judicata." *Perez v. Pawtucket Redevelopment Agency*, 302 A.2d 785, 792 (R.I. 1973).

Before this Court and the Board of Review, there is an identity of issues (whether Skoly was properly denied unemployment compensation benefits) and the party against whom estoppel is asserted is the same (Skoly).  Moreover, as explained above, even though Skoly has appealed the Board of Review's decision to the Rhode Island District Court, under *Perez*, principles of res judicata and collateral estoppel apply.  *See id*. at 792 ("we will leave it to the sound discretion of the individual trial justice as to whether, in situations such as the one now before us, final judgment on the second suit should be delayed until the pending appeal has been decided").

Because Skoly is estopped from challenging the Board of Review's decision, Skoly's foundational premise that he requires injunctive relief to once again preclude an unlawful denial of benefits is misplaced.

Additionally, injunctive relief is improper because such an injunction would concern future unknown facts and enjoin the state administrative and judicial process from applying state law. Among the requirements to receive unemployment benefits, an applicant must establish that they have made "an active, independent search for suitable, full-time work." R.I. Gen. Laws § 28-44-12(a)(3). Skoly makes no allegation that he complied with this state law requirement, nor does Skoly contest the Board of Review's conclusion (through this lawsuit) that he failed to comply with this requirement. Should Skoly become unemployed in the future, Skoly's request that this Court enjoin future denial of benefits would seemingly alleviate Skoly's obligation to comply with state law.

Skoly cannot demonstrate that he is "immediately in danger of sustaining some direct injury," i.e., losing his job as a refusal to comply with a vaccination requirement and then being unlawfully denied unemployment compensation benefits based upon his failure to conduct "an active, independent search for suitable, full-time work." R.I. Gen. Laws § 28-44-12(a)(3). For all these reasons, this Court should not entertain Skoly's request to enjoin future conduct where no immediate threat of injury is present.

Respectfully submitted,

Daniel J. McKee, in his individual and
official capacity as the Governor of the State
of Rhode Island; Nicole Alexander-Scott, in
her individual and official capacities as
former RI DOH Director; James McDonald,
MD, MPH, in his individual and official
capacity as the former Interim Director of
the Rhode Island Department of Health;
Utpala Bandy, in her individual and official
capacities as Interim RI DOH Director;
Matthew D. Weldon, in his individual and
official capacity as Director of the Rhode
Island Department of Labor and Training;
State of Rhode Island; the Rhode Island
Department of Health; and the Rhode Island
Department of Labor and Training

Defendants,

BY:

PETER F. NERONHA,
ATTORNEY GENERAL

*/s/ Michael W. Field*
Michael W. Field, Bar No. 5809
Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400 Ext. 2380
mfield@riag.ri.gov

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that I filed the within via the ECF filing
system and that a copy is available for viewing and downloading. I have also caused
a copy to be sent via the ECF System to counsel of record on this 28th day of October,
2022.

*/s/ Michael W. Field*