# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| **DR. STEPHEN T. SKOLY, Jr.,** | |
| *Plaintiff,* | **C.A. 1:22-cv-00058-MSM-LDA** |
| v. | |
| **DANIEL J. McKEE, sued in his official and individual capacities as the Governor of the State of Rhode Island; NICOLE ALEXANDER-SCOTT, sued in her official and individual capacities as the former Director of the Rhode Island Department of Health; JAMES McDONALD, sued in his official and individual capacities as the former Interim Director of the Rhode Island Department of Health; UTPALA BANDY, sued in her official and individual capacities as the current Interim Director of the Rhode Island Department of Health; MATTHEW D. WELDON, sued in his official and individual capacities as the Director of the Rhode Island Department of Labor and Training; the STATE OF RHODE ISLAND; the RHODE ISLAND DEPARTMENT OF HEALTH; and the RHODE ISLAND DEPARTMENT OF LABOR AND TRAINING,** | **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS** |
| *Defendants.* | |

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................... i

I.      BACKGROUND ..................................................................................................... 1

II.     STANDARD OF REVIEW .......................................................................................... 4

III.    ARGUMENT ........................................................................................................... 5

    A.   Plaintiffs Plea for Injunctive and Declaratory Relief Is Not Moot .................................. 6

    B.   The Right to Be Free from Selective Prosecution on the Basis of One's Public
         Statements Is "Clearly Established" ........................................................................... 9

    C.   Defendants Cannot Show that Administrative Actions Against Dr. Skoly Would Have
         Been Taken Absent Retaliatory Motive ..................................................................... 18

    D.   Dr. Skoly Pleaded Sufficient Facts to Survive a Motion Under Fed. R. Civ. P.
         12(b)(6) ................................................................................................................ 20

IV.     CONCLUSION ....................................................................................................... 24

Plaintiff Dr. Stephen T. Skoly, Jr., by and through his attorneys at the New Civil Liberties Alliance ("NCLA") and Gregory Piccirilli, Esq., files the present brief in opposition to Defendants' Rhode Island Gov. Daniel J. McKee, *et al.* (collectively "Rhode Island") Motion to Dismiss the Third Amended Complaint, ECF 42.

## I. BACKGROUND

Dr. Skoly, an oral and maxillofacial surgeon, had been practicing his profession in the State of Rhode Island for over two decades when, in response to the COVID-19 pandemic, Defendants unlawfully, and in contravention of several constitutional provisions, essentially shuttered his practice. As alleged in the Complaint, Defendants, in violation of Dr. Skoly's First Amendment rights, targeted him in retaliation for his public protest against Rhode Island's healthcare workers' vaccine mandate.

For years, long before COVID, Dr. Skoly treated prisoners, mental health patients, and people who could not afford to pay. *See* Third Am. Complaint, ¶¶ 23-35. Page ID#701-03. Dr. Skoly and his staff continued treating patients (including the most vulnerable ones, such as prisoners and mental health patients) even when COVID-19 lockdowns began in March 2020. The treatments were done in person, which, of course, is the only way that dental procedures can be performed. In order to protect his patients, Dr. Skoly and his staff engaged in scrupulous masking and other hygiene requirements. Not one of Dr. Skoly's patients contracted Covid as a result of visiting his office, nor did any of Dr. Skoly's staff contract the disease from Dr. Skoly or any of the patients. However, in November of 2020, Dr. Skoly came down with COVID-19. After his recovery and appropriate quarantine period, Dr. Skoly returned to work.

In addition to his work as an oral and maxillofacial surgeon, Dr. Skoly serves as Chairman of the Rhode Island Center for Freedom and Prosperity—an organization "dedicated to providing

concerned citizens, the media, and public officials with empirical research data, while also advancing market-based solutions to major public policy issues in the state." *See About Us*, R.I. Ctr. for Freedom & Prosperity, https://rifreedom.org/about-us/.  This organization has also been vocal in opposing heavy-handed COVID restrictions that have lacked empirical or logical support. *See, e.g.*, Andrew Bostom, *The Scientific Truth About Mask Mandates*, R.I. Ctr. for Freedom & Prosperity (Feb. 9, 2022), https://bit.ly/3WOPb4h.  Because Dr. Skoly has served and continues to serve as the public face of the Center, his disagreements with Rhode Island's COVID policies have always been prominent in the public's eye.

In August of 2021, the Rhode Island Department of Health—an agency within the Executive Branch of the State of Rhode Island—promulgated a temporary emergency regulation 216-RICR-20-15-8 ("original vaccine mandate") mandating that "all health care workers and health care providers be vaccinated against COVID-19 by October 1, 2021."  Because of Dr. Skoly's prior experience with Bell's Palsy[1] and his acquisition of natural immunity as a result of his November 2020 infection with COVID, he declined vaccination.  Despite Dr. Skoly's condition, his commitment to patient safety, and lack of any evidence of patients becoming infected at his office, Rhode Island refused to provide Dr. Skoly with a medical exemption from

---

[1] Bell's Palsy is a condition that causes sudden weakness in the muscles on one side of the face.  The condition affects the facial nerve, which controls the muscles responsible for closing the eyelids.  Because patients with Bell's Palsy cannot close their eyelids, they tend to exhibit symptoms such as watery eye and extreme dry eye.  As a result, visual perception in such patients may be impaired.  Needless to say, this is a debilitating condition for a surgeon, especially one like Dr. Skoly who operates in a fairly small field and deals with minute anatomical structures.

"That Bell's Palsy is a risk factor for COVID-19 vaccination has been documented in the scientific literature, including the CDC's VAERS Report."  ECF 31, ¶ 94.  As one of the experts relied on by Dr. Skoly in his request for a medical exemption from the vaccine mandate opined,

> In view of Dr. Skoly's known history of Bell's Palsy, his confirmed natural immunity from prior COVID-19 infection and known protection it provides, the potential debilitating effect a recurrent Bell's Palsy incidence can produce, and the recently observed increased incidences of Bell's Palsy related to COVID-19 vaccines … Dr. Skoly should not get a COVID-19 vaccine[, because] [t]he potential significant harm to Dr. Skoly outweighs any benefit vaccination would incur to him or any patient he treats, particularly if he adheres to the strict masking protocols of dental surgery.

*Id.*, ¶ 97.

the vaccine requirement.  Instead, on October 1, 2021, pursuant to R.I. Gen. L. § 23-1-20, Defendant Dr. Nicole Alexander-Scott, in her capacity as then-Director of the Rhode Island Department of Health, issued Dr. Skoly a Notice of Violation and Compliance Order that directed him to immediately "cease professional conduct as a health care provider … unless and until he has complied with the terms and conditions of" the vaccination mandate.  It is important to highlight that under Rhode Island's law, the Notice of Violation was <u>not</u> immediately operable. *See* R.I. Gen. L. §§ 23-1-20, -22.  Despite the clear statutory language, Rhode Island ordered Dr. Skoly to *immediately* cease practicing and posted the Compliance Order on the Department of Health's website, thus falsely conveying to the public that Dr. Skoly was subject to professional discipline.

Dr. Skoly sought an administrative hearing on the compliance order, but this request was resolved through a stipulation of dismissal.  On March 11, 2022, Rhode Island replaced the original vaccine mandate with a revised one that did not apply to Dr. Skoly's practice within his office.  According to the new mandate, Dr. Skoly could practice if he either submitted to vaccination *or* agreed to wear an N-95 mask.  On the same date, and in recognition of the fact that from the beginning of the pandemic, Dr. Skoly *always* wore an N-95 mask, Rhode Island and Dr. Skoly entered into a stipulated dismissal of the order.  Nevertheless, until sometime after the filing of the operative complaint, Rhode Island did not remove the Notice of Violation and Compliance Order from its webpage, thus continuing to falsely convey to the public that Dr. Skoly remained subject to professional discipline.

Rhode Island points out that since the filing of the operative complaint most of the issues have been resolved in Dr. Skoly's favor.  However, his First Amendment claim has not been resolved.  As alleged in the Complaint, Dr. Skoly was targeted "because he had 'opened his big

mouth' by speaking to the press."  ECF 31, ¶ 77.  Indeed, Dr. Alexander-Scott explicitly stated in one of her press conferences that enforcement action pursuant to the original vaccine mandate would be taken only against those practitioners who "*publicly stated* that they would not comply." AnchorRising.com, *Governor McKee Declines to Comment about 854 Unvaccinated Health Care Workers*, https://bit.ly/3CtcQzM.  The question of whether Defendants retaliated against Dr. Skoly for exercising his First Amendment rights remains live, and the Court can furnish the requested relief.  Accordingly, Defendants' motion to dismiss should be denied except as to Count IV.

## II.     Standard of Review

The court must deny Defendants' motion to dismiss if Plaintiff's "pleadings plausibly establish that [he is] entitled to relief."  *Mulero-Carrillo v. Roman-Hernandez*, 790 F.3d 99, 104 (1st Cir. 2015).  In evaluating Plaintiff's pleadings, the Court must "assume the truth of all well-pleaded facts and indulge all reasonable inferences that fit the plaintiff['s] stated theory of liability."  *In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 15 (1st Cir. 2003).

While "a case may be rendered moot (and, therefore, subject to dismissal) if changed circumstances eliminate any possibility of effectual relief," *Maine School Admin. Dist. No. 35 v. Mr. and Mrs. R.*, 321 F.3d 9, 17 (1st Cir. 2003), a case is not mooted "when a defendant voluntarily ceases the challenged practice in order to moot the plaintiff's case and there exists a reasonable expectation that the challenged conduct will be repeated after the suit's dismissal." *Bos. Bit Labs, Inc. v. Baker*, 11 F.4th 3, 9 (1st Cir. 2021) (cleaned up).  "[T]he burden of showing that the voluntary-cessation doctrine does *not* apply still lies with the party claiming mootness."  *Id.* at 10 (emphasis in original).

Finally, although it is well-settled that monetary damages against a State or its officers acting in their official capacities are barred by the doctrine of sovereign immunity, *see Will v.*

*Michigan*, 491 U.S. 58, 71 (1989), both injunctive and declaratory relief are available against state officers acting in their official capacities but in contravention to the federal Constitution.  *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) ("[W]e have long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted."); *Ex Parte Young*, 209 U.S. 123, 155-56 (1908).  Furthermore, under 42 U.S.C. § 1983, "if, while acting under the 'color of law,' [state] officials exceed their scope of authority, act pursuant to an unconstitutional statute, or personally deprive the plaintiff of a federal right, the officials can be sued in their personal capacity."  *Han v. DOJ*, 824 F. Supp. 1480, 1490 (D. Haw. 1993), *aff'd by* 45 F.3d 333 (9th Cir. 1995).  Damages for such actions are recoverable when those officials' actions violate a "clearly established" constitutional right, *see, e.g.*, *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014).

### III.   ARGUMENT

Although certain developments in this case since filing of the third amended complaint, have obviated the need for judicial intervention as to some matters, given that the State of Rhode Island has never disavowed its powers to repeat the conduct complained of and has indeed maintained the "State of Emergency" first promulgated on March 9, 2020, *see* R.I. Exec. Or. 23-01; R.I. Exec. Or. 20-02, the case remains live and this Court can and should provide Dr. Skoly with the requested relief.[2]  Specifically, the Court can and should fashion injunctive relief and enter a declaratory judgment with respect to Counts I and II, because although Rhode Island has permitted Dr. Skoly to return to practice in his office, it has never formally disavowed its ability to reinstate the prior restrictions and has maintained a legal regime that would allow it to do so. Furthermore, the Court can and should order monetary damages against Defendants McKee,

---

[2] Plaintiff agrees to dismiss Count IV of the Complaint.

Alexander-Scott, McDonald, and Bandy who, while acting under "color of law" personally deprived Dr. Skoly of his federal constitutional right to be free from retaliation.[3]

### A.   Plaintiffs Plea for Injunctive and Declaratory Relief Is Not Moot

"[A] case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.  Another way of putting this is that a case is moot when the court cannot give any effectual relief to the potentially prevailing party." *Town of Portsmouth v. Lewis*, 813 F.3d 54, 58 (1st Cir. 2016) (quoting *ACLU of Mass. v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 52 (1st Cir. 2013) ("*ACLUM*")).  A case is moot when intervening "events have completely and irrevocably eradicated the effects of the alleged violation." *Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 446 (2d Cir. 2021) *(*quoting *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016)).  "The 'heavy' burden of showing mootness is on the party raising the issue." *Bos. Bit Labs*, 11 F.4th at 8.

It is not enough for a party to show that the complained of conduct has ceased.  *See, e.g.*, *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) ("[E]ven if the government withdraws or modifies a COVID restriction in the course of litigation, that does not necessarily moot the case.").  This is known as a "voluntary cessation doctrine" and it "exists to stop a scheming defendant from trying to immunize itself from suit indefinitely by unilaterally changing its behavior long enough to secure a dismissal and then backsliding when the judge is out of the picture, repeating this cycle until it achieves all its unlawful ends." *Bos. Bit Labs*, 11 F.4th at 10 (cleaned up).  Indeed, when

---

[3] Dr. Skoly notes that Defendants' brief does not accurately presents all facts.  For example, on page 5 of their brief, Defendants state that "Skoly does not plead that he requested a hearing on the 'Notice of Violation and Compliance Order.'"  That is flatly incorrect.  In Paragraph 68 of the Third Amended Complaint, Dr. Skoly explicitly states that he "promptly commenced a Rhode Island administrative proceeding to prevent the proposed order from becoming effective," and later on in Paragraphs 126-127 he alleges that the administrative process ended by stipulation when "Defendants withdrew the Compliance Order … and Dr. Skoly withdrew his request for an administrative hearing."  Nevertheless, because these (and several other) misstatements of fact are ultimately not material to the resolution of the pending Motion to Dismiss, Plaintiff will not further dwell on them here.

a defendant voluntarily ceases complained of conduct, there nevertheless remains a "presumption that the controversy reflected by the violation of alleged rights continues to exist." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 213 (2000) (Scalia, J., dissenting).

Given the presumption "that that the controversy reflected by the violation of alleged rights continues to exist," *id.*, "if the offending conduct ceases after the suit is filed, [it is] the defendant [who] must establish mootness by showing that its offending conduct 'could not reasonably be expected to recur,'" *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1185-86 (10th Cir. 2012) (quoting *Laidlaw*, 528 U.S. at 189); *see also Bos. Bit Labs*, 11 F.4th at 10 ("[T]he burden of showing that the voluntary-cessation doctrine does *not* apply still lies with the party claiming mootness."). The burden is not an easy one to meet, and a proponent of the mootness argument must "show[] that it is *absolutely clear* the allegedly wrongful behavior could not reasonably be expected to recur." *ACLUM*, 705 F.3d at 55 (emphasis added) (quoting *Laidlaw*, 528 U.S. at 190).

Here, Rhode Island has failed to carry its burden and overcome the presumption that the controversy remains live. Two cases, both concerning administratively-imposed COVID restrictions, and which were recently decided by the First Circuit, provide useful guidance. In *Bayley's Campground, Inc. v. Mills*, plaintiffs challenged an executive order promulgated by the Governor of Maine that "required persons traveling to that state to self-quarantine upon their arrival for a period of fourteen days before venturing out in public." 985 F.3d 153, 155 (1st Cir. 2021). Several months later, while plaintiffs' appeal from a denial of preliminary injunction against the order was pending, the Governor rescinded the challenged executive order and replaced it with a new one which was significantly narrower in scope. *Id.* at 156-57. The Governor then moved for dismissal of the case on the ground of mootness. The First Circuit rejected the argument

7

finding that although "nothing in the record suggests that the Governor rescinded [the challenged executive order] for litigation-related reasons rather than to account for changing conditions owing to the course of the virus itself," the Governor never "denied that a spike in the spread of the virus in Maine could lead her to impose a self-quarantine requirement just as strict." *Id.* at 157.   On those facts, the court concluded that the Governor failed to carry "'the formidable burden' that she bears 'of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* at 157-58 (quoting *ACLUM*, 705 F.3d at 55).

Seven months later, the First Circuit decided *Boston Bit Labs*.  There, plaintiff challenged, on equal protection grounds, an executive order issued by the Governor of Massachusetts that permitted certain businesses in Bay State to reopen while keeping plaintiff's business shuttered. 11 F.4th at 6.  However, as soon as plaintiff filed its case, the Massachusetts Governor modified the challenged order in such a way as to address plaintiff's complaint. *Id.* at 7.  This modification is not what was "critical" for the First Circuit.  Rather, what the court found to be a "critical" issue was the fact that while the appeal was pending, the Governor has fully "terminated the COVID-19 state of emergency by issuing 'COVID-19 Order No. 69'—which ultimately ended his authority 'to impose any COVID-19 related restrictions' under the earlier emergency declaration and rescinded his COVID-19 emergency orders issued pursuant to the [Massachusetts] Civil Defense Act too." *Id.*  Given this new development, the court concluded that *Boston Bit Labs* was materially different from *Bayley's Campground*.  The court explained that "[t]he key to [its] not-moot ruling [in *Bayley's Campground*] was how 'the [g]overnor ha[d] not denied that a spike in the spread of the virus in Maine could lead her to impose a self-quarantine requirement just as strict as' the rescinded one." *Id.* at 11 (quoting *Bayley's Campground*, 985 F.3d at 157).  In contrast, in *Boston Bit Labs* "the offending order [was] gone, along with the COVID-19 state of

8

emergency." *Id.*   The court concluded that this disavowal of any ability to reinstitute the challenged orders and the formal end to the declaration of emergency that permitted the Governor to issue such orders in the first place, did "show that it is absolutely clear that the supposedly wrongful behavior could not reasonably be expected to recur." *Id.* (cleaned up).

The lesson to be drawn from the *Bayley's Campground/Boston Bit Labs* double feature is this—in order for defendant to show that the voluntary cessation doctrine does not apply, the defendant must do more than just formally rescind a challenged policy, and must instead take significant steps to disavow or surrender the very power to maintain such a policy.   Only then can the plaintiff (and the Court) be confident that "it is absolutely clear that the supposedly wrongful behavior could not reasonably be expected to recur." *Id.*

The State of Rhode Island fails this test for a very simple reason.   Not only has Governor McKee not declared an end to the state of emergency in Rhode Island, but he has extended it nearly *thirty* times, including as recently as January 9, 2023.   *See* R.I. Exec. Or. 23-01 (extending R.I. Exec. Or. 20-02 until February 9, 2023).[4]   Nor has Governor McKee—nor the Rhode Island Department of Health through any of its leaders (including Drs. Nicole Alexander-Scott, James McDonald, and Utpala Bandy)—ever publicly stated that they do not expect to re-impose the blanket vaccination requirement.   All of this mirrors the situation in *Bayley's Campground*, while standing in sharp contrast with *Boston Bit Labs*.   Accordingly, Dr. Skoly's request for declaratory and injunctive relief on Counts I-III of his complaint is not moot.

B.   *The Right to Be Free from Selective Prosecution on the Basis of One's Public Statements Is "Clearly Established"*

"If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion."  *W.*

---

[4] The initial order was issued by the then-Governor of Rhode Island, Gina M. Raimondo.

*Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). As the Supreme Court has recognized, "[a] fundamental principle of the First Amendment is that all persons have access to places where they can speak and listen, and then, after reflection, speak and listen once more," *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735 (2017), and the "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content," *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002).

The First Amendment not only protects citizens from Government's direct attempts at suppressing speech, *see, e.g.*, *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785 (1978), but also proscribes retaliatory actions against individuals whose speech has displeased the Government, *see Crawford–El v. Britton*, 523 U.S. 574, 588, n.10 (1998). As the Supreme Court held over 15 years ago, "official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right,' and *the law is settled* that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (alterations in original; emphasis added) (quoting *Crawford–El*, 523 U.S. at 588, n.10).

Plaintiff does not dispute that "the Government retains 'broad discretion' as to whom to prosecute." *Wayte v. United States*, 470 U.S. 598, 607 (1985) (quoting *United States v. Goodwin*, 457 U.S. 368, 380, n.11 (1982)). The discretion, however, is not unfettered and is subject to constitutional constraints. *United States v. Batchelder*, 442 U.S. 114, 125 (1979). Specifically, the "decision to prosecute may not be 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification,' including the exercise of protected statutory and constitutional rights." *Wayte*, 470 U.S. at 608 (quoting *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978)).

10

Because retaliatory prosecution for exercising one's First Amendment rights is unequivocally prohibited, courts have denied qualified immunity to officials who have brought such prosecutions. Thus, in *Lacey v. Maricopa County*, 693 F.3d 896, 917 (9th Cir. 2012) (*en banc*), the Ninth Circuit rejected the qualified immunity claim of a special prosecutor who allegedly instituted proceedings in retaliation for a newspaper publishing articles critical of the then-Maricopa County Sheriff. The court explained that because the prosecutor "intended to punish [newspaper publishers] for their First Amendment activities and deter them from future activities," and because the illegality of such conduct had long been established, the prosecutor was not entitled to any immunity. *Id.* at 917. Similarly, in *Klen v. City of Loveland*, 661 F.3d 498, 506 (10th Cir. 2011) the Tenth Circuit rejected the qualified immunity defense in the face of an allegation that the City issued criminal citations to the plaintiffs in retaliation for their concededly "vituperative and abusive comments to and concerning City employees." *Id.* at 501, 511. The Tenth Circuit held that clearly established constitutional law prohibits the government from taking an "adverse action [against a plaintiff that is] substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Id.* at 508 (quoting *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000)). Thus, the City's officers could find no shelter in the qualified immunity doctrine.

It is true that, in order to overcome the qualified immunity defense, a plaintiff must show that the "right allegedly violated [was] established, 'not as a broad general proposition,' but in a 'particularized' sense so that the 'contours' of the right are clear to a reasonable official." *Reichle v. Howards*, 566 U.S. 658, 665 (2012) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (*per curiam*)). This test is easily met here. As the First Circuit explained, in determining whether the "the 'contours' of the right are clear to a reasonable official," *id.*, "the salient question is

whether the state of the law at the time of the alleged violation gave the defendant fair warning that his particular conduct was unconstitutional," *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st Cir. 2009). At the same time, "a plaintiff need not show that the conduct of which he complains is an exact replica of conduct that previously has been held unlawful." *Bergeron v. Cabral*, 560 F.3d 1, 12 (1st Cir. 2009), *abrogated on other grounds by Maldonado*, 568 F.3d 263.

Here, Defendants—per their own admission—prohibited Dr. Skoly from practicing dentistry in retaliation for his public opposition to the state's vaccine mandate. Dr. Alexander-Scott explicitly stated that only those who publicly stated they would not comply would be punished in this manner. Noncompliance itself was *not* the basis for this penalty, according to Dr. Alexander-Scott. In other words, the State exercised discretion and penalized individuals— including Dr. Skoly—for exercising their First Amendment rights.

The First Circuit has addressed the question of whether a denial of a medical license in retaliation for the exercise of First Amendment freedoms is permissible, and unambiguously held that it is not, because "Government actors offend the First Amendment when they retaliate against an individual for constitutionally protected speech." *See Gonzalez-Droz v. Gonzalez-Colon*, 660 F.3d 1, 16 (1st Cir. 2011).[5]

Because the right to remain free from retaliation for constitutionally protected speech is firmly and clearly established, the qualified immunity defense offers no succor to Defendants.

C.     *Defendants Who Were Not Engaged in Prosecutorial Functions Are Not Absolutely Immune from Dr. Skoly's Claim*

---

[5] Although in *Gonzalez-Droz* the First Circuit ultimately found that Puerto Rico's Medical Board did not violate the plaintiff-physician's rights, it did so because the plaintiff failed to show a causal connection between the Board's adverse action and his First Amendment-protected statements. *See* 660 F.3d at 16 (noting that "neither of the described incidents [that the plaintiff alleged were the 'real' basis for his suspension from the practice of medicine] forge[d] the necessary causal link."). This, however, does not undermine the court's conclusion that the Constitution prohibits actions against a person's medical license if they are taken in retaliation for the exercise by such person of his First Amendment rights. *Id.* As discussed below, *see infra*, Part III.D, unlike the plaintiff in *Gonzalez-Droz*, Dr. Skoly is able to establish a causal link between his protected speech and the administrative penalty levied against him.

In their Motion to Dismiss, Defendants argue that they are absolutely immune from malicious prosecution claims that arise under 42 U.S.C. § 1983. In support of this contention, Defendants cite *Goldstein v. Galvin*, 719 F.3d 16, 21 (1st Cir. 2013). In that case, a securities trader sued the Massachusetts Secretary of the Commonwealth, allegedly for instituting a securities investigation in retaliation for the trader's exercise of First Amendment rights. The First Circuit affirmed dismissal of the complaint, reasoning that the Secretary acted in a prosecutorial capacity and therefore was absolutely immune from suit. *Id.* at 29. However, the Court's rationale rested on the fact that the relevant Massachusetts statute reposed in the Secretary the authority to both initiate administrative prosecutions and adjudicate any administrative violations under the Act. *See id.* at 24 ("By statute, the Secretary is responsible for both adjudicatory and prosecutorial functions with respect to the Act."). Thus, only Dr. Alexander-Scott is even arguably similarly situated to the *Goldstein* defendant, because the relevant Rhode Island statute empowered her, in her capacity as Director of the Rhode Island Department of Health, "[t]o deny, revoke, or suspend licenses and registrations or discipline licensees in accordance with the provisions of" the Act governing the practice of medicine and dentistry in the State of Rhode Island. R.I. Gen. L. § 5-37-1.4(6).

By contrast, the *Governor* of the State (though ultimately the head of Rhode Island's Executive Branch, *see* R. I. Const. art. IX, § 1), has no prosecutorial or judicial power. Yet, it was the Governor (or his subordinates) who indicated that Dr. Skoly was being targeted because he "opened his big mouth." ECF 31, ¶ 77. Governor McKee, however, was a "stranger[] to the prosecutorial process and, therefore, d[oes] not enjoy prosecutorial immunity." *Goldstein*, 719 F.3d at 26.

13

With respect to the Governor, this case is more akin to *Hartman v. Moore*, 547 U.S. 250 (2006) than to *Goldstein*. In *Hartman*, the plaintiff alleged that postal service inspectors cajoled an Assistant United States Attorney into bringing charges against him in retaliation for plaintiff's vocal opposition to the Postal Service's adoption of certain technology. *Id.* at 252-54. The Court explained that an

> action for retaliatory prosecution will not be brought against the prosecutor, who is absolutely immune from liability for the decision to prosecute. Instead, the defendant will be a nonprosecutor, an official … who may have influenced the prosecutorial decision but did not himself make it, and the cause of action will not be strictly for retaliatory prosecution, but for successful retaliatory inducement to prosecute.

*Id.* at 261-62. Likewise, in this case, the Governor is a "nonprosecutor" who "influenced the prosecutorial decision but did not himself make it," and the "cause of action" against him is "for successful retaliatory inducement to prosecute."

Furthermore, even prosecutors are not entitled to absolute immunity when they engage in non-prosecutorial functions. "The [Supreme] Court made clear that absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342 (2009) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 431 n.33 (1976)). In other words, absolute immunity attaches not to the *office* (or officeholder) but to the *function* performed by the officeholder at any given time. *See Auriemma v. Montgomery*, 860 F.2d 273, 277 (7th Cir. 1988) ("Absolute immunity is designed to protect the functions that particular government officials perform, not the government officials themselves."); *Burns v. Reed*, 500 U.S. 478, 486 (1991) (collecting cases applying "functional approach" to immunity). Dr. Skoly concedes that "a state official who performs prosecutorial functions, including the initiation of administrative

14

proceedings that may result in legal sanctions, is absolutely immune from damages actions." *Goldstein*, 719 F.3d at 26.   Thus, while Dr. Alexander-Scott's decision to levy administrative charges against Dr. Skoly may well be immune from judicial challenge, other retaliatory actions she took are not similarly immune.

Specifically, Dr. Alexander-Scott decided to post on the Department of Health's website the Notice of Violation and the Compliance Order issued to Dr. Skoly, thus conveying to the general public the impression that Dr. Skoly has either already been disciplined or is an imminent threat to public health, even though neither was ever true.   Under Rhode Island law, "[w]henever the director [of the Department of Health] determines that there are reasonable grounds to believe that there is a violation of any law … the director may give notice of the alleged violation to the person responsible for it."   R.I. Gen. L. § 23-1-20.   The statute further provides that the notice does not mature into a "compliance order" until after a hearing on the violation alleged in the notice, or in the absence of such request for a hearing, 10 days after the service of the notice.   *Id.* § 23-1-22. Rhode Island law also authorizes the Director to issue an "immediate compliance order," but only where "the director determines that there exists a violation of any law, rule, or regulation within the jurisdiction of the director which requires immediate action to protect the health, welfare, or safety of the public or any member of the public."   R.I. Gen. L. § 23-1-21.   If the Director issues an "immediate compliance order," "[n]o request for a hearing … may be made."   *Id.*

Dr. Skoly did *not* receive an "immediate compliance order" under § 23-1-21.   In fact, he received a notice of violation that explicitly cited § 23-1-**20** as its basis.   The notice also explicitly referenced Dr. Skoly's right to a hearing.   *See* ECF 1-2, Exh. I, Page ID# 72-73.   It follows then that until after a hearing there was no operative "compliance order" and Dr. Skoly had not been subject to any discipline.   *See* R.I. Gen. L. §§ 23-1-20, 23-1-22.   Despite this fact, not only did

Rhode Island (contrary to its own regulations) order Dr. Skoly "to cease professional conduct as a health care provider," but it posted the "Compliance Order" (even though as a legal matter, *see* R.I. Gen. L. §§ 23-1-20, 23-1-22, there was never an effective "Order") on the Department's website, thus intimating that Dr. Skoly had already been disciplined. This premature action, in turn, caused Dr. Skoly both reputational and financial harm, because various insurance companies and third-party payors would not deal with Dr. Skoly so long as he had a disciplinary matter against him.

Furthermore, Dr. Alexander-Scott's successors maintained the record of the "Order of Compliance" on the Department of Health's official website for months after the Department and Dr. Skoly stipulated to dismissal of the charges. Neither the initial web posting decision nor the decision to retain the posting was a *prosecutorial* decision. The administration of the State's database is a purely administrative and not a prosecutorial function because proper maintenance of the database is not an "act[] undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur[s] in the course of his role as an advocate for the State." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *see also Goldstein*, 719 F.3d at 29 (agreeing that "the use of the plaintiff's name in the public announcement of the enforcement proceeding on the Secretary's website" is an "act that is not within the scope of either judicial or prosecutorial immunity," and addressing this portion of the complaint on the merits.) Indeed, in the present case, once Dr. Skoly and the Department of Health entered into a stipulation of dismissal, all prosecutorial and judicial functions of the Secretary were done. Because the decision to maintain the record of discipline on the website was "not relate[d] to [the DOH Director's] preparation for the initiation of a prosecution or for judicial proceedings," the director is "not entitled to absolute immunity." *Buckley*, 509 U.S. at 273.

The inclusion and continued maintenance of Dr. Skoly's name on the list of individuals subjected to discipline is crucially different from *Goldstein*, where the First Circuit did not find a constitutional violation in the Secretary's publication of charges against the plaintiff.  In *Goldstein*, the "plaintiff d[id] not contend that the website announcement was false or misleading" and instead merely alleged that Secretary's publication of the allegations and identification of plaintiff by name "departed from the Secretary's 'custom and usual practice when issuing a public announcement of the filing of an administrative complaint' under which he does not normally 'identify any individual respondent by name.'"  719 F.3d at 30.  By contrast, because Rhode Island never had a valid "Compliance Order" against Dr. Skoly, identification of him on the Department's website as someone who has been disciplined was both "false [and] misleading" and amounted to "adverse conduct or speech."  *Id.* at 31 (quoting *Balt. Sun Co. v. Ehrlich*, 437 F.3d 410, 419 (4th Cir. 2006)) (emphasis omitted).  Even if the Court were to disagree as to the initial existence of a valid Compliance Order, certainly once Rhode Island and Dr. Skoly entered into a stipulation dismissing the Notice of Violation and Compliance Order, continued identification of him on the Department's website as someone who has been disciplined was both "false [and] misleading" and amounted to "adverse conduct or speech."  *Id.*  And because Dr. Skoly plausibly alleges that this "adverse conduct or speech" was taken in retaliation for his exercising First Amendment rights, individuals responsible for this conduct are not entitled to either absolute or qualified immunity.

In sum, actions taken by Defendants that were not in "prepar[ation] for the initiation of judicial proceedings or for trial" do not enjoy absolute immunity, and therefore, neither Governor McKee, who never had any prosecutorial functions, nor the Directors of the Rhode Island Department of Health, can seek shelter in the doctrine (at the very least with respect to actions taken after the March 11, 2022 Stipulation to Dismiss the Notice of Violation).

17

C.      *Defendants Cannot Show that Administrative Actions Against Dr. Skoly Would Have Been Taken Absent Retaliatory Motive*

"In order to prevail on a § 1983 claim of retaliation for First Amendment activity under the legal standard enunciated in *Mt. Healthy* [*City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1976)], a plaintiff must first show that his conduct was constitutionally protected, and that this conduct was a substantial factor or a motivating factor for the defendant's retaliatory decision." *Powell v. Alexander*, 391 F.3d 1, 17 (1st Cir. 2004) (cleaned up).  A defendant may then rebut that showing by convincing the court "that it would have reached the same decision absent the protected speech."  *Gonzalez-Droz*, 660 F.3d at 17.[6]

Dr. Skoly has made a sufficient initial showing that his vocal opposition to Rhode Island's vaccine mandates "was a substantial factor or a motivating factor" for the Notice of Violation and Compliance Order.  First, Dr. Skoly alleged that Rhode Island officials explicitly stated that he was being pursued because he "opened his big mouth."  ECF 31, ¶ 77.  Second, the Court can take judicial notice that Dr. Skoly was the *only* (or at least one of very few) medical professionals to have received a similar Notice of Violation, despite the fact that dozens if not hundreds of other Rhode Island healthcare providers also remained unvaccinated.  *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *In re Colonial Mortg.*, 324 F.3d at 20 (noting that in adjudicating a motion to dismiss, a District Court may consider "the complaint, the documents incorporated by reference in it, matters of public record, and other matters susceptible to judicial notice").  The fact that Dr. Skoly at all relevant times served (and continues to serve) as the Chairman of the Rhode Island

---

[6] As discussed below, even if a defendant proffers a rebuttal, the resolution of the dispute is inappropriate at the motion to dismiss stage.

Center for Freedom & Prosperity and thus was a public face of opposition to and scientific questioning of the draconian COVID mandates only bolsters the inference that the actions taken against him (and only him) were in retaliation for his public advocacy.

Further still, Rhode Island authorities singled out Dr. Skoly for disparaging treatment of a kind more appropriate to someone on the FBI's Most Wanted List rather than a respected medical professional who had provided years of noble service to state prisoners.  For example, authorities in the Department of Corrections prominently posted Dr. Skoly's photograph with "Not Permitted In RIDOC Facilities" appearing in bold underneath.  *See* Attachment A.  Even assuming that it was rational to bar Dr. Skoly from Department of Corrections facilities, the prominent identification of him together with what can only be described as a "mug shot" could not have served any legitimate purpose.  Given that he never threatened to enter DOC facilities without permission, the only reason such a posting would appear is for retaliatory purposes and perhaps as a warning to others not to follow in Dr. Skoly's intrepid footsteps.

Any contention that Rhode Island "would have reached the same decision [to issue the Notice of Violation and Compliance Order] absent the protected speech" is both inappropriate for resolution at this stage—as it is a question of fact—and belied by the record.  It should not be surprising that both *Gonzalez-Droz* itself and all cases it cited were resolved on summary judgment rather than as a motion to dismiss.[7]  As the First Circuit explained,

> [t]o succeed in making out [the *Mt. Healthy*] defense to the degree necessary to win on summary judgment, [a defendant] would need to show that the record would compel a reasonable jury to conclude by a preponderance of the evidence that the

---

[7] *See Back Beach Neighbors Comm. v. Town of Rockport*, __ F.Supp.3d __, __, No. 20-11274-JGD, 2022 WL 1719292, at *8 (D. Mass. May 27, 2022); *Stuart v. City of Framingham*, No. 16-cv-12559-IT, 2020 WL 360552, at *7 (D. Mass. Jan. 22, 2020) (unpublished), *aff'd*, 989 F.3d 29 (1st Cir. 2021); *McCue v. Bradstreet*, 36 F. Supp. 3d 169, 178 (D. Me. 2014), *rev'd*, 807 F.3d 334 (1st Cir. 2015); *Winfield v. Town of Andover*, 305 F. Supp. 3d 286, 293 (D. Mass. 2018) (all citing to *Gonzalez-Droz*, 660 F.3d at 17 and all decided on summary judgment).

> [State] would have taken the same adverse action against [the plaintiff] even if [he] had not engaged in protected conduct.

*McCue v. Bradstreet*, 807 F.3d 334, 345 (1st Cir. 2015).

In contrast, at this stage of the proceedings, the Court must "assume the truth of all well-pleaded facts and indulge all reasonable inferences that fit the plaintiff's stated theory of liability." *In re Colonial Mortg.*, 324 F.3d at 15. The operative complaint alleges that Dr. Skoly was targeted "because he had 'opened his big mouth' by speaking to the press." ECF 31, ¶ 77. Dr. Skoly's affidavit attached to the present pleading, as well as public reporting on Dr. Alexander-Scott's statements, further bolster this allegation. The fact that no other medical professionals appear to have been similarly disciplined provides additional support to Dr. Skoly's "stated theory of liability." To the extent Rhode Island argues that it "would have reached the same decision [to issue the Notice of Violation and Compliance Order] absent the protected speech," this assertion cannot be credited when deciding the motion to dismiss. Furthermore, such an assertion is not credible given that Rhode Island did not bring similar charges against any other medical provider. Because the Court is required to "indulge all reasonable inferences that fit the plaintiff's stated theory of liability," *In re Colonial Mortg.*, 324 F.3d at 15, at this early stage it must infer that Dr. Skoly's "constitutionally protected activity was a substantial or motivating factor in" Rhode Island taking its enforcement action, *Maloy v. Ballori-Lage*, 744 F.3d 250, 252 (1st Cir. 2014). The Court should further infer that the State never had any intention to bring administrative charges against anyone "absent [that person's] protected speech," *Gonzalez-Droz*, 660 F.3d at 17. Accordingly, at least at present, Rhode Island cannot avail itself of the *Mt. Healthy* defense.

### D.   *Dr. Skoly Pleaded Sufficient Facts to Survive a Motion Under Fed. R. Civ. P. 12(b)(6)*

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint "must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'" *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In determining whether the burden has been met, the First Circuit "perform[s] [a] two-step analysis." *Cardigan Mountain Sch. v. N.H. Ins. Co.*, 787 F.3d 82, 84 (1st Cir. 2015). At step one, the Court separates factual allegations from legal conclusions, crediting the former in full and ignoring the latter, *see id.*, and at step two the Court "determine[s] whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable," *id.* (quoting *Garcia–Catalan v. United States*, 734 F.3d 100, 103 (1st Cir. 2013)). In the context of a retaliation claim, a plaintiff "must have alleged facts sufficient to allow the court to draw the reasonable inference that her constitutionally protected activity was a substantial or motivating factor in" the State taking its enforcement action. *Maloy*, 744 F.3d at 252.

With respect to Count III of the Complaint, Dr. Skoly has made a showing that in important respects is similar to the showing made by the plaintiff in *Maloy*. There, the plaintiff "testified publicly about alleged government corruption." *Id.* She submitted that the relevant State official was aware of these accusations because that official explicitly and publicly labeled them "false." *Id.* Thereafter, the State denied the plaintiff's application for a real estate license. The First Circuit held that the plaintiff's allegations that she engaged in protected speech, that there was a "plausible motive" for the retaliation by the State, and that her application for a real estate license was rejected despite "complying with all lawful requirements," "would normally be enough to carry a complaint across the starting line in the face of a Rule 12(b)(6) motion." *Id.* at 253. Dr. Skoly has made similar showings. First, he explicitly alleged that he engaged in protected speech when he vocally opposed Rhode Island's vaccine mandate. Second, Dr. Skoly's "complaint … permits a reasonable inference that at least some of the [Rhode Island officials] had become aware of" his speech questioning the scientific basis for the mandates. This awareness provided a "plausible motive"

21

for Rhode Island's actions against Dr. Skoly.  That these actions were taken exclusively (or nearly exclusively) against him provides further evidence that, much like the plaintiff in *Maloy*, he was treated differently from other similarly situated individuals.[8]  In fact, Dr. Skoly's allegations require less reliance on "judicial experience and common sense," *Iqbal*, 556 U.S. at 679, than the allegations in *Maloy* because, unlike the plaintiff in *Maloy*, who merely alleged that State officials were aware of her accusations of corruption, Dr. Skoly explicitly alleges that Rhode Island officials were not just aware of his opposition to the vaccine mandate, but also that they explicitly stated that he was being targeted "because he had 'opened his big mouth' by speaking to the press."  ECF 31, ¶ 77.

The temporal proximity between Dr. Skoly's voicing his opposition to the vaccine mandate and the adverse actions taken against him further buttress his retaliation claim.  Under First Circuit precedent, "[t]emporal proximity alone may, in certain circumstances, support an inference of retaliation."  *Gonzalez-Droz*, 660 F.3d at 16; *see also Philip v. Cronin*, 537 F.3d 26, 33 (1st Cir. 2008).  In *Philip*, the court held, where the Office of the Chief Medical Examiner of Massachusetts fired the plaintiff after "he made critical comments to persons outside of " that agency, that "[a] jury could have concluded that it was this going outside the agency with his criticisms that was at least a motivating factor in [the] firing," 537 F.3d at 33.  The same analysis applies to this case.  A reasonable jury could conclude that Dr. Skoly's public rejection of the vaccine mandate "was at least a motivating factor in" Dr. Alexander-Scott's issuance of the Notice of Violation and the Order of Compliance and her successors' later refusal to remove it from its website for months after they were legally obligated to do so.

---

[8] The adverse actions include both the issuance of Notice of Violation and the Order of Compliance and the refusal to remove these documents from the Department of Health's website even after the parties stipulated to the dismissal of that matter.

With respect to Count I (Violation of Equal Protection Clause), Dr. Skoly has made a sufficient showing that *whatever the level of review applicable to* the original vaccine mandate, it was never rational to permit individuals with active, ongoing COVID infections to treat patients, while preventing individuals like Dr. Skoly who had natural immunity from doing so. The Supreme Court has "recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). To the extent that there is a dispute whether or not any data did or even could remotely support the distinction, such a question is inappropriate for resolution at the motion to dismiss stage. *Cf. McCarthy v. City of Newburyport*, 252 F. App'x 328, 333 (1st Cir. 2007) (unpublished) (holding that the plaintiff's equal protection claim fails, but doing so at *summary judgment* stage).

Furthermore, and separate from the decision to treat Dr. Skoly different from and worse than individuals with active ongoing COVID infections, Rhode Island violated Dr. Skoly's rights to equal protection when it chose to enter a Notice of Violation and a Compliance Order against him. As detailed above, Dr. Skoly was treated differently than every other healthcare professional in Rhode Island, whether vaccinated or not. This suffices to survive a motion to dismiss. *See Olech*, 528 U.S. at 564; *Wayte*, 470 U.S. at 608 ("It is appropriate to judge selective prosecution claims according to ordinary equal protection standards."); *Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir. 1995) (holding that a plaintiff states an equal protection claim when he alleges that "the decision to prosecute is made either in retaliation for the exercise of a constitutional right, such as the right to free speech or to the free exercise of religion, or because of membership in a vulnerable group").

Finally, with respect to Count II (Violation of Due Process Clause), Dr. Skoly has made sufficient allegations that Rhode Island's actions to summarily bar him from practicing his profession, *in violation of its own laws*, deprived him of his constitutionally protected liberty.  It is well established that "a physician enjoys a protected property interest in a license to practice medicine," *Lowe v. Scott*, 959 F.2d 323, 334 (1st Cir. 1992), and that "the revocation of the license of a practicing physician must comport with the requirements of procedural due process … [including] notice of the charges and an opportunity to be heard," *id.* at 335.  Dr. Skoly received neither notice nor an opportunity to be heard before being summarily ordered to cease his practice of dentistry.  And while Plaintiff recognizes that in cases where there exists a threat that requires "immediate action to protect the health, welfare, or safety of the public or any member of the public," R.I. Gen. L. § 23-1-21, the State can order an immediate cessation of practice with a hearing to occur later, here, Rhode Island *expressly declined* to make a finding that Dr. Skoly's practice constituted such a threat.  *See* ECF 1-2, Exh. I, Page ID# 72-73.  Consequently, prior to suspending Dr. Skoly from the practice of dentistry, Rhode Island was obliged to provide him with sufficient notice and an opportunity to be heard.  *Lowe*, 959 F. 2d at 335.  Because it failed to do so, it violated Dr. Skoly's constitutional right to due process of law.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss should be denied, except as to Count IV.

Respectfully submitted, this 30th day of January, 2023.

/s/ Gregory Dolin*
Gregory Dolin
Greg.Dolin@NCLA.legal

/s/ Jenin Younes*

24

Jenin Younes
Jenin.Younes@NCLA.legal

NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210
*Attorneys for the Plaintiff*

*Admitted Pro Hac Vice Pursuant to Court Order*

/s/ Gregory Piccirilli
Gregory Piccirilli, Esq., #4582
148 Atwood Ave., #302
Cranston, Rhode Island 02920
Telephone: (401) 578-3340
Facsimile: (401) 944-3250
gregory@splawri.coms

25

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all attorneys of record.

/s/ Gregory Dolin*
Gregory Dolin
New Civil Liberties Alliance
1225 19th Street NW, Suite 450
Washington, DC 20036
(202) 869-5210
Greg.Dolin@NCLA.legal

*Attorney for the Plaintiff*
*Admitted Pro Hac Vice pursuant to*
*Court Order of 11/14/2022*

/s/ Gregory Piccirilli
Gregory Piccirilli, Esq., #4582
148 Atwood Ave., #302
Cranston, Rhode Island 02920
Telephone: (401) 578-3340
Facsimile: (401) 944-3250
gregory@splawri.com

Exhibit A





# STEPHEN SKOLY – Dentist

## NOT PERMITTED IN RIDOC FACILITIES

# Effective: 02/11/2022